**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| JAMES KELLY, | **:** |
| | **:** |
| Plaintiff, | **:** |
| | **:** |
| v. | **:** Civil Action No. 2:24-cv-06701-JFM |
| | **:** |
| THE CITY OF PHILADLPHIA, et al., | **:** HONORABLE JOHN F. MURPHY |
| | **:** |
| Defendants. | **:** |
| | **:** |
| | **:** |

**DEFENDANTS THE CITY OF PHILADELPHIA AND DETECTIVES HOFFNER,
GROSS, LUBIEJEWSKI, MEE, DOUGHERTY, VIVARINA AND REINHOLD'S
<u>MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

INDEX OF AUTHORITIES ......................................................................................... ii

ARGUMENT .................................................................................................................6

I.      Legal Standard.................................................................................................6

II.     Counts I And VI For Malicious Prosecution Should Be Dismissed Because Williams'
        Identification Of Plaintiff Provided Probable Cause For Plaintiff's Prosecution. ..............7

III.    Count II For Various Due Process Violations Must Be Dismissed Because Plaintiff Has
        Not Alleged Any Movant Fabricated Or Withheld Evidence, And Plaintiff Cannot Sue
        Movants Merely Because He Thinks They Should Have Done A Better Job..................10

        A.      Plaintiff has not pled that any Movant fabricated evidence against him..................10

        B.      Plaintiff has not pled that any Movant, as opposed to possibly the District Attorney's
                Office, failed to disclose exculpatory or impeachment evidence. ............................10

IV.     Count III For Conspiracy Should Be Dismissed Because Plaintiff Has Not Alleged An
        Underlying Wrong That Movants Could Have Conspired To Commit. ...........................13

V.      Count IV For Failure To Intervene Should Be Dismissed Because No Such Claim Existed
        During The Relevant Time, And No Underlying Wrong Is Alleged Anyway..................14

VI.     Count V For Monell Liability Against The City Should Be Dismissed Because Plaintiff
        Has Not Alleged That Any Defendant Violated His Constitutional Rights. .....................14

CONCLUSION..............................................................................................................15

i

## INDEX OF AUTHORITIES

**Cases**

*A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572 (3d Cir. 2004)....................14

*Albright v. Olivier*, 510 U.S. 266 (1994)...........................................................................7

*Allen v. N.J. State Police*, 974 F.3d 497 (3d Cir. 2020)........................................................7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..............................................................................7

*Brady v. Maryland*, 373 U.S. 83 (1963)............................................................................10

*Burke v. Bachert*, 702 F. Supp. 3d 347 (E.D. Pa. 2023).......................................................8

*Connelly v. Lane Const. Corp.*, 809 F.3d 780 (3d Cir. 2016) ................................................7

*Dennis v. Sec'y, Penn. Dep't of Corr.*, 834 F.3d 263 (3d Cir. 2016)......................................11

*Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120 (3d Cir.2003)...............................14

*Jutrowski v. Township of Riverdale*, 904 F.3d 280 (3d Cir. 2018) .........................................13

*Kelley v. Gen. Teamsters, Chauffeurs & Helpers, Loc. Union 249*, 544 A.2d 940 (Pa. 1988)........7

*Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458 (3d Cir. 2021) .....................6

*Lazar v. City of Philadelphia*, No. CV 24-907, 2025 WL 886952, *8, n.9 (E.D. Pa. Mar. 21, 2025)....................................................................................................................7

*Merkle v. Upper Dublin School Dist.*, 211 F.3d 782 (3d Cir. 2000).........................................7

*Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)........................................................14

*Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902 (3d Cir. 1997).............................................7

*Rosembert v. Borough of E. Lansdowne*, 14 F. Supp. 3d 631 (E.D. Pa. 2014)..........................13

*Thomas v. City of Harrisburg*, 88 F.4th 275 (3d Cir. 2023) .................................................14

*Trabal v. Wells Farbo Armored Serv. Corp.*, 269 F.3d 243 (3d Cir. 2001)...............................8

*U.S. v. Mitchell*, 365 F.3d 215 (3d Cir. 2004) ..................................................................11

