## IN THE UNITED STATES DICTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

JAMES KELLY,                          | CIVIL ACTION

                        Plaintiff,    | NO. 24-cv-06701-JFM

            v.

WALTER HOFFNER, *et al.*,

                        Defendants.

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS THE CITY OF PHILADELPHIA AND DETECTIVES HOFFNER, GROSS, LUBIEJEWSKI, MEE, DOUGHERTY, VIVARINA AND REINHOLD'S <u>FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) MOTION TO DISMISS</u>

This matter is now before the Court in connection with the Motion to Dismiss the amended complaint filed by Defendants The City of Philadelphia and Defendant Detectives Hoffner, Gross, Lubiejewski, Mee, Dougherty, Vivarina and Reinhold pursuant to Federal Rule of Civil Procedure 12(b)(6) (collectively "Officer Defendants").  Plaintiff James Kelly's Amended Complaint claims that the Officer Defendants combined to violate his civil rights in such a manner that he was caused to spend twenty-nine years in prison for a crime he did not commit.

The Defendants move to dismiss every one of Plaintiff's claims, arguing that he has failed to sufficiently allege facts that support the constitutional violations claimed, and that he fails to set forth plausible claims of a conspiracy and failure to intervene.  Because the 116-paragraph amended complaint is detailed, specific, and well-pled, and since the allegations satisfy the pleading standard set forth in *Twombly* and *Iqbal*, the Defendants' Motion should be denied.

## ARGUMENT

*Rule 12(b)(6) Standard*

The pleading requirements of the Federal Rules are clear and unequivocal.  As the Third

Circuit recently reiterated, "[t]he Rules demand 'only a short and plain statement of the claim

showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the

. . . claim is and the grounds upon which it rests.'"  *Connelly v. Lane Constr. Corp.*, 809 F.3d

780, 786 (3d Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also*

Fed. R. Civ. P. 8(a).

A court considering a motion to dismiss conducts a two-part analysis.  *Fowler v. UPMC*

*Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).  First, the court "must accept all of the

complaint's well-pleaded facts as true," *id.* at 210, including "all allegations in the complaint and

all reasonable inferences that can be drawn from them after construing them in the light most

favorable to the nonmovant." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d

Cir. 2014) (quotation marks and citation omitted).

Second, the court "must then determine whether the facts alleged in the complaint are

sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Fowler*, 578 F.3d at 211

(*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  This plausibility analysis is "a context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense." *Id*.  But "the plausibility standard does not impose a heightened pleading requirement"

or require a plaintiff to "plead 'specific facts' beyond those necessary to state a valid claim."

*Schuchardt v. President of the United States*, 839 F.3d 336, 347–48 (3d Cir. 2016).  Indeed, "a

well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those

facts is improbable." *Twombly*, 550 U.S. at 556.

**Plaintiff Has Stated Claims Against the Officer Defendants for Malicious Prosecution**

*Malicious Prosecution Claims Under the Fourth Amendment and Pennsylvania State Law*

Plaintiff asserts a malicious prosecution claim against the Officer Defendants under both the Fourth and Fourteenth Amendments and pursuant to Pennsylvania law. *See* Am. Compl. ¶¶ 85–90 (Count I) and ¶¶ 111-113 (Count VI). The Officer Defendants argue for dismissal of Plaintiff's Fourth Amendment[1] and state law malicious prosecution claims because their reliance on Ernestine Williams's identification of Mr. Kelly as being involved in the murder of Hughston served as a basis for probable cause, which negates a necessary element of a malicious prosecution claim. Mot. to Dismiss at 8. For the reasons explained below, the Amended Complaint sufficiently alleges that the Officer Defendants provided false information in the investigation and affidavit of probable cause such that they can be held liable for malicious prosecution.

To state a claim under the Fourth Amendment for malicious prosecution, the plaintiff must allege that: (1) the defendant initiated a criminal proceeding without probable cause; (2) the criminal proceeding ended in the plaintiff's favor; (3) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (4) the plaintiff suffered deprivation of liberty as a result of the underlying legal proceeding. *Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007). A claim under Pennsylvania law contains virtually similar elements. *See York v. Kanan*, 298 A.3d 533, 542 (Pa. Commw. 2023) (providing that a claim for malicious prosecution under Pennsylvania law requires "(1) the institution of proceedings against the plaintiff without probable cause and with malice" and (2) a showing that "the proceedings were terminated in favor of the plaintiff."). While it is up to a prosecutor to decide whether to initiate a prosecution, police

_____

[1] The Officer Defendants argue that they are entitled to qualified immunity on the malicious prosecution claim brought under the Fourteenth Amendment because such a claim did not exist during the relevant timeframe. Mot. to Dismiss at 7 n.3.

3

officers may be held liable for malicious prosecution claims where there is evidence that they influenced a prosecutorial decision through either concealing or misrepresenting material facts to district attorneys. *Halsey v. Pfeiffer*, 750 F.3d 273, 297 (3d Cir. 2014).