*White v. Brommer*, 747 F. Supp. 2d 447 (E.D. Pa. 2010) ....................................................8

*Williams v. Sec'y Pennsylvania Dep't of Corr.*, 117 F.4th 503 (3d Cir. 2024)...........................14

*Wilson v. Russo*, 212 F.3d 781 (3d Cir. 2000)...................................................................10

*Wright v. City of Philadelphia*, 409 F.3d 595 (3d Cir. 2005)................................................7

**Rules**

Federal Rule of Civil Procedure 12(b)(6).............................................................................6

Beneath its conclusory language and inflammatory rhetoric, Plaintiff's Amended Complaint tells a surprisingly innocuous story as it relates to Movants. Plaintiff was convicted of murder based on the testimony of two eyewitnesses who identified Plaintiff as one of the assailants. One eyewitness – who Plaintiff does not suggest was manipulated in any way – purportedly identified a different man as being involved in the murder before identifying Plaintiff. However, per Plaintiff's own allegations, that identification was memorialized by the interviewing officer in, and it appears it was the District Attorney's Office ("DAO"), if anyone, who did not produce that information prior to Plaintiff's trial.

While Plaintiff implies that the other eyewitness was somehow coerced into implicating Plaintiff, there are zero facts pled supporting that theory. All Plaintiff says is that the eyewitness was interviewed numerous times because – according to the witness – police did not believe her original story, and that as her story changed, she eventually identified Plaintiff as one of the men involved in the murder. There is nothing unconstitutional about that, as police are not prohibited from interviewing a witness multiple times, nor must they accept any witness's original version of events. Further dispelling the aura of suspicion Plaintiff casts over Movants is the fact that only one defendant is alleged to have interviewed this witness multiple times, and even then, only twice.

Finally, Plaintiff alleges that other crimes in the area around the same timeframe were related to a drug war, and that this fact was not properly disclosed to him prior to trial. However, once again Plaintiff does not allege Movants withheld any information about these drug related crimes from the DAO, as opposed to the DAO seemingly not producing such information to Plaintiff (assuming these peripheral crimes even needed to be disclosed, as the mere existence of other drug-related crimes in the area is not *per se* exculpatory to begin with).

1

Overall, Plaintiff's Complaint promises more than it delivers, as it is heavy on innuendo but woefully light on relevant facts. When parsing Plaintiff's allegations on a Movant-by-Movant basis, this becomes even more apparent. Because Plaintiff's vague aspersions do not support his claims against Movants, those claims should be dismissed.

### Plaintiff's Allegations

On the evening of January 1, 1993, Travis Hughston was shot and killed outside his girlfriend's house. (Pl.'s Am. Compl. (DI 32), ¶ 21.) Non-defendant officers who responded to emergency calls were directed by a man named Colie Baxter to Hughston's body. (*Id.* at ¶ 22.) Baxter was initially interviewed by Detective Dougherty and said that he had been stopped in his car at a traffic light when he heard gunshots. He then saw two black men run into a white car and drive away, and that he was able to get a look at the two men as they drove past. (*Id.*) Baxter provided Dougherty with general descriptions of the two men, including that the driver wore a black trench coat and the passenger wore a medium blue sweat suit. (*Id.*)

About ten months later, Baxter was re-interviewed by Detectives Snell and Vivarina[1], during which Baxter said he had nothing to add to his earlier statement. (*Id.* at ¶ 24.) Baxter was then shown a photo array and identified one of the men he saw on the night of the murder. (*Id.*) The man Baxter identified was named Larry Mullins. (*Id.*)

Hughston's girlfriend, Tamika Ledbetter, informed police that after she heard gunshots, she went outside to see a black man in a trench coat run into a white car and then saw Hughston on the ground. (*Id.* at ¶ 27.) Ledbetter also shared that Hughston was involved in the drug trade and that several people had been shot in the neighborhood in the prior months. (*Id.* at ¶ 28.)

---

[1] Defendant Det. Vivarina is incorrectly identified as "Divarina" in the complaint. He is called in this memo by his correct name. Undersigned counsel intends to enter Appearances for Defendant Vivarina within the week.