The Officer Defendants argue that an eyewitness's identification of a person can be enough to show that there was probable cause to arrest him and to defeat liability for malicious prosecution, even if the witness later turns out to be unreliable. *See* Mot. to Dismiss at 7–8 (citing *Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 790 (3d Cir. 2000); *Trabal v. Wells Farbo Armored Serv. Corp.*, 269 F.3d 243 (3d Cir. 2001)). They acknowledge that police officers can be liable for malicious prosecution if they have knowingly "provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion." Mot. to Dismiss at 8 (citation omitted). They contend, however, that even assuming Ernestine Williams's identification of Mr. Kelly was false, Plaintiff has failed to plausibly allege that any of the Officer Defendants knew that it was false or knowingly provided any false information to the prosecution. *Id.*

Specifically, the Officer Defendants contend that any Officer that is not alleged to have ever spoken to Williams cannot be held liable for malicious prosecution.[2] They also argue that any detectives that allegedly conducted Williams's first three interviews also cannot be held liable

---

[2] The Defendants identify Hoffner, Mee, Dougherty and Vivarina as the moving Officer Defendants who are not alleged to have ever spoken with Williams. Defendants are correct that the amended complaint does not state that any of these four officers took a statement from Williams. However, Plaintiff inadvertently omitted that Defendant Officer Hoffner took Williams' third and fourth statements (on September 14 and 15, 1993, respectively). As explained *infra*, Plaintiff believes that all of the Defendant Officers can be held liable for malicious prosecution, even if their name isn't found on any of the interview records with Williams. But in the event that the Court agrees with Defendants that any detective that is not alleged to have ever spoken to Williams cannot be held liable for malicious prosecution, then Plaintiff requests that the Court grant him leave to amend his complaint to include allegations of Hoffner's involvement in taking Williams' third and fourth statements.

4

for malicious prosecution because Williams did not implicate Plaintiff in any of these interviews.[3]
*Id.* at 8.

The defendants further contend that Detectives Gross and Lubiejewski, whom Plaintiff alleges conducted the fifth police interview of Williams in July of 1995, should not be held liable for malicious prosecution, even though it was during this interview that Williams stated for the first time that Plaintiff had passed a gun to his co-conspirator Mullins just before Mullins shot Hughston. Noting that "this was *not* the first time Williams identified Plaintiff as the man with Mullins . . .[as] Plaintiff made that identification in her prior interview to unnamed officers," the Officer Defendants argue that Plaintiff "alleges no facts indicating that Gross or Lubiejewski somehow fabricated" the new detail about Plaintiff passing the gun "or otherwise knew it was false." *Id.* at 9. Defendants then argue that Plaintiff's allegation in paragraph 1 of the amended complaint that Williams has "recanted her testimony, confirming that she was coerced by the Defendant Detectives" is not supported by other allegations in the complaint. As Defendants characterize the allegations in the complaint, Williams told Plaintiff's investigator that she was harassed by the police because she was interviewed multiple times and police did not originally believe her. *Id.* at 9 (citing Am. Compl. ¶ 37). Based on that characterization, Defendants argue that "conducting multiple interviews of a witness and showing initial skepticism of her statements is not improper, regardless of whether the witness subjectively deems that 'harassing.'" *Id.* Because Gross and Lubiejewski are alleged to have interviewed her only this one time, the Officer

---

[3] The Defendants identify Defendant Reinhold as fitting into this category, as Plaintiff alleges that he took Williams's first and second statements (on January 1 and March 21, 1993, respectively). As noted above, Defendant Hoffner should be in this category as well, as Hoffner took Williams's third statement on September 14, 1993.

Defendants conclude that "Williams' complaints about being interviewed multiple times and initially being disbelieved cannot be tied to Gross and Lubiejewski." *Id.*

Plaintiff believes that his malicious prosecution claims have been properly stated against all of the Officer Defendants, even those whose name is not found on any of the interview records with Williams. The Officer Defendants omit numerous paragraphs in the amended complaint that contain factual allegations supporting Plaintiff's claim that all of the Officer Defendants coerced Ernestine Williams to falsely identify Mr. Kelly as being involved in the crime and to use her false testimony as a basis to arrest and prosecute. These allegations include the following:

> On July 2, 1995, nearly 22 months after her September 1993 identification, police brought Williams in again for her fifth interview. The only documentation of this interview is found in the July 5, 1995 Affidavit of Probable Cause for Mr. Kelly's arrest warrant, wherein her July 2, 1995 "re-interview" by Detectives Gross and Lubiejewski is summarized. No interview record form 75-483 or activity sheet reflecting this interview was produced in pretrial discovery, and the DAO [District Attorney's Office] never found any such record in the PPD Archive File. According to Detective Gross's summary in the affidavit of probable cause, Detectives Gross and Lubiejewski first gave Williams the opportunity to review her March and September 1993 interview statements. Williams then purportedly related essentially the same description of what she observed on the night of the homicide as she had stated in her March and September, 1993 interviews, with one significant exception: *she told the police for the first time that she had seen Mr. Kelly pass Mullins a gun before the shooting*. … Also notable at this interview was that the police again showed Williams two photo arrays: one containing a picture of Larry Mullins and the other containing a picture of James Kelly. This is notable because law enforcement officials should avoid showing witnesses suspects or fillers more than once, as studies have shown that once witnesses identify an innocent person from a mugshot, a "significant number" then reaffirm their false identification in a later line up, even if the actual target is present.