A woman named Ernestine Williams, who lived two doors down from Ledbetter, was interviewed multiple times by different officers:

- Initially, Ms. Williams told Detective Reinhold that she was in her bedroom when she heard gunshots. Upon looking out the window, she saw Hughston's body and recognized him as someone she asked to give her car a jump earlier that evening. (*Id.* at ¶ 29.) She did not say during this interview that she saw the shooter. (*Id.*)

- In a second statement to unidentified detectives, Williams allegedly said that after she asked Hughston to jump her car (which he did not do), she saw two men walk past her and go into a bar. (*Id.* at ¶ 31.) Williams then said that she went into her house and saw from her bedroom the two men sitting on a street corner drinking beer with a teenager she knew from the neighborhood; one man was wearing a black trench coat and the other wore a beige coat. (*Id.*) Williams stated that she eventually saw Hughston exit a house onto the street, and one of the two men walked up to Hughston, received a brown bag from him, and then shot him in the head. (*Id.*) She then saw the two suspects run away. (*Id.*) Lastly, Williams allegedly said that a few days after the shooting, she saw the man in the beige coat come out of a bar, but had not seen the shooter since the night of the murder. (*Id.*)

- Williams gave a third statement five months later, also to unidentified officers. (*Id.* at ¶ 32.) At this point, Williams said she was now able to name Hughston's shooter, because she had been buying drugs from him since about a month after the shooting. (*Id.*) She identified the shooter as "Larry." (*Id.*)

- The following day, Williams provided another statement, again to unidentified officers. This time she was shown two photo arrays – one array containing a picture

3

of Larry Mullins, and the other array containing a fifteen-year-old picture of Plaintiff. (*Id.* at ¶ 33.) Williams identified Mullins as Hughston's shooter and Plaintiff as the man who had been with Mullins. She added that she had seen Plaintiff a month earlier at a wedding. (*Id.*) (Baxter's second interview – as described above – occurred roughly a month after this interview, during which he independently identified Mullins as the passenger in the getaway car. (*Id.* at ¶ 34).)

- Roughly 22 months later, Detectives Gross and Lubiejewski interviewed Williams. (*Id.* at ¶ 35.) She was first given the opportunity to review her earlier statements, and then allegedly gave the same description of what she had observed, except Williams added that she had seen Plaintiff pass Mullins a gun while the two men were drinking beer. (*Id.*) As before, Williams identified from photo arrays Mullins as the shooter and Plaintiff as the man who had been with Mullins. (*Id.*)

Based on Williams' identification, Plaintiff was arrested and charged with murder. (*Id.* at ¶ 36.) A few weeks later, Williams was interviewed by a private investigator for Plaintiff. (*Id.* at ¶ 37.) Williams allegedly said that after the murder she had been harassed by police, asserting she had been brought to the police station "about six times" before making her March 21, 1993, statement. (*Id.*) She also claimed that police did not believe her during her initial interviews, and that during one of her interviews police showed her a picture of Plaintiff and told her his name, even though other unnamed detectives told her they believed "Tommy" was the killer. (*Id.*) Importantly, *Plaintiff does not allege that Williams recanted to this investigator her identification of Plaintiff* (and as noted below, Williams stood by that identification at trial).

The morning of Plaintiff's preliminary hearing, Williams gave another statement to unidentified officers, during which she repeated what she had already said about Mullins being the

shooter and Plaintiff passing him a gun. (*Id.* at ¶ 39.) Shortly thereafter, Williams testified at the preliminary hearing. (*Id.* at ¶ 40.) When asked to identify Plaintiff, Williams said "he don't look like the picture I saw," but still identified Plaintiff as the man who passed Mullins a gun. (*Id.*)

Five months later, Plaintiff went to trial. Baxter testified consistently with his statements to police, but for the first time added that he recognized Plaintiff as the driver of the getaway car. (*Id.* at ¶ 42.) Williams also testified and identified Mullins and Plaintiff as being involved in Hughston's murder. (*Id.* at ¶ 43.)