Am. Compl. ¶ 35.

On July 6, 1995, Kelly was arrested and charged with murdering Travis "Bud" Hughston, along with related charges.  In addition to the summary of Williams' July 2, 1995 interview, the affidavit of probable cause contained a summary of Tamika Ledbetter's statement from the night of the shooting, and a summary of Colie Baxter's statements given in January and October 1993.  Neither Ledbetter's nor Baxter's statements provided any basis for probable cause to arrest Mr. Kelly. . . . [Therefore,] probable cause to arrest Mr. Kelly was based solely on Detectives Gross and Lubiejewski's re-interview of Ernestine Williams – her fifth statement given to police in this case.

Am. Compl. ¶ 36.

The coercion of witnesses by the individual defendants is evidenced in the non-credible evolution of the multiple statements of Ernestine Williams taken by the detectives in this case.  New evidence of what Ernestine purportedly saw on the night of Hughston's murder appears on each successive statement, starting with no knowledge about who committed the crime, and then morphing into her claim that Mr. Kelly handed the shooter the gun to be used to kill Hughston.  This was a direct result of the individual defendants using coercion to manufacture evidence, and to conceal exculpatory evidence.

Am. Compl. ¶ 55.

To Benoff [Plaintiff's investigator], Williams claimed that in the aftermath of Hughston's homicide, she was being harassed by the police, asserting that police brought her to the homicide division for questioning "about six times" before she made her March 21, 1993 statement.  She also claimed that during her initial interviews, police detectives did not believe her and speculated that she was "taking money from these other guys, drug dealers, to put the blame on somebody else."  She reported that during one of the interviews, police showed her a single 8 x 10 picture of James Kelly and told her his name, even though other detectives, whose names she could not recall, told her they believed "Tommy," a man who lived on Page Street, was involved in the homicide.

Am. Compl. ¶ 37.

Thus, Ernestine Williams was being called in to speak with the PPD even more often than the dates for which there are recorded statements.  The detectives were closely managing her and were

unwilling to accept her version of what took place on January 1, 1993, unless it fell in line with the PPD's preferred narrative.

Am. Compl. ¶ 38.

Mr. Kelly's conviction was secured through the PPD's practice of using "ghost informants," whose identities were not disclosed to defendants, as a way for the Commonwealth to choose who to prosecute despite having no basis to pursue those suspects.  In this case, the PPD engaged in this practice with how they manipulated and coerced Ernestine Williams.

Am. Compl. ¶ 54.

[E]xculpatory evidence the Commonwealth withheld from Mr. Kelly included [that a]round the time of the Stacy Williams homicide [September 1993], the other key prosecution witness, Ernestine Williams, sold her house to Thomas Lockwood for $100. This sale occurred one month before Ernestine first identified Larry Mullins as the shooter in the Hughston homicide and James Kelly as "guy with Larry" that killed Hughston.  She continued to live in that house with Lockwood as the owner until shortly before Mr. Kelly's trial, when the Commonwealth relocated her to a more affluent area in South Philadelphia in exchange for her testimony against Mr. Kelly in 1996.  Although defense counsel cross-examined Williams and police investigators on her inconsistencies and the basis for her identification, counsel had been deprived of an obvious explanation for why Williams might have come to falsely accuse Kelly and not named Lockwood as the perpetrator. Additionally, the PPD provided Williams with other incentives to provide testimony in line with their narrative by placing her in drug rehab prior to the preliminary hearing and/or trial.

Am. Compl. ¶ 50(b).

Had the Commonwealth disclosed the information above, the jury would have known that Ernestine Williams had undisclosed connections to Thomas Lockwood—a known member of a violent drug gang.

Am. Compl. ¶ 51.

In the 1990's, the way that the PPD's Homicide Unit operated was such that all detectives knew what was going on with all of the Unit's open cases, whether or not they were officially assigned to them.  Additionally, given the overlap between the investigation of

> the Hughston homicide and the investigation of the Stacy Williams homicide in date, location, and investigating detectives shows that at the time of Mr. Kelly's 1996 trial, all detectives in the PPD Homicide Unit knew about the drug organization, the drug territory disputes happening in the immediate area of both homicides, the names and faces of known members of the drug organization, and the color and types of vehicles commonly driven by each member and were therefore involved in the investigations of both murders.

Am. Compl. ¶ 58.

> Even though prior to Mr. Kelly's conviction, all detectives in the Homicide Unit knew that Hughston had been killed by Lockwood, they were deliberately indifferent when they suppressed this evidence and failed to link the two homicides to each other.

Am. Compl. ¶ 60.