The defense only called Hughston's brother, Kenyatta, who said that on two different occasions, Williams told him that she witnessed the shooting and that "Tommy, Kendall, and Boonchie" were responsible. (*Id.* at ¶ 44.) It was pointed out, however, that Detective Reinhold had earlier interviewed Kenyatta about the murder, and that those interview notes do not indicate that Kenyatta ever mentioned these purported statements of Williams. (*Id.* at ¶ 52.)

Kelly was convicted of murder and sentenced to life without parole. (*Id.* at ¶ 45.) Twenty-seven years later, the District Attorney's Office produced to Plaintiff the Hughston homicide file, and the files for two other murders committed in the same area within months of Hughston's death, along with police files related to the prosecution of gang members who were purportedly trying to control drug sales in the area of the murder. (*Id.* at ¶ 47.) Plaintiff alleges this information included: (1) "newly produced notes from the Hughston homicide investigation" showing that prior to trial, Baxter was shown a photo array by Detective Jastrzembski, from which Baxter identified Tommy Lockwood as the getaway car driver, *id.* at ¶ 49(a), (2) documents showing that homicide detectives were aware that Lockwood had not been incarcerated on the day Hughston was killed, *id.* at ¶ 49(b), and (3) statements made to unnamed police by two "witnesses,"[2] Kevin Brown and Lydell

---

[2] It is unclear from Plaintiff's complaint how, or in what capacity, these men were "witnesses."

Jackson, implicating a local drug group and Lockwood in Hughston's homicide and the death of someone named Aidell Corbett. (*Id.* at ¶ 49(c).)

Plaintiff further alleges that the "Commonwealth" withheld from Plaintiff that (i) Lockwood was charged with a September 1993 murder of someone named Stacy Williams, which occurred four blocks from where Hughston was killed, *id.* at ¶ 50(a), and that (ii) around that time, Williams sold her house to Lockwood for $100, and the "Commonwealth" had relocated Williams to a better neighborhood and placed her in drug rehab prior to her giving testimony in the Plaintiff's criminal case. (*Id.* at ¶ 50(b).) Plaintiff further claims that at the time of Hughston's murder, Lockwood was known to drive at least four cars the same color as the getaway car. (*Id.* at ¶ 50(c).)

Finally, Plaintiff alleges that his conviction was the result of a pattern and practice by the City of Philadelphia of coercing witnesses and withholding exculpatory evidence. *Id.* at ¶¶ 64-80.

Based on all this, Plaintiff bring claims for federal Malicious Prosecution (**Count I**), Due Process Violations (**Count II**), Conspiracy (**Count III**), Failure to Intervene (**Count IV**), *Monell* liability (**Count V**), and state law Malicious Prosecution (**Count VI**).

## Argument

## I.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed if it fails to state an actionable claim. To survive such a motion, the complaint must include enough factual allegations to state a claim "that is plausible on its face." *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (internal citation and quotations omitted). This requires sufficient facts for the Court to reasonably infer that a particular defendant is liable for the alleged misconduct. *Id.* Courts may properly draw upon their experience and common sense in deciding whether allegations make a claim plausible, as opposed to merely possible. *Connelly*

*v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (noting that mere possibility is not sufficient to state a valid claim under federal pleading standards). An averment which is "merely consistent with a defendant's liability…stops short of the line between possibility and plausibility of entitlement to relief." *Id.*; *accord Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." (citation omitted)). The same is true for "naked assertions devoid of further factual enhancement…." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under this standard, Plaintiff's claims against Movants do not survive.

## II.    Counts I And VI For Malicious Prosecution Should Be Dismissed Because Williams' Identification Of Plaintiff Provided Probable Cause For Plaintiff's Prosecution.