Plaintiff will first address the Officer Defendants' arguments that the amended complaint does not adequately plead a claim for malicious prosecution against Officers Gross and Lubiejewski. With respect to their contention that Plaintiff "alleges no facts indicating that Gross or Lubiejewski somehow fabricated" the new detail [in Williams' fifth statement to police] about Plaintiff passing the gun "or otherwise knew it was false," paragraphs 35 and 36 of the amended complaint, which are quoted at length in the first two paragraphs above, should put that contention to rest. In those paragraphs, Plaintiff alleges that nearly two years after giving her prior statement, Officer Defendants Gross and Lubiejewski "reinterviewed" her, and after giving her the opportunity to review her March and September 1993 interview statements and showing her again two photo arrays containing a picture of Larry Mullins and a picture of James Kelly, Williams told the police for the first time that she had seen Mr. Kelly pass Mullins a gun before the shooting. The complaint alleges that it was suspicious that the detectives showed Williams the two photo

arrays again because once witnesses identify an innocent person from a mugshot, a "significant number" then reaffirm their false identification in a later line up, even if the actual target is present. Plaintiff also alleges that the only documentation of this interview is found in the July 5, 1995 Affidavit of Probable Cause for Mr. Kelly's arrest warrant, which was sworn out by Officer Defendant Gross, and where Williams' July 2, 1995 "re-interview" by Detectives Gross and Lubiejewski is summarized. Plaintiff further alleges that only three days later, Officer Defendant Gross swore out the affidavit of probable cause, and the next day Mr. Kelly was arrested and charged with murdering Travis "Bud" Hughston, along with related charges. Plaintiff alleges that probable cause to arrest Mr. Kelly was based solely on Detectives Gross and Lubiejewski's re-interview of Ernestine Williams.

These allegations alone are more than sufficient to state a malicious prosecution claim against Officer Defendants Gross and Lubiejewski. But, as set forth above, the amended complaint contains many, many more allegations supporting Plaintiff's claim that these two Defendants coerced Williams to re-identify Plaintiff as Mullins co-conspirator, coerced her to state that she saw Mr. Kelly pass a gun to Mullins, knew this was false, and knowingly included this false, coerced evidence in the affidavit of probable cause to arrest Mr. Kelly. For example, Plaintiff alleges that "the coercion of witnesses by the individual defendants is evidenced in the non-credible evolution of the multiple statements of Ernestine Williams taken by the detectives in this case. New evidence of what Ernestine purportedly saw on the night of Hughston's murder appears on each successive statement, starting with no knowledge about who committed the crime, and then morphing into her claim that Mr. Kelly handed the shooter the gun to be used to kill Hughston. This was a direct result of the individual defendants using coercion to manufacture evidence." Am. Compl. ¶ 55. He also alleges that "Williams was being called in to speak with the PPD even

more often than the dates for which there are recorded statements.  The detectives were closely managing her and were unwilling to accept her version of what took place on January 1, 1993, unless it fell in line with the PPD's preferred narrative."  Am. Compl. ¶ 38.

As to whether Plaintiff has alleged enough facts to support his claim that the rest of the Officer Defendants coerced Williams to identify Plaintiff as involved in the crime while knowing this was false, Plaintiff submits that he has asserted adequate allegations to maintain his malicious prosecution claims against them.  Although the Officer Defendants contend that Plaintiff merely alleges that Williams complains that the police harassed her by interviewing her multiple times and by not believing her, Plaintiff alleges that she experienced more serious mistreatment by the police.  For example, Plaintiff alleges that Williams stated that during these many, many interviews, some of which were not recorded, the police accused her of "taking money from these other guys, drug dealers, to put the blame on somebody else."  She also claimed that during one of the interviews, police showed her a single 8 x 10 picture of James Kelly and told her his name. She said that in other interviews, detectives told her they believed that a man named "Tommy" who lived on Page Street was involved in the homicide.  Am. Compl. ¶ 37.  Plaintiff also alleges that because the Defendant Detectives knew that she was a drug user, they placed her in drug rehab prior to the preliminary hearing to incentivize her to provide testimony in line with their narrative. Am. Compl. ¶ 50(b).  These allegations do not merely reflect the police submitting a witness to a large number of interviews or showing "skepticism" of her statements.  They show that numerous detectives who were investigating the Hughston murder worked in tandem to subject Williams to numerous interviews, many of which were not recorded, where they accused her of taking money from drug dealers, showed her a picture of the plaintiff and told her Plaintiff's name in order to get her to identify him for them.

In addition, Plaintiff alleges that at the time of the Hughston investigation, all of the detectives on the Homicide Unit knew what was going on with all of the Unit's open cases, whether or not they were officially assigned to them, that the overlap between the investigation of the Hughston homicide and the investigation of the Stacy Williams homicide in date, location, and investigating detectives shows that at the time of Mr. Kelly's 1996 trial, all detectives in the PPD Homicide Unit knew about the drug organization, the drug territory disputes happening in the immediate area of both homicides, and that by the time the Stacy Williams homicide investigation began in September of 1993, all detectives in the Homicide Unit knew that Hughston had been killed by Lockwood, and thus they knew that Mr. Kelly was not his killer. Am. Compl. ¶¶ 58, 60. Therefore, Plaintiff's allegation that police on the Homicide Unit knew that approximately one month before Williams first identified Larry Mullins as the shooter and Plaintiff as the "guy with Larry," (which was in her third and fourth statements taken in September of 1993), Williams sold her house to Thomas Lockwood for $100, where she continued to live with Lockwood as the owner up until Plaintiff's trial, is further evidence that all the detectives working on this investigation knew that Williams' identification of Mr. Kelly as involved in the crime was false.[4]