The gravamen of a malicious prosecution claim under both the Fourth Amendment[3] and Pennsylvania law is that a defendant causes the prosecution of the plaintiff without having probable cause to believe that the plaintiff committed a crime. *See Allen v. N.J. State Police*, 974 F.3d 497, 502 (3d Cir. 2020); *see also Kelley v. Gen. Teamsters, Chauffeurs & Helpers, Loc. Union 249*, 544 A.2d 940, 941 (Pa. 1988). "Probable cause is not a high bar." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (internal citation and quotations omitted). It does not require that officers' "determinations of credibility" be correct. *Wright v. City of Philadelphia*, 409 F.3d 595, 603 (3d Cir. 2005). And the identification of a putative eyewitness can be enough. *See*, *e.g.*, *Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 790 (3d Cir. 2000) (probable cause existed based on statement of one witness); *accord Trabal v. Wells Farbo Armored Serv. Corp.*, 269 F.3d 243 (3d

---

[3] Plaintiff brings Count I under both the Fourth and Fourteenth Amendments; however, Movants are entitled to qualified immunity on the latter theory because such a claim did not exist during the relevant timeframe. *See Lazar v. City of Philadelphia*, No. CV 24-907, 2025 WL 886952, *8, n.9 (E.D. Pa. Mar. 21, 2025) (McHugh, J.) ("Almost every judge in this District has concluded that after *Albright*, there was no clearly established right under the Fourteenth Amendment to be free of malicious prosecutions."); *see also Albright v. Olivier*, 510 U.S. 266, 271 (1994).

Cir. 2001) (statement of eyewitness was sufficient, even if eyewitness later turned out to be unreliable); *Stanley v. City of Pittsburgh*, No. 9-1450, 2011 WL 1327634, *3 (W.D. Penn. Apr. 6, 2011) ("Plaintiff points to no rule that precludes a single witness from supplying probable cause.").

Moreover, because prosecutors decide whether to prosecute someone instead of police, officers are typically only liable for malicious prosecution if they have "provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion." *Burke v. Bachert*, 702 F. Supp. 3d 347, 362 (E.D. Pa. 2023); *accord White v. Brommer*, 747 F. Supp. 2d 447, 459 (E.D. Pa. 2010) ("[T]he police officer must take an active role in the initiation of the proceedings and communicate information to the prosecutor which the officer knows to be false.").

Here, Williams identified Plaintiff as being involved in Hughston's murder, which allegedly led to Plaintiff's prosecution. Thus, if officers did not know Williams' identification was false (assuming *arguendo* it even was), no claim for malicious prosecution exists. The question then becomes whether Plaintiff has plausibly alleged such known falsity. The answer is no.

The Court can immediately resolve that question in favor of Movants Hoffner, Mee, Dougherty, Vivarina and Reinhold. The first four of these Detectives are not alleged to have ever spoken to Williams. And while Reinhold is alleged to have conducted the first two interviews of Williams, in neither of those interviews did Williams implicate Plaintiff, and thus neither could have caused Plaintiff's prosecution. (*See* Pl.s' Am. Compl., ¶¶ 29-31.) Only Detectives Gross and Lubiejewski require further analysis, but not much.

Gross and Lubiejewski are alleged to have jointly interviewed Williams once, during which Williams stated for the first time that Plaintiff had passed Mullins a gun before Mullins shot Hughston. (*Id.* at ¶ 35.) However, this was *not* the first time Williams identified Plaintiff as the man with Mullins; to the contrary, Plaintiff made that identification in her prior interview to

unnamed officers. (*Id.* at ¶ 34.) And it is important to note that Williams' identification of Mullins was corroborated shortly thereafter by Baxter, lender further credence to Williams as a witness.

As to the new detail about Plaintiff passing Mullins a gun, Plaintiff alleges no facts indicating that Gross or Lubiejewski somehow fabricated that statement or otherwise knew it was false. Tellingly, while Plaintiff opens his complaint with the dramatic assertion that Williams has "recanted her testimony, confirming that she was coerced by [Detectives]," *id.* at ¶ 1, Plaintiff's subsequent allegations come nowhere close to supporting that assertion. Specifically, in paragraph 37 of his complaint, Plaintiff claims that Williams told one of Plaintiff's investigators that she was "harassed" by police because she was interviewed multiple times and police did not originally believe her. (*Id.* at ¶ 37.) But conducting multiple interviews of a witness and showing initial skepticism of her statements is not improper, regardless of whether the witness subjectively deems that "harassing." Moreover, Gross and Lubiejewski did not allegedly conduct the early interviews of Williams, and are only alleged to have interviewed her once. Thus, Williams' complaints about being interviewed multiple times and initially being disbelieved cannot be tied to Gross and Lubiejewski (putting aside that such acts are not wrongful in their own right).[4]