Based on the foregoing, Plaintiff submits that the allegations in the amended complaint sufficiently describe each individual Officer Defendant's role in coercing and/or submitting false evidence as a basis for the wrongful arrest of Mr. Kelly. Even though each detective working on the Hughston investigation did not take every statement from Ernestine Williams, the complaint

---

[4] The Officer Defendants also argue that Plaintiff's malicious prosecution claim should fail because he "does not allege that the fact Williams was interviewed repeatedly, or that her story changed over time, was hidden from prosecutors." Mot. to Dismiss at 9. As explained above, Plaintiff is not alleging that the Officer Defendants hid Williams' statements from the prosecutors. He is alleging that the Officer Defendants hid from the prosecutors the fact that they fed Williams Mr. Kelly's name and photo to coerce her into falsely identifying him.

alleges that these detectives "were closely managing her and were unwilling to accept her version of what took place on January 1, 1993." Plaintiff alleged how Ernestine Williams's multiple statements evolved from January 1, 1993, when she knew nothing about who committed the crime, to two years later suddenly remembering seeing Mullins and Mr. Kelly. New evidence of what Ernestine purportedly saw on the night of Hughston's murder appears on each successive statement, starting with no knowledge about who committed the crime, and then morphing into her claim that Mr. Kelly handed the shooter the gun to be used to kill Hughston. Additionally, the allegations that all detectives on the Homicide Unit were aware of all of the investigations, especially ones, like the Hughston and Stacy Williams homicides, that were interrelated, lend further support to Plaintiff's claim.

At the motion to dismiss stage, the Officer Defendants' arguments should not preclude plaintiff from pursuing his claims, and are more suited to summary judgment and/or trial. It is premature to conclude that any of the Officer Defendants were not directly involved in the coercion of Ernestine Williams to falsely identify Mr. Kelly as involved in this crime.

For the reasons set forth above, Plaintiff believes that all of the Defendant Officers can be held liable for malicious prosecution, including those whose names are not found on any of Williams' interview records, and those who interviewed Williams but where she did not implicate Plaintiff. In the event that the Court agrees with the Officer Defendants that any detective that is not alleged to have ever spoken to Williams cannot be held liable for malicious prosecution, then Plaintiff requests that the Court grant him leave to amend his complaint to include allegations about Hoffner's involvement in taking Williams' third and fourth statements.

**Plaintiff Has Stated Claims Against the Officer Defendants for Fabricating and Withholding Evidence and Failing to Conduct a Constitutionally Adequate Investigation**

In Count II, Plaintiff asserts a claim against the individual Officer Defendants for violation of his Fourteenth Amendment right to due process and denial of a fair trial by fabricating inculpatory evidence, withholding material exculpatory and impeachment evidence, and deliberately failing to conduct a constitutionally adequate investigation. *See* Am. Compl. ¶¶ 91–96 (Count II). The Officer Defendants move for the dismissal of Plaintiff's claims under all three of these theories. As explained below, Plaintiff has stated a claim against the Officer Defendants on the first two theories. Plaintiff requests that his claim for deliberately failing to conduct a constitutionally adequate investigation be dismissed without prejudice.

*Fabrication of Evidence Claims*

Plaintiff asserts a fabrication of evidence claim against all of the Officer Defendants based on their deliberate use of coercion to obtain inculpatory statements and testimony from Ernestine Williams. *See* Am. Compl. ¶ 92 (alleging that the Officer Defendants "deprived Mr. Kelly of his clearly established constitutional right to due process of law and to a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain inculpatory witness statements, including without limitation the false statements of witnesses.").

To succeed on a Fourteenth Amendment claim based on evidence fabrication, Plaintiff must prove that the police "formulated or submitted false evidence willfully, knowingly, or with a reckless disregard for its truth," *Mervilus v. Union Cty.*, 73 F.4th 185, 194–95 (3d Cir. 2023), and that it is reasonably likely that without the use of the fabricated evidence, the plaintiff would not have been convicted. *Halsey v. Pfeiffer*, 750 F.3d 273, 294–95 (3d Cir. 2014).

For the same reasons the Officer Defendants argued that Plaintiff has not stated a claim for malicious prosecution against them, they argue that Plaintiff has not plausibly alleged that any Officer Defendant fabricated Williams's identification of Mr. Kelly as being involved in the crime.

Plaintiff likewise refers the Court to the arguments he made *supra* in support of his malicious prosecution claims as applicable to support his fabrication of evidence claims, with one small addition. To the extent the Court puts temporal limits on the scope of Plaintiff's malicious prosecution claim, whereby it only considers police misconduct leading up to the Plaintiff's arrest, Plaintiff submits that the Officer Defendants can be liable for the fabrication of evidence at any point in time from the investigation leading to Mr. Kelly's arrest, his prosecution, and conviction. Thus, in addition to the numerous paragraphs in the amended complaint that Plaintiff cited which contain factual allegations supporting Plaintiff's claim that all of the Officer Defendants coerced Ernestine Williams to falsely identify Mr. Kelly as being involved in the crime and to use her false testimony as a basis to arrest and prosecute, Plaintiff refers the Court to the following additional paragraph from the amended complaint:

> [T]he PPD provided Williams with other incentives to provide testimony in line with their narrative by placing her in drug rehab prior to the preliminary hearing and/or trial.