Lastly, Plaintiff does not allege that the fact Williams was interviewed repeatedly, or that her story changed over time, was hidden from prosecutors by any Movant. Thus, even if these factors somehow negate probable cause – which they do not – that would have been an error in judgment by the prosecutor, not a constitutional violation by Movants. Because of all this, Plaintiff's Counts I and VI must be dismissed as to all Movants.

---

[4] Plaintiff also alleges in paragraph 37 that Williams was shown a photograph of Plaintiff by unnamed officers and was told Plaintiff's name, and that unnamed officers also said "Tommy" was the shooter. Because none of this is tied to any named defendant, it goes nowhere and supports none of Plaintiff's Counts.

**III.    Count II For Various Due Process Violations Must Be Dismissed Because Plaintiff Has Not Alleged Any Movant Fabricated Or Withheld Evidence, And Plaintiff Cannot Sue Movants Merely Because He Thinks They Should Have Done A Better Job.**

Plaintiff raises three theories in his Count II: (1) that police fabricated evidence against him, (2) that police withheld exculpatory evidence from him, and (3) that police did not conduct an adequate investigation. The latter merits no discussion because there is no right to an adequate investigation. *See Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (holding negligence does not create a due process violation). The other two theories fare no better.

**A.    Plaintiff has not pled that any Movant fabricated evidence against him.**

At trial, the evidence against Plaintiff was allegedly Williams' and Baxter's identifications. As discussed above, despite trying, Plaintiff has not plausibly alleged that any Movant fabricated Williams' identification. As to Baxter, Plaintiff does not even try. Instead, Plaintiff merely says that Baxter identified Plaintiff for the first time during trial, to everyone's surprise. (Pl.'s Am. Compl., ¶ 42.) While defendants Dougherty and Vivarina allegedly interviewed Baxter during the investigation phase, in neither interview is Baxter alleged to have implicated Plaintiff.[5]

Because no defendant is plausibly alleged to have fabricated either Williams' or Baxter's testimony, and because that was all the evidence allegedly used against Plaintiff at trial, there can be no due process claim based on purportedly fabricated evidence.

**B.    Plaintiff has not pled that any Movant, as opposed to possibly the District Attorney's Office, failed to disclose exculpatory or impeachment evidence.**

Plaintiff's remaining due process theory arises under *Brady v. Maryland*, 373 U.S. 83 (1963), which held that criminal defendants are affirmatively entitled to receive certain

---

[5] Detective Mee is not alleged to have interviewed Baxter *or* Williams, making his inclusion in this lawsuit especially confusing.

exculpatory or impeachment evidence that supports their innocence. The elements of a *Brady* claim are (1) the defendant withheld exculpatory or impeachment evidence from the plaintiff and (2) the withheld evidence was material. *See Dennis v. Sec'y, Penn. Dep't of Corr.*, 834 F.3d 263, 284-85 (3d Cir. 2016). Materiality means there is a reasonable probability that the withheld evidence would have changed the case's outcome. *See U.S. v. Mitchell*, 365 F.3d 215, 254 (3d Cir. 2004).

The duty to disclose exculpatory evidence under *Brady* applies primarily to prosecutors. *Gibson v. Superintendent of N.J. Dep't of Law and Public Safety-Div. of State Police*, 411 F.3d 427, 442 (3d Cir. 2005). As such, only if police officers fail to disclose such evidence to prosecutors, thereby thwarting further disclose it to a criminal defendant, can officers be liable under *Brady*.

Here, Plaintiff's *Brady* claim against Movants can be broken down into two sub-theories: (1) that Movants purportedly failed to disclose Baxter's identification of Lockwood as the shooter, and (2) that Movants purportedly failed to disclose other gang related crimes that occurred in the same general area around the same general time. Neither is sufficiently pled.