Am. Compl. ¶ 50(b).

Therefore, based on the Officer Defendants' deliberate use of coercion to obtain inculpatory statements and testimony from Ernestine Williams, Plaintiff has stated a claim against each Officer Defendant for the fabrication of evidence.

*Suppression of Exculpatory Evidence Claim*

Plaintiff asserts a suppression of exculpatory evidence claim against all of the Officer Defendants. He alleges that the individual Officer Defendants deprived him of his Fourteenth Amendment due process right to a fair trial by intentionally withholding, concealing and/or suppressing material exculpatory and impeachment evidence. *See* Am. Compl. ¶ 93. Specifically, he alleges that the Officer Defendants did following:

They withheld the fact that prior to trial, Colie Baxter identified Lockwood as the getaway driver in the Hughston murder from a photo array he was shown by Detective Jastrzembski. Notes from the Hughston homicide investigation file disclosed this fact. (Am. Compl. ¶ 49(a));

They withheld statements given to the police by two witnesses, Kevin Brown and Lydell Jackson, within a few months of Hughston's January 1, 1993 murder, that implicated Lockwood and his local drug organization in Hughston's homicide. (Am. Compl. ¶ 49(c));

They concealed the fact that just before Williams identified Mr. Kelly as involved in the crime in September of 1993, Williams was living in a home owned by Lockwood, and continued to live there until just before Mr. Kelly's trial. (Am. Compl. ¶ 50(b));

They concealed the fact that in July 1993, homicide detectives ran court histories for Thomas Lockwood. (Am. Compl. ¶ 49(b));

They concealed statements and other information from investigation files from two other murders that occurred close in time and in the same neighborhood as the Hughston murder, which showed a pattern of similar murders involving drug territory disputes and the same local drug organization of which Lockwood was a member and contained witness statements implicating Lockwood and other members of a local drug organization in both Hughston's murder and one of the other murders. (Am. Compl. ¶¶ 48, 50(a));

They concealed their coercion of Ernestine Williams to provide false statements inculpating Mr. Kelly in the crime. (Am. Compl. ¶ 55);

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and its progeny, criminal defendants are entitled to receive exculpatory or impeachment evidence that supports their innocence. *Gibson v. Superintendent*, 411 F.3d 427, 442 (3d Cir. 2005), *overruled on other grounds by Dique v. N.J. State Police*, 603 F.3d 181, 183 (3d Cir. 2010). The elements of a *Brady* claim are that (1) the

defendant withheld exculpatory or impeachment evidence from the plaintiff and (2) there is a reasonable probability that the withheld evidence would have changed the outcome of the case. *Dennis v. Sec'y, Penn. Dep't of Corr.*, 834 F.3d 263, 284-85 (3d Cir. 2016). Police officers can violate a defendant's due process rights by "affirmatively conceal[ing] material [exculpatory] evidence from the prosecutor." *Gibson*, 411 F.3d at 443.

The Officer Defendants contend that Plaintiff's claim regarding the withholding of Baxter's identification of Lockwood is inadequately pled. With respect to this claim, Plaintiff alleges, *inter alia*, that the Officer Defendants withheld the fact that prior to trial, Colie Baxter identified Lockwood as the getaway driver in the Hughston murder from a photo array he was shown by Detective Jastrzembski, and that notes from the Hughston homicide investigation file disclosed this fact. Am. Compl. ¶ 49(a). The Officer Defendants argue that because the identification was allegedly only made to Detective Jastrzembski, Plaintiff's *Brady* claim as to Baxter's identification of Lockwood is limited to just Jastrzembski. They contend that Plaintiff cannot link any other defendants to the suppression of this identification if they were not involved with Baxter's identification of Lockwood. They assert that even the three Officer Defendants who interviewed Baxter (Det. Dougherty on June 1, 1993 and Detectives Snell and Vivarina on October 13, 1993) cannot be held liable for the wrongful withholding of Baxter's identification of Lockwood because they did not show him the photo array when Baxter identified Lockwood. Mot. to Dismiss at 11–12.

The Officer Defendants further argue that Plaintiff's claim against Detective Jastrzembski fails because Plaintiff does not allege that Jastrzembski, or any Officer Defendant, hid this information from the prosecutor. In support of this assertion, defendants cite the allegation in the complaint that Baxter's statement "was suppressed by the Commonwealth until recently." *Id.* at

12 (citing Am. Compl., ¶ 1).  They claim that this shows that Plaintiff is alleging that the evidence underlying his *Brady* claim was withheld from the Plaintiff by the DAO, not by the Officer Defendants withholding it from the DAO.  *Id.*

Addressing their latter argument first, although Plaintiff may have inartfully used the term "Commonwealth" instead of "police" in that one instance, Plaintiff clearly pleads elsewhere in the complaint that it was the police officers who withheld Baxter's identification of Lockwood as the shooter/driver of the getaway car from the prosecutors.  The following allegations support this position:

> Recent investigation conducted by both Mr. Kelly's attorneys and the DAO has revealed exculpatory evidence that was improperly withheld from Mr. Kelly, helps establish his factual innocence, and provides significant corroboration of the fact that Hughston's killing was perpetrated by Tommy Lockwood, and not Jim Kelly.