As to Baxter's purported identification of Lockwood during the investigation phase, that was allegedly only made to Det. Jastrzembski. (Pl's Am. Compl., ¶ 49(a).) Plaintiff claims that this identification was withheld by Jastrzembski "and the other individual defendants," *id.*, but this is a conclusory throwaway allegation that irrationally lumps all defendants together. For example, Det. Mee is alleged only to have interviewed Hughston's girlfriend. From that, it cannot plausibly be inferred that Mee had anything to do with Baxter's identification of Lockwood, let alone any purported withholding of it. The same goes for Detectives Gross and Lubiejewski, who are not alleged to have ever spoken with Baxter. Even the Movants who allegedly interviewed Baxter are not alleged to have been involved with Baxter's identification of Lockwood. Thus, Plaintiff's

*Brady* claim as to Baxter's identification of Lockwood is limited to Det. Jastrzembksi, who Plaintiff has already voluntarily dismissed from this case (*see* DI 35).

Yet even that more limited theory fails. As Det. Jastrzembski argued in his own motion to dismiss, Plaintiff ironically only knows about Baxter's identification of Lockwood because Jastrzembski memorialized it in the investigatory file. (*See* Pl.'s Am. Compl., ¶ 49(a)(1).) There is no allegation that Jastrzembski – or any Movant – hid this information from the DAO. To the contrary, Plaintiff expressly alleges that Baxter's statement "*was suppressed by the Commonwealth*[6] until recently.*" (Pl.'s Am. Compl., ¶ 3 (emphasis added).)

Herein lies the biggest problem with Plaintiff's Count II – Plaintiff does not plausibly allege that any evidence underlying his *Brady* claim was withheld from the DAO by Movants, as opposed to withheld from Plaintiff by the DAO (inadvertently or otherwise).[7] This is further exemplified by the other drug-related crimes that purportedly occurred in the area around the time of Hughston's death. For instance, Plaintiff again expressly states that "[o]ther critical, exculpatory evidence *the Commonwealth* withheld from [Plaintiff] included" that Lockwood was charged with a September 1993 murder of a woman named Stacy Williams, which occurred near Hughston's murder, *id.* at ¶ 50(a) (emphasis added), and that Ernestine Williams had sold her house to Lockwood and had been relocated by "the Commonwealth" to a more affluent area, *id.* at ¶ 50(b). Indeed, virtually all the information Plaintiff claims was not disclosed to him before his trial, he

---

[6] It is clear from Plaintiff's complaint that he uses the word "Commonwealth" to refer to the DAO and not the City of Philadelphia, as he separately refers to the latter as the "City of Philadelphia," *see*, *e.g.*, Pl.'s Am. Compl., ¶ 56, and uses the word "Commonwealth" in contexts that only make sense when talking about the DAO, *see*, *e.g.*, *id.* at ¶ 8 (alleging "the Commonwealth" requested dismissal of Plaintiff's criminal case), ¶ 29, n.1 (noting "the Commonwealth" made certain assumptions in its legal filings), and ¶ 40 (noting that Williams testified "for the Commonwealth").

[7] Movants do not countenance Plaintiff's claim that the DAO withheld material evidence, but merely assume Plaintiff's allegations of such withholding are true for purposes of this motion.

learned from the DAO's own records. (*See id.* at ¶¶ 47-48.) Plaintiff ties this all up by saying "[h]ad *the Commonwealth* disclosed [this] information, the jury would have known…that members of a violent gang were responsible for more than a dozen similar drug related homicides in this neighborhood in the days before [Hughston's] death." (*Id.* at ¶ 51 (emphasis added).)

Because Movants are not plausibly alleged to have withheld any *Brady* material from the DAO, Plaintiff's *Brady* due process theory fails like the others.

## IV.    Count III For Conspiracy Should Be Dismissed Because Plaintiff Has Not Alleged An Underlying Wrong That Movants Could Have Conspired To Commit.