Am. Compl. ¶ 46.

> The exculpatory evidence came to light when, 27 years after Mr. Kelly's arrest, the DAO produced *the homicide investigation files (the "H files") for the Hughston murder* and for two other murders committed in the same area within months of the Hughston homicide, as well as PPD files related to the criminal prosecutions of members of a violent drug gang that was attempting to control all drug sales in the area of the Hughston murder during same time period.

Am. Compl. ¶ 47 (emphasis added).

> Examples of improperly withheld witness statements implicating Lockwood and other members of the local drug operation as the perpetrators of Hughston's murder include the following: . . . [N]ewly produced notes *from the Hughston homicide investigation* show that sometime prior to trial, Baxter was shown a photo array by Detective Jastrzembski, from which he identified Thomas Lockwood as the getaway driver.  The photo array and identification were suppressed by Detective Jastrzembski and the other individual defendants.

Am. Compl. ¶ 49(a) (emphasis added).

It is clear that Plaintiff has alleged that these notes from the police file regarding Baxter's identification of Lockwood were found decades after the Hughston murder investigation and Mr. Kelly's trial in the Houghston "H" file, not in the DAO's investigation file. According to these allegations, when the DAO produced the police notes regarding Baxter's identification of Lockwood to Plaintiff's PCRA counsel, the DAO had obtained this information from the Hughston Homicide file 27 years after Mr. Kelly was arrested for this crime. *See* Am. Compl. ¶ 47. They did not find the police notes in their own DAO file, as the Officer Defendants represent. Therefore, Plaintiff has alleged that the Baxter identification of Lockwood was withheld from the Plaintiff because the Officer Defendants withheld it from the prosecutor several decades ago.

As to the Officer Defendants' contention that the only person who can be held liable for withholding of the Baxter identification of Lockwood is the officer who obtained the identification from Baxter, that is an unduly narrow interpretation of the limits of a *Brady* claim. Plaintiff's claim is that the Officer Defendants knew about Baxter's identification of Lockwood as the shooter/getaway car driver, but intentionally failed to disclose this piece of evidence to the prosecutor. Plaintiff has alleged that at the time of the Hughston investigation, all of the detectives on the Homicide Unit knew what was going on with all of the Unit's open cases. It can therefore be reasonably inferred that the Officer Defendants would have had access to any of the notes in the homicide investigation file, even if they did not present Baxter with the photo array or author the note memorializing the identification. In fact, the primary purpose of putting a note in the file is so that any detective working on the case can see what work other detectives have performed on the case. Because all of the Officer Defendants worked on the Hughston investigation, each of them had access to the "H" file. Therefore, Plaintiff has adequately alleged that each Officer

Defendant failed to disclose to the prosecutors the fact that Baxter identified Lockwood as the shooter.

The Officer Defendants also contend that Plaintiff's claim regarding the withholding of information about other gang-related crimes that occurred in the same general area around the same general time as the Hughston murder is inadequately pled. In support of this assertion, defendants note several instances in the amended complaint where Plaintiff alleges that "the Commonwealth" withheld certain pieces of exculpatory evidence, which they say shows that the police could not have withheld the evidence because they gave it to the DAO. Mot. to Dismiss at 12–13. The Officer Defendants point to the following allegations in the amended complaint:

> "Other critical, exculpatory evidence *the Commonwealth* withheld from [Plaintiff] included" that Lockwood was charged with a September 1993 murder of Stacy Williams, which occurred near the site of Hughston's murder, and that Ernestine Williams had sold her house to Lockwood and had been relocated by "the Commonwealth" to a more affluent area. (Am. Compl. ¶ 50(a) and (b)).

> Had *the Commonwealth* disclosed [this] information, the jury would have known…that members of a violent gang were responsible for more than a dozen similar drug related homicides in this neighborhood in the days before [Hughston's] death." (Am. Compl. ¶ 51).

Additionally, citing paragraphs 47 and 48 of the amended complaint, the Officer Defendants contend that "virtually all the information Plaintiff claims was not disclosed to him before his trial he learned from the DAO's own records." Mot. to Dismiss at 12–13.

Plaintiff concedes that he mistakenly used the term "Commonwealth" instead of "police" in the instances noted by the Officer Defendants. However, if those allegations are considered side-by-side with other allegations in that section of the complaint, one can reasonably infer that Plaintiff intended to state that the "police" failed to disclose those pieces of evidence. For example, in paragraph 47, Plaintiff alleges that:

The exculpatory evidence came to light when, 27 years after Mr. Kelly's arrest, the DAO produced *the homicide investigation files (the "H files") for the Hughston murder* and for two other murders committed in the same area within months of the Hughston homicide, as well as PPD files related to the criminal prosecutions of members of a violent drug gang that was attempting to control all drug sales in the area of the Hughston murder during same time period.

Am. Compl. ¶ 47 (emphasis added).  Then, in the following paragraph, Plaintiff alleges that:

the City's homicide file consisted of fewer than 60 pages. Investigators looked into other murder investigations from the same time and neighborhood and found additional suppressed material and further corroboration of Mr. Kelly's innocence.  These files show a pattern of similar murders involving the same cast of characters as well as contain witness statements implicating Thomas Lockwood and other members of a local drug organization in Hughston's murder.  This withheld evidence specifically corroborated the trial testimony of the only defense witness -- the victim's brother, Kenyatta Hughston -- that just a few days after his brother's death, Ernestine Williams told him that "Tommy, Kendall, and Boonchie" were responsible.