To adequately plead a claim for conspiracy, Plaintiff must plead that Movants reached an "agreement" to violate Plaintiff's constitutional rights. *See Jutrowski v. Township of Riverdale*, 904 F.3d 280, 293–95 (3d Cir. 2018). This typically requires alleging "with particularity conduct violating plaintiffs' rights, the time and place of these actions, and the people responsible therefor." *Rosembert v. Borough of E. Lansdowne*, 14 F. Supp. 3d 631, 648 (E.D. Pa. 2014).

Here, as discussed in sections II and III above, Plaintiff has not alleged an underlying constitutional violation by any Movant, and thus cannot have alleged a conspiracy to commit such a violation. Moreover, the patchwork allegations against Movants do not intuitively support any plausible allegation of a conspiracy. For the most part, each Movant seems to be sued for no other reason than he interviewed someone at some point during the investigation. Det. Reinhold interviewed Williams the first two times (when she did not even mention Plaintiff), Pl.'s Am. Comp.¶¶ 29-30, and Detectives Gross and Lubiejewski interviewed her roughly 22 months later the fifth time, after she had already done so, *id.* at ¶ 35. Detective Dougherty interviewed Baxter the first time and Detectives Snell and Vivarina interviewed him roughly ten months later. *Id.* at ¶¶ 23-24. Detective Mee interviewed Hughston's sister. *Id.* at ¶ 27. And it remains unclear why Hoffner is sued at all, as he is not specifically alleged to have done anything, including a witness

13

interview. *Id.* at *passim*. Even if these isolated acts were wrongful – which they are not – together they do not plausibly give rise to an "agreement" to violate Plaintiff's rights. As such, Count III fails.

**V.      Count IV For Failure To Intervene Should Be Dismissed Because No Such Claim Existed During The Relevant Time, And No Underlying Wrong Is Alleged Anyway.**

The Third Circuit has not clearly recognized a failure to intervene claim against police officers outside the context of excessive force or sexual assault. *Thomas v. City of Harrisburg*, 88 F.4th 275, 285 (3d Cir. 2023). Because no such right to intervention in other contexts clearly exists, Movants are entitled to qualified immunity on this claim. *See Williams v. Sec'y Pennsylvania Dep't of Corr.*, 117 F.4th 503, 514–15 (3d Cir. 2024) (explaining qualified immunity exists when officers' alleged conduct did not violate clearly established law). Additionally, because Plaintiff has not alleged that any Movant violated Plaintiff's rights, there was nothing requiring intervention. These failings are fatal to Plaintiff's Count IV.

**VI.     Count V For Monell Liability Against The City Should Be Dismissed Because Plaintiff Has Not Alleged That Any Defendant Violated His Constitutional Rights.**

Lastly, in his Count V, Plaintiff attempts to hold the City of Philadelphia liable for purported wrongs of the individual defendants through *Monell* liability, named after the seminal case *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Under a *Monell* theory, a city can be liable for the constitutional violations of its officers if those violations were caused by a municipal policy that showed the city was deliberately indifferent to the plaintiff's rights. *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).

Analyzing *Monell* claims can be very complicated. But not here, because a *Monell* claim cannot exist if there was no underlying constitutional violation to begin with. *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3d Cir.2003). As discussed in the sections above,

Plaintiff has not pled that any Movant, or any other police officer, violated his rights. (The fact that there are no plausible allegations that Williams was coerced at all, or that any police officer withheld *Brady* evidence from the DAO, exculpates Movants along with all other named defendants.) Because Plaintiff has not plausibly alleged any underlying constitutional violation, his *Monell* claim is a nonstarter and must also be dismissed.

## <u>Conclusion</u>

Plaintiff's Counts I-VI against Movants should be dismissed.

Dated: June 27, 2025                                Respectfully submitted,

                                                                By:    */s/ Brian Wilson*
                                                                        Natalie Adeeyo
                                                                        Jami Galbraith
                                                                        Kimberly Mann
                                                                        Brian Wilson
                                                                        Nathan & Kamionski LLP
                                                                        206 South Jefferson Street
                                                                        Chicago, IL 60661
                                                                        (312) 957-6649
                                                                        bwilson@nklawllp.com
                                                                        *Attorneys for Defendants*

15