Am. Compl. ¶ 48.

As explained above, paragraph 47 alleges that the DAO produced the Hughston "H" files and the H files for the two other murders, as well as PPD files related to the criminal prosecutions of members of a violent drug gang, to Plaintiff decades after the Hughston murder investigation, but the DAO did not have them in its possession all those years.  The DAO only got its hands on these old "H" files as part of a Conviction Integrity Unit investigation it conducted decades later.

Then, in paragraph 48, Plaintiff alleges that in these "H" files, which the Officer Defendants had *not* produced to the prosecutors at the time of Mr. Kelly's arrest and trial, there was suppressed material pertaining to the other gang-related crimes that occurred in the same general area around the same general time frame as the Hughston murder.

21

Therefore, Plaintiff has adequately stated a claim regarding the Officer Defendants' withholding of exculpatory and impeachment evidence concerning other gang-related crimes that occurred in the same general area around the same general time as the Hughston murder.

In the event that the Court agrees with the Officer Defendants that he has not adequately pled his claims that the Officer Defendants withheld exculpatory and impeachment evidence due to his inartful use of the term "Commonwealth," then Plaintiff requests that the Court grant him leave to amend his complaint to substitute the word "Commonwealth" with "police."

**Plaintiff Has Stated A Claim for Civil Rights Conspiracy Against the Officer Defendants**

*Civil Rights Conspiracy Claim*

In Count III of the amended complaint, Plaintiff asserts a claim for civil rights conspiracy against the Officer Defendants. *See* Am. Compl. ¶¶ 97–100 (Count I). The Officer Defendants argue for dismissal of this claim on two grounds. First, they argue that Plaintiff has not alleged an underlying constitutional violation by any Officer Defendant, and thus cannot have alleged a conspiracy to commit such a violation. Second, they contend that even if any alleged individual actions had been wrongful, together they do not plausibly give rise to an "agreement" to violate Plaintiff's rights.

To state a claim for a conspiracy under § 1983, "a plaintiff must establish (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Rosembert v. Borough of E. Lansdowne*, 14 F. Supp.3d 631, 647 (E.D. Pa. 2014) (citation omitted). The plaintiff must plead that there was an agreement or "meeting of the minds," to violate their constitutional rights. *Id.*

For the reasons set forth *supra*, Plaintiff submits that he has adequately pled that each Officer Defendant violated Plaintiff's constitutional rights. He has alleged that the individual defendants coerced Ernestine Williams to falsely identify Plaintiff as a participant in the crime, and that they have suppressed exculpatory and impeachment evidence regarding Baxter's identification of Lockwood and other evidence.

With respect to the existence of an agreement to violate Plaintiff's rights, all of the detectives on the Homicide Unit knew what was going on with all of the Unit's open cases, whether or not they were officially assigned to them. As described in greater detail *supra*, Plaintiff has alleged that all the detectives working on the Hughston investigation knew that Williams' identification of Mr. Kelly as involved in the crime was false. Therefore, Plaintiff has stated a claim for civil conspiracy.

### Failure to Intervene Claim

Plaintiff requests that his claim in Count IV for failure to intervene be dismissed without prejudice.

### Municipal Liability Claim

The City argues for dismissal of Plaintiff's municipal liability claim on the ground that the Plaintiff has not plausibly alleged any underlying constitutional violation by any Officer Defendant. For the reasons discussed throughout this response to the Defendants' motion, Plaintiff submits that he has plausibly alleged many constitutional violations committed by the City's Police Officers. On that basis, Plaintiff requests that the City's motion to dismiss the *Monell* claim be denied.

**<u>CONCLUSION</u>**

For the reasons set forth above, Plaintiff James Kelly respectfully requests that this Honorable Court grant in part and deny in part the Defendants' Motion to Dismiss the Amended Complaint.  The Court should dismiss without prejudice Plaintiff's claim in Count II for deliberately failing to conduct a constitutionally adequate investigation and Plaintiff's claim in Count IV for failure to intervene.  The Court should deny the Defendants' motion in all other respects, and order Defendants to file an answer to the amended complaint.

In the event that the Court determines that any of Plaintiff's claims are inadequately pleaded, Plaintiff respectfully requests the Court to grant him leave to amend the complaint to cure any deficiencies.

Additionally, if the Court would find it helpful, Plaintiff respectfully requests oral argument on the motion.

 

 

Respectfully submitted,

MARRONE LAW FIRM

By:    /s/Peggy B. Greenfeld
       Pa. Attorney ID No. 73377
       Michael D. Pomerantz, Esquire
       Pa. Attorney ID No. 83415
       200 South Broad, Ste. 610
       Philadelphia, PA. 19102
       (215) 732-6700 – Phone
       (215) 732-7660 – Fax
       pgreenfeld@marronelaw.com
       mpomerantz@marronelaw.com

Counsel for Plaintiff

Date: July 25, 2025