## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES KELLY, | CIVIL ACTION |
| Plaintiff, | NO.    24-cv-06701-JFM |
| v. | |
| CITY OF PHILADELPHIA, andDETECTIVE WALTER HOFFNER, DETECTIVE RICHARD REINHOLD, DETECTIVE LEON LUBIEJEWSKI, DETECTIVE MICHAEL GROSS, DETECTIVE JAMES COLLINS, MICHAEL P. FENERTY in his capacity as Administrator of the Estate of Detective ROBERT A. SNELL, DETECTIVE STEVEN VIVARINA, DETECTIVE FRANK JASTRZEMBSKI, and DETECTIVE JAMES DOUGHERTY, in their individual capacities, | **THIRD AMENDED COMPLAINT** |
| Defendants. | |

Plaintiff, James Kelly, by and through his attorneys, the Marrone Law Firm, LLC, hereby alleges as follows:

### <u>INTRODUCTION</u>

1.      In 2024, James "Jim" Kelly was released from incarceration at the urging of the Philadelphia District Attorney's Office ("DAO") after having served twenty-nine years in state prison for a crime he did not commit.  There was never any evidence to connect Mr. Kelly to the January 1, 1993, murder of Travis "Bud" Hughston, other than the coerced testimony of cooperating witnesses Ernestine Williams and the fabricated stories of Colie Baxter.  Williams has since confirmed that she was coerced by Philadelphia Police Department ("PPD") detectives.  Baxter was a confidential informant who worked with police over a long period of time, a fact

that was deliberately concealed from Mr. Kelly while he was being wrongfully prosecuted. This is a long-standing practice of the PPD that wasthe subject of a 2017 lawsuit *Frazier, et al. v. City of Phila*, Eastern District of PA, 17-cv-5421, where members of the Philadelphia police department sued their supervisors who were requiring them to use off-the-book informants, just as were used in this case. Additionally, conclusive evidence of an alternative suspect was suppressed by the City of Philadelphia and its police force.  A review of the City's files has now revealed that the PPD had multiple pieces of information that pointed to Tommy Lockwood, and not Jim Kelly, as being the culprit.  Lockwood was identified by Colie Baxter, who was at the scene of the shooting.  The identification in question was deliberately suppressed by the PPD until recently.  Additionally, the PPD withheld other witness statements and evidence obtained during their investigation of two other homicides in the same area.  These materials supported the conclusion that Tommy Lockwood, rather than Jim Kelly, killed Hughston. That murder was tied to the ongoing drug-related conflicts in the neighborhood which were known to the PPD long before Mr. Kelly was put on trial. Despite this knowledge, the PPD suppressed information about the similar homicides in the same neighborhood.  Furthermore, the PPD concealed the fact that Ernestine Williams resided in a house owned by Tommy Lockwood. Police learned this because when they went to look for Lockwood they found Ernestine. This fact influenced the prosecution's decision not to pursue a case against Lockwood.  Given that Williams would not testify against Lockwood, the authorities fabricated her account to bring the case to a close.

2.     The wrongful arrest and conviction of Jim Kelly was part of a pattern and practice of the City of Philadelphia, whereby "cold" cases were eventually resolved by a unit called the Special Investigation Unit ("SIU"), which routinely used coerced statements and testimony, as well as fabricated and suppressed evidence.  In 1995, the SIU pursued this case and fabricated a

2

basis for probable cause to arrest Mr. Kelly *more than two-and-a-half years after the murder*. At that time, Kelly was a former Marine who was working full-time in the City's sanitation department. The City's theory at trial -- that Mr. Kelly was involved in the illegal drug trade -- was not supported by any competent evidence. In fact, the only way that the City was able to secure a conviction was through the use of unconstitutional means, as evidenced by the DAO's decision to *nolle pros* all charges after supporting Mr. Kelly's request for post-conviction relief.

3. Mr. Kelly now makes the within claims for violations of his rights secured by the Fourth and Fourteenth Amendments to the United States Constitution. He was arrested and convicted on the basis of false evidence, which was known by the Defendants herein to be false at the time it was used in the affidavit of probable cause to arrest. Mr. Kelly's constitutionally protected right to due process was also violated by the suppression of exculpatory evidence, which, if not withheld, would have changed the outcome of the trial. As a result of this conduct, Mr. Kelly was forced to spend nearly three decades in state prison. He now seeks compensation for the wrongful arrest, wrongful conviction, and wrongful incarceration that robbed him of so much time.

## JURISDICTION AND VENUE

4. This action is brought pursuant to 42 U.S. § 1983 to redress the deprivation under color of law of the Plaintiff's rights as secured by the United States Constitution. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

5. This Court has supplemental jurisdiction over the plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

6. Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

**JURY DEMAND**

7.      Plaintiff demands a trial by jury on all issues and claims set forth in this

Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of

Civil Procedure 38(b).

**PARTIES**

8.      Plaintiff **James Kelly** is, and at all times relevant to this Complaint was, a

resident of Pennsylvania.  Mr. Kelly was born on April 24, 1956.  In August of 1996, Mr. Kelly

was wrongfully convicted of the murder of Travis "Bud" Hughston, and, as a result, served more

than twenty-nine years in jail and prison until evidence of the Commonwealth's wrongful, illegal

and unconstitutional conduct provided a basis for Mr. Kelly's conviction to be vacated in June

2024, and the court to enter of record the Commonwealth's request to dismiss all charges against

him in July 2024.

9.      Defendant **City of Philadelphia** is, and at all times relevant to this Complaint

was, a municipality located in the State of Pennsylvania.  The City of Philadelphia was, at all

times relevant to this Complaint, officially responsible for the policies, practices and customs of

the Philadelphia Police Department (PPD), and was the employer of the individual PPD

Defendants in this matter.

10.     Defendant **Walter Hoffner**, at all times relevant to this Complaint, was an officer

of the PPD acting under color of law and within the scope of his employment pursuant to the

statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the

PPD.  He is sued in his individual capacity.  Upon information and belief, Hoffner was assigned

as a detective with the Homicide Unit at the time of this investigation, as well as to the Special

Investigations Unit of the PPD's Homicide Division, which investigated unsolved homicides.

11.     Defendant **Richard Reinhold**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Reinhold was assigned as a detective with the Homicide Unit at the time of this investigation.

12.     Defendant **Leon Lubiejewski**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Lubiejewski was assigned as a detective with the Homicide Unit at the time of this investigation.

13.     Defendant **Michael Gross**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Gross was assigned as a detective with the Homicide Unit at the time of this investigation.

14.     Defendant **James Collins**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Collins was assigned as a detective with the Homicide Unit at the time of this investigation.

15.     Defendant **Michael P. Fenerty** is the Administrator of the Estate of **Robert A. Snell**.  Snell, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations,

policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Snell was assigned as a detective with the Homicide Unit at the time of this investigation.

16.    Defendant **Steven Vivarina**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Vivarina was assigned as a detective with the Homicide Unit at the time of this investigation.

17.

18.    Defendant **Frank Jastrzembski**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Jastrzembski was assigned as a detective with the Homicide Unit at the time of this investigation

19.    Defendant **James Dougherty**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Dougherty was assigned as a detective with the Homicide Unit at the time of this investigation.

20.    At all times relevant to this Complaint, the individual Defendants named above acted in concert and in conspiracy with one another in order to deprive Mr. Kelly of his constitutionally protected rights.

## FACTUAL ALLEGATIONS

21.    On January 1, 1993, at approximately 8:08 p.m., Travis "Bud" Hughston was shot to death while standing outside his girlfriend Tamika Ledbetter's home at 2000 N. Bambrey Street in Philadelphia.

22.    The police received emergency calls immediately thereafter, and upon being dispatched to the scene, Officers Stephen McCuster and Thomas Demalto encountered a black male, later identified as Colie Baxter, in his vehicle on 25th and Diamond Streets.  Baxter directed officers to the location of the gunfire, and the officers found Hughston lying face down just outside 2027 N. Bambrey Street.  He was bleeding from the head, where he had been shot. Hughston was transported to a hospital and pronounced dead at 8:26 p.m.


**COLIE BAXTER:**

23.    Colie Baxter's involvement in the Hughston homicide investigation is highly problematic for a number of reasons:

    a.    At the time of the shooting, Baxter was alleged to be an innocent bystander, but recent investigation has revealed that Baxter had a history as a drug dealer, which was known to the PPD Detectives who are defendants in this case; this knowledge was deliberately concealed from Mr. Kelly and from the prosecutor prior to the time of Mr. Kelly's trial;

    b.    The Commonwealth used the illegal drug trade as a motive for the murder, even as PPD Detectives suppressed Colie Baxter's history as a drug dealer;

    c.    Colie Baxter has now been shown to be an off-the-books informant who had given assistance to PPD detectives on numerous prior occasions; this fact was

deliberately concealed Detectives Vivarina, Snell and the other Individual
Defendants from Mr. Kelly and from the prosecutor prior to the time of Mr.
Kelly's trial;

d.  Pre-trial discovery that was provided to Mr. Kelly by the prosecutor included two
statements written statements from Colie Baxter, one dated the night of the
murder, and the other dated ten months later; In Baxter's initial statement, which
was taken by Detective Dougherty, he was stopped in his car at a red light on 25th
and Diamond Streets when he heard several gunshots.  He first observed a black
male running from the direction of the scene and immediately pulled his car over
to the right side of Diamond Street.  He saw the man get into the driver's seat of a
small two-door white car with sun guards in the back window, which was parked
on a small street near Diamond.  He then observed a second black male run out of
an alley onto the street where the getaway car was parked, and he got into the
passenger seat.  Baxter described the driver of the getaway vehicle as having
"brown skin, in his 20's, about 5'8", 180 lbs. . . . carrying something in his right
hand by the way he was holding his arm to his side, . . . wearing a dark hat, like a
Kofu or maybe knit, [and] a long black trench coat."  Baxter described the
passenger as "a black male, in his 20's too . . . shorter, about 5'5", thin, dark
brown complexion . . . [and] wearing a light to medium blue sweat suit with some
red in it."  He stated that the vehicle slowed down while it passed him, allowing
him to make eye contact with both the driver and passenger, but then it sped off
and turned up 25th Street.

e.  On October 13, 1993, Detectives Snell and Vivarina brought Baxter in for another statement.  After confirming that he had nothing to add to the statement he had given on the night of the homicide, he was shown a photo array of eight black males.  Baxter stated that he recognized one person in the photo array as the man who, after the gunshots rang out, ran out of the alleyway and got into the passenger seat of the "tan Corolla."  He distinguished him from the man who ran up the street and got into the driver's seat of the car and then sped off.  Detective Snell noted on the interview record that the man in the photo who Baxter identified was Larry Mullins.

f.  At trial, seemingly to the surprise of everyone, Baxter identified Jim Kelly for the first time as someone involved in the shooting. This testimony, along with the testimony of highly compromised witness Ernestine Williams (see below) was the only evidence which connected Kelly to the crime. This turn of events was very irregular because Baxter had supposedly given two formal statements to police and none of them contained an identification of Jim Kelly.

g.  Yet another irregularity occurred in connection with the deliberately and intentionally concealed identification Colie Baxter made of another individual who was not Jim Kelly. According to documents only recently shared by the Philadelphia District Attorney's office, Colie Baxter identified Tommy Lockwood as the culprit. This identification was deliberately concealed by PPD from prosecutors and from Mr. Kelly. Although this identification appears on an undated Activity Sheet (Attached as Exhibit "A"), it is clear from the other

information on the activity sheet that it was created before the October 13, 1993, identification of Mullins by Colie Baxter.

h.  The failure to date the above-referenced activity sheet was one of several known procedural failures related just to the use of Colie Baxter in this case. As stated above, there was the "surprise" identification at trial, as well as the failure to memorialize Baxter's identification in a formal written statement signed by the witness.

i.  Colie Baxter was indicted on federal drug crimes in 1999. Those charges were dismissed as a result of the cooperation that Baxter had been giving the PPD, including in the Kelly case.

**INVESTIGATION**:

24.     On the night of Hughston's murder, Officers Tyrone Redding and Mark Alston arrived and immediately began to secure the scene and interview witnesses.  Based on these interviews, a flash description was sent for law enforcement to be on the lookout for two black males between eighteen and twenty years old, one of whom was approximately six feet tall, wearing a 3/4 length black trench coat and red pants, and driving a white compact car with sun visors in the rear window.

25.     George Patterson, owner and resident of 2000 N. Bambrey Street, told police that he had been watching football with his niece Tamika Ledbetter and her boyfriend Travis Hughston.  Shortly after he observed Ledbetter and Hughston saying goodbye and saw Hughston leave the home, Patterson heard several gunshots.  Consistent with other witness descriptions, Patterson reported that when he looked outside, he saw a man in a long black trench coat running

toward Diamond Street.  He then instructed his niece to call the police.  He never made an identification of the man wearing the black coat.

26.     Tamika Ledbetter, who was interviewed by Detective Mee, said that Hughston had been at her home with her that night and that he had just left when she heard three gunshots. She opened the door and saw a black male in front of her door running toward Glenwood, who was wearing a black skull cap and black ¾ length trench coat, putting a gun in his waistband. She watched him enter a white vehicle, drive toward Diamond Street, and turn onto Glenwood Avenue.  Then she saw Hughston laying on the ground approximately two houses away. Ledbetter stated that she eventually heard a car start up, and the same man in the black coat drove past on Diamond and he was taking his hat off.  Ledbetter said there was another man in the car.  Despite having observed the perpetrator more closely and for a longer duration than any other eyewitness, she was never presented with a photo array to make an identification.  As a result, she never identified the individual wearing the skull cap and black coat, who was holding the gun.

27.     Ledbetter also provided background information to police that Hughston was involved in the illegal sale of drugs in the area.  She reported that in the months before Hughston's homicide, several people had been shot in the neighborhood.  She stated that she did not believe rumors circulating that Hughston may have had something to do with these prior shootings.

**ERNESTINE WILLIAMS**:

28.     As part of the initial investigation, police also interviewed Ernestine Williams. This would be the first of multiple interviews with police that would result  widely diverging

statements taken over the course of the next two-and-a-half years.  There were even more irregularities and procedural failures in connection with Ernestine Williams than with Collie Baxter. What is assumed to be the first interview with Ms. Williams has the date blacked out. Suppressing the date of the statement is a clear breach of required procedures, made much worse by the fact that Williams was interviewed over and over. Suppression of the date also corroborates the fabricated nature of Ms. Williams' statements.

29.    According to the undated interview record completed by Detective Reinhold,[1] Williams, who lived two doors down from where Hughston was shot, told police that she was in her second-story bedroom with her boyfriend Kevin Mathis when they both heard gunshots.  She stated that about thirty minutes before the shooting, her car broke down as she was pulling out of a parking space in front of her house at 2023 N. Bambrey Street.  She then saw Mathis walk up the street toward her and he got into the car.  After he sat in there for an unspecified amount of time, Mathis got out of her car and went into her house.  About three minutes later, a gray station wagon pulled up and parked near Williams' car, but it could not get by her because her car was blocking the street.  Williams saw a young black male get out of the grey station wagon and start walking down the street.  Williams then asked him to give her a jump.  He responded by repeating what she had said, and then he continued walking and went into Tamika Ledbetter's house.  Williams then went into her own house and up to her bedroom on the second floor.  She heard the gunshots about a half hour later.  She asked Mathis to look out the window to see what happened.  He told her that someone was lying on the ground.  Then Williams looked out the window and saw a man lying on the ground and a woman standing next to him crying and screaming.  The man on the ground was the man whom she had asked for a jump for her car.

---

[1] In the PCRA filings, both the Commonwealth and Mr. Kelly's defense counsel assumed that this interview took place on January 1, 1993.

Unlike in her future statements, Williams denied seeing the shooting, denied seeing anyone with a gun, and denied seeing anyone running away from the scene.

30.     Williams provided a second statement to Detectives Collins and Reinhold on March 21, 1993, wherein she is alleged to have told them that she had, in fact, witnessed the shooting and had even spoken with Hughston's two assailants before his death.  However, she stated that she could not identify the shooter or accomplice because she had never seen them before. Later Williams stated that her second statement was signed after she had been held against her will for several hours. At the time, Ms. Williams was suffering from drug dependency. PPD detectives, including Detectives Collins and Rreinhold were aware of this and used it to their advantage to eventually have Williams give the story individual Defendants manufactured for her.

31.     In this second statement, Williams allegedly told the detectives that around 7:30 pm on the night of the homicide she got into her car, which was parked in front of her house at 2023 N. Bambrey Street.  As she was pulling out of the parking space, the car stalled out.  While she remained in her car, she saw a man get out of a grey station wagon that he had parked in the space she had just left and watched him go into Tamika's house.  This man turned out to be the victim, Hughston.  She then saw two men come down the street from Glenwood Avenue and Diamond Street, walk past her car, and go to "Ms. Dolphine's speakeasy" on 2552 W. Page Street.  Williams described one of the men as being 5'7" tall, approximately 31years old with a dark complexion, short/close haircut, stocky build, and wearing a 3/4 length black leather coat, black shoes, black turtleneck, and gold chain.  She described the other man as a thin, 5'11" to 6'1" tall 33-year-old black male, with big lips, a box haircut and brown skinned, wearing a full-length beige cashmere coat and dress shoes.  According to this second statement, Williams asked

the man in the beige coat, who was standing outside the speakeasy, for a jump for her car, but he declined. Then the man in the black coat came out of the speakeasy, and the two men walked away. According to the statement, Williams went into her house, and about twenty minutes later, from inside her house in her second-story bedroom, she saw the two men sitting on the corner of Bambrey and Page Streets drinking beer and talking with a 15-year-old male named Devon Gilliard, whom she knew from the neighborhood. Williams then saw Hughston come out of Tamika's house, walk to his car, take something out of the car, and walk back into Tamika's house. About ten minutes later, Hughston came out of Tamika's house again. According to this March 21, 1993, statement of Ms. Williams, she then saw the man in the black coat begin walking away from the man in the beige coat and toward where Hughston was standing. The statement then says that Hughston reached into his coat and handed the man in the black coat a brown bag. The man took the bag, put a gun to Hughston's ear and shot him. Hughston fell into the shooter, who then laid him on the ground, pulled Hughston's coat over his face and kept shooting at him in his face. Williams then observed the shooter run through an abandoned house across the street from Tamika's house and saw Devon and the man in the beige coat run on Page Street to Glenwood Avenue. Williams claimed that she then fell on the floor and asked her boyfriend, Kevin Mathis, to look outside to see if there was a body in the street. He told her there was. She denied seeing any of the three males get in or out of a car that evening. She noted that two days after the shooting, while she was walking on Page Street, she saw the man who had been wearing the beige coat come out of the speakeasy, also walking on Page Street. She claimed that he asked her how she was doing, that she responded to him with the same question, and then she kept walking. She stated that she had not seen the shooter since the incident.

32.     Five months later, on September 14, 1993, the police brought Williams in to provide her third statement.  In this interview, Williams allegedly stated that she could now name Hughston's shooter, as she had been buying drugs from him at the "Chinese store" at 24th and Norris Streets since about one month after the shooting, and she had seen him there almost every day since.  She had learned that his name was "Larry" because "everyone says the guy that shot Travis - his name is Larry."  She also told detectives that the man in the beige coat - the man with the "big lips" - is "at the house on 24th all the time" and lives in the Johnson Home Projects.

33.     The next day, on September 15, 1993, Williams provided another statement. During this police interview, she was shown two photo arrays: one containing a picture of Larry Mullins and the other containing a fifteen-year-old picture of James Kelly – taken in 1978 when he was 22 years old.  For the first time, Williams identified Larry Mullins as Hughston's shooter and James Kelly as "the guy with Larry that killed Travis Hughston."  She added that she had seen Mr. Kelly a month earlier at his brother's wedding at 21st and Diamond.

34.     The details of Ms. Williams' 9/14/93 and 9/15/93 statements are important to determing the date of the concealed identification of Tommy Lockwood by Colie Baxter as the killer. The undated Activity Sheet contains summaries of other witnesses' statements. The summary of information provided by Ernestine Williams does not include the fact that she had, as of 9/15/93 identified both Mullins and Kelly as being responsible for the shooting. The absence of this key detail shows that the undated Activity Sheet was created before 9/15/93.

35.     Another key piece of exculpatory evidence that was deliberately withheld by the PPD was information that, just before those statements attributed to Ernestine Williams from September 1993 (where she is alleged to have identified Larry and Mr. Kelly), Williams sold her

house to Tommy Lockwood for $100. This information was known to PPD detectives and was deliberately concealed from prosecutors and from Mr. Kelly.

36.    One month later, on October 13, 1993, Detectives Snell and Vivarina brought Colie Baxter back in.  As described above, he was shown a photo array from which he identified Larry Mullins as the man who got into the passenger seat of a tan Corolla. The October 13, 1993, statement of Colie Baxter makes no reference to the fact that Baxter had previously identified Tommy Lockwood as the murderer. This omission was procured by Detectives Vivarina and Snell who did not want Baxter to identify Tommy Lockwood because the police knew of the relationship between Lockwood and Ernestine Williams. PPD Detectives knew that Williams would not implicate Lockwood. She was living in his house at the time. Thus, PPD detectives needed Baxter to identify someone else. If PPD detectives had not suppressed the evidence of Lockwood's guilt, Mr. Kelly would never have been arrested and convicted.

37.    On July 2, 1995, nearly 22 months after her September 1993 identification, police brought Williams in again for yet another  interview. Once again, PPD detectives showed deliberate indifference by failing to make a recorded statement that was signed by the witness. Instead, the only documentation of this interview is found in the July 5, 1995 Affidavit of Probable Cause for Mr. Kelly's arrest warrant, wherein her July 2, 1995 "re-interview" by Detectives Gross and Lubiejewski is allegedly summarized.  As stated above, no interview record using standard form 75-483 or activity sheet reflecting this interview was ever produced in pretrial discovery, and to this day the DAO has never found any such record in the PPD Archive File.  According to Detective Gross's summary in the affidavit of probable cause, Detectives Gross and Lubiejewski first gave Williams the opportunity to review her March and September 1993 interview statements.  Williams then purportedly related essentially the same

description of what she observed on the night of the homicide as she had stated in her March and September 1993 interviews, with one significant exception: *she told the police for the first time that she had seen Mr. Kelly pass Mullins a gun before the shooting*. This passage of the gun supposedly took place while the two men were sitting on the corner of Page and Bambrey Streets drinking beer,[2] just before the shooter walked toward Hughston and shot him. Also notable at this interview was that the police again showed Williams two photo arrays: one containing a picture of Larry Mullins and the other containing a picture of James Kelly.[3] From the first photo array, Williams identified Mullins as the shooter, and from the second array, she selected James Kelly as the man who passed Larry the gun before Larry walked down the street and shot Hughston.

38.    On July 6, 1995, Kelly was arrested and charged with murdering Travis "Bud" Hughston, along with related charges. In addition to the summary of Williams' July 2, 1995, interview, the affidavit of probable cause contained a summary of Tamika Ledbetter's statement from the night of the shooting, and a summary of Colie Baxter's statements given in January and October 1993. Neither Ledbetter's nor Baxter's statements provided any basis for probable cause to arrest Mr. Kelly: The summary of Ledbetter's statement states that she saw a black male in a long black coat putting a gun in his waistband running from the scene and getting into the driver's seat of a white car. The summary of Baxter's statement from the night of the shooting states that after Baxter heard gunshots, he observed two males running from the scene and getting into a white car, with one male running from a small street, and the other running

---

[2] Unlike in her March 21, 1993 statement, in this interview Williams did not mention that Devon Gilliard was with them drinking beer.

[3] This is notable because, as the Commonwealth stated in its Response to Mr. Kelly's PCRA petition, law enforcement officials should avoid showing witnesses suspects or fillers more than once, as studies have shown that once witnesses identify an innocent person from a mugshot, a "significant number" then reaffirm their false identification in a later line up, even if the actual target is present.

from out of an alley.  The summary of Baxter's statement from October 1993 states that after he re-read his earlier statement and confirmed it was correct, he was shown *two* photo arrays, each consisting of eight black males.  Baxter made no identification from the first photo array but identified one person in the second photo array as the man who got into the passenger seat of the car.  The man in the photo was Larry Mullins.  Thus, because Ledbetter and Baxter's statements did not link Mr. Kelly to any aspect of the Hughston shooting, probable cause to arrest Mr. Kelly was based solely on Detectives Gross and Lubiejewski's re-interview of Ernestine Williams – her fifth statement given to police in this case.

39.    A few weeks after Mr. Kelly was arrested, Ernestine Williams was interviewed by Jerry Benoff, a private investigator for the defense.  To Benoff, Williams claimed that in the aftermath of Hughston's homicide, she was being harassed by the police, asserting that police brought her to the homicide division for questioning "about six times" before she made her March 21, 1993, statement.  She also stated that during her initial interviews, police detectives did not believe her and speculated that she was "taking money from these other guys, drug dealers, to put the blame on somebody else." She reported that during one of the interviews, police showed her a single 8 x 10 picture of James Kelly and told her his name, even though other detectives, whose names she could not recall, told her they believed "Tommy," a man who lived on Page Street, was involved in the homicide. Theroughout her statement to the investigator, Ms. Williams maintains that Mr. Kelly was innocent and not involved in the murder of Hughston. A true and correct copy of the statement to the defense investigator is attached as Exhibit "B".

40.    The statement to the investigator also establishes that Ernestine Williams was being called back in to speak with the PPD even more often than the dates for which there are

recorded statements.  The detectives were closely managing her and were unwilling to accept her version of what took place on January 1, 1993, unless it fell in line with the PPD's preferred narrative.

41.    On October 31, 1995, which was the morning of Mr. Kelly's preliminary hearing, Williams gave yet another statement to the police.[4]  She repeated what she had stated in her July 2, 1995 interview, including the new fact that she had never mentioned in her first four statements to the police- that she had seen Mr. Kelly pass Mullins a gun before the shooting.

42.    Minutes after providing that statement, Williams testified for the Commonwealth at Mr. Kelly's and Mullins' preliminary hearing.  When asked to identify Kelly, Williams stated: "He don't look like the picture I saw."  It was not until the court declared Williams a hostile witness that she acquiesced and identified Kelly as the man she saw the evening of Hughston's murder who passed Mullins the gun.

**THE TRIAL**

43.    Five months later, Mr. Kelly's jury trial took place, from August 14-20, 1996. Although the Commonwealth argued at trial that Hughston was killed because of a drug territory dispute, it never connected Mr. Kelly to any history of drug dealing or to any drug territory disputes occurring anywhere, including in the neighborhood where Hughston was killed. Instead, the prosecution's case was based solely on the identification testimony of Ernestine Williams and Colie Baxter, two witnesses who had significant, undisclosed credibility issues, including their manipulation and coercion by the detectives investigating the Hughston homicide.

---

[4] This was Ernestine Williams *sixth* statement given to the police.  If it is difficult to keep track of all of her statements, that is understandable, as it is highly unusual for the PPD to obtain so many statements from one witness.

No other witnesses who saw the shooter that evening – like Patterson and Ledbetter - identified Mullins or Kelly.

44.     Consistent with his initial statement to police on the night of the shooting, Baxter testified that he was stopped at a light at 25th and Diamond Streets when he heard gunfire.  After he pulled over to the side of the road, he observed two men run from the area of the gun shots. Baxter described the first man as wearing a long black trench coat and holding something down by his side, who got into the driver's seat of the getaway car, and the second man as wearing a sweatsuit and who got in the passenger side.  However, in a move that surprised all parties, during his direct examination, Baxter identified Mr. Kelly, for the first time, as the driver of the vehicle he observed that evening.  This contradicted the Commonwealth's proffer to the Court during an *in camera* hearing before opening statements that mentioned Baxter only as a witness against Kelly's co-defendant, Larry Mullins, as well as the Commonwealth's opening statement, where the prosecutor indicated to the jury only that Baxter would link Mullins to the crime.

45.     Ernestine Williams' testimony at trial was even further embellished than her testimony at Mr. Kelly's preliminary hearing.  She made an in-court identification of Mr. Kelly and Mr. Mullins, claiming to have seen both men approach Hughston and shoot him.  Notably, Williams admitted to having drunk alcohol and smoked crack cocaine throughout the day on January 1, 1993.

46.     At trial, defense counsel called only one witness on Kelly's behalf—the victim's brother, Kenyatta Hughston.  He testified that in the days after his brother's shooting, Ernestine Williams told him, on two different occasions, that she had witnessed the shooting and that "Tommy, Kendall, and Boonchie"[5] were responsible for his brother's death.

---

[5] "Tommy" referred to Thomas Lockwood; and "Kendall" and "Boonchie" referred to other members of an area drug organization.

47.     Following a six-day trial, and after deliberating for nearly two full days, a jury found Mr. Kelly and Mr. Mullins guilty of first-degree murder and criminal conspiracy, though Mr. Kelly was found not guilty of possessing an instrument of crime. The court sentenced both men to life in prison without the possibility of parole.

**POST CONVICTION INVESTIGATION**

48.     Recent investigation conducted by both Mr. Kelly's attorneys and the DAO has revealed exculpatory evidence that was improperly withheld from Mr. Kelly, helps establish his factual innocence, and provides significant corroboration of the fact that Hughston's killing was perpetrated by Tommy Lockwood, and not Jim Kelly.

49.     The exculpatory evidence came to light when, 27 years after Mr. Kelly's arrest, the DAO produced the homicide investigation files (the "H files") for the Hughston murder and for two other murders committed in the same area within months of the Hughston homicide, as well as PPD files related to the criminal prosecutions of members of a violent drug gang that was attempting to control all drug sales in the area of the Hughston murder during same time period.

50.     Despite the investigation going on for more than two years before Mr. Kelly was wrongfully arrested, the City's homicide file consisted of fewer than 60 pages.[6] Investigators looked into other murder investigations from the same time and neighborhood and found additional suppressed material which further corroboration of Mr. Kelly's innocence. These files show a pattern of similar murders involving the same cast of characters, and contain witness statements implicating Thomas Lockwood and other members of a local drug organization in

---

[6] In connection with providing legal services to individuals who are seeking to vacate their convictions, undersigned counsel has reviewed dozens of these homicide files in other cases. They routinely consist of more than 1000 pages. Notably, the Commonwealth conceded in its Answer to Mr. Kelly's PCRA petition that because "the PPD homicide file is largely missing in this case, save the 57 pages stored in archive, the entirety of PPD's investigation into Hughston's murder is unclear." The fact that the City was unable to properly maintain its records of an investigation that went on for years is further corroboration of the claims that form the basis of this Complaint.

Hughston's murder.  This withheld evidence specifically corroborated the trial testimony of the only defense witness -- the victim's brother, Kenyatta Hughston -- that just a few days after his brother's death, Ernestine Williams told him that "Tommy, Kendall, and Boonchie" were responsible.  The evidence from the other homicides, as described below, was withheld by PPD detectives from both Mr. Kelly and the prosecutor. As a result, Mr. Kelly was denied a fair trial in violation of his constitutional rights.

51.    Examples of improperly withheld witness statements implicating Lockwood and other members of the local drug operation as the perpetrators of Hughston's murder include the following:

a.  Key witness for the prosecution, Colie Baxter, who in his October 1993 statement identified Larry Mullins as the passenger of the getaway car fleeing the Hughston homicide scene, but prior to trial never identified the driver of the getaway car much less ever identified Mr. Kelly as involved in this case at all, made a surprise in-court identification of Kelly as the driver of the getaway vehicle.  But a newly produced Activity Sheet from the Hughston homicide investigation shows that **sometime prior to trial, Baxter was shown a photo array, from which he identified Thomas Lockwood as the getaway driver.**  The photo array and identification were suppressed by Detective Jastrzembski and the other individual defendants.

b.  The PPD Archive File shows that as part of their investigation into Hughston's murder, in July 1993 homicide detectives ran court histories for Thomas Lockwood, and two other individuals whose names were redacted.  None of these histories showed that any of these individuals had been incarcerated on the day

that Hughston was killed. These histories were run by PPD Detectives because they knew that there were alternatives suspects. PPD Detectives acted with deliberate indifference by not providing these documents to the prosecutor or to the defense.

c. Statements given to the police by two witnesses, Kevin Brown and Lydell Jackson, were obtained within a few months of Hughston's January 1, 1993, murder, implicating a local drug organization and Lockwood in Hughston's homicide, as well as in the subsequent homicide of Aidell Corbett that took place on February 21, 1993. Homicide detectives working on the Hughston case knew that the statements taken in the Corbett case and acted with deliberate indifference in withholding the, from the prosecution and defense in the Hughston case.

52.    Other critical, exculpatory evidence the PPD withheld from prosecutors and Mr. Kelly included, but was not limited to, the following:

a. In February of 1995, Thomas ("Tommy") Lockwood was charged with the September 1993 murder of Stacy Williams (no relation to Ernestine Williams). The Stacy Williams murder shared several factual similarities with the Hughston homicide and occurred just four blocks away and less than nine months later. This was five months before Mr. Kelly was arrested for Hughston's murder. Lockwood was convicted of third-degree murder of Stacy Williams on March 18, 1996, which was five months before Mr. Kelly was convicted of Hughston's murder.

b.  Around the time of the Stacy Williams homicide, the other key prosecution
    witness, Ernestine Williams, sold her house to Thomas Lockwood for $100.  This
    sale occurred one month before Ernestine first identified Larry Mullins as the
    shooter in the Hughston homicide and James Kelly as "guy with Larry" that killed
    Hughston.  She continued to live in that house with Lockwood as the owner until
    shortly before Mr. Kelly's trial, when the Commonwealth relocated her to a more
    affluent area in South Philadelphia in exchange for her testimony against Mr.
    Kelly in 1996.  Although defense counsel cross-examined Williams and police
    investigators on her inconsistencies and the basis for her identification, counsel
    had been deprived of an obvious explanation for why Williams might have come
    to falsely accuse Kelly and not named Lockwood as the perpetrator.  Additionally,
    the PPD provided Williams with other incentives to provide testimony in line with
    their narrative by placing her in drug rehab prior to the preliminary hearing and/or
    trial. The fact that Ernestine Williams sold her house to Tommy Lockwood for a
    mere $100 and then continued to live there with him as her landlord was known to
    PPD detectives who deliberately concealed this fact from prosecutors and the
    defense.

c.  At the time of Hughston's homicide, Lockwood was known by PPD homicide
    detectives to own and drive at least four white or light-colored vehicles matching
    the description of the getaway car given by several witnesses on the night of
    Hughston's murder. Once again, this fact was deliberately concealed from the
    prosecution and the defense.

53.    Had the defense known the information above, the jury would have known that Ernestine Williams had undisclosed connections to Thomas Lockwood—a known member of a violent drug gang.  The jury would have also known that Colie Baxter had identified Lockwood as the driver of the getaway vehicle he observed that night.  The jury should also have learned that members of a violent drug gang were responsible for more than a dozen similar drug related homicides in this neighborhood and that in the days before his death, Travis Hughston was actively engaged in a drug territory dispute with this very gang.

54.    During the investigation, Detective Reinhold had interviewed Kenyatta Hughston about the murder of his brother.  The statement does not reflect any conversation he had with Ernestine Williams about who committed the crime.  On cross examination and in the closing argument, the Commonwealth called into question Kenyatta Hughston's credibility, asking repeatedly why the names "Tommy, Kendall, Boonchie, and Ernestine" were not contained in his interview with law enforcement and questioning whether he had ever spoken with Ernestine Williams.  However, Brown's and Jackson's statements implicating the local drug organization and specifically Thomas Lockwood in Hughston's homicide support Kenyatta Hughston's testimony.  Had this information been turned over, defense counsel could have called into question the thoroughness of the Hughston homicide investigation and the prosecution would not have been able to question the credibility of Kenyatta Hughston's testimony in the same way.  This was material to Mr. Kelly's defense because that homicide occurred just four blocks from the scene of Hughston's homicide and shared several factual similarities.

55.    Detective Jastrzembski was the scene detective in the homicide of Stacey Williams, which occurred less than nine months after the Hughston murder.  As previously noted, the circumstances surrounding both murders were very similar in that they occurred in the

same neighborhood and were believed to be related to drug territory disputes that Lockwood's violent drug gang had with Hughston and Williams.

56.     Mr. Kelly's conviction was secured through the PPD's practice of using "ghost informants," whose identities were not disclosed to defendants, as a way for the Commonwealth to choose who to prosecute despite having no basis to pursue those suspects.  In this case, the PPD engaged in this practice with how they manipulated and coerced Ernestine Williams, and Colie Baxter.

57.     The coercion of Ernestine Williams is supported by her own statements to the defense investigator. The fact that she was coerced is corroborated by the non-credible evolution of the multiple statements attributed to  Ernestine Williams in this case.  New evidence of what Ernestine purportedly saw on the night of Hughston's murder appears on each successive statement, starting with no knowledge about who committed the crime, and then morphing into her claim that Mr. Kelly handed the shooter the gun to be used to kill Hughston.  This was a direct result of the individual defendants using coercion to manufacture evidence, and to conceal exculpatory evidence.

58.     The wrongful arrest and conviction of Jim Kelly was part of a pattern and practice of the City of Philadelphia whereby "cold" cases were eventually resolved using coerced statements and testimony, as well as fabricated and suppressed evidence.

59.     The deliberate withholding of critical, exculpatory evidence deprived Mr. Kelly of a fair trial.  At all relevant times the PPD had the tools and the evidence to (a) determine that Mr. Kelly was not involved in this crime in any way, and (b) that the actual perpetrator was Tommy Lockwood.  Despite this knowledge, the Defendants herein opted to use coerced and manufactured evidence, and to conceal exculpatory evidence. While the PPD was manufacturing

false charges against Mr. Kelly, the actual perpetrator Tommy Lockwood went on to commit more acts of violence, including the killing of Stacy Williams.

60.     In the 1990's, the way that the PPD's Homicide Unit operated was such that all detectives knew what was going on with all of the Unit's open cases, whether or not they were officially assigned to them.  Additionally, given the overlap between the investigation of the Hughston homicide and the investigation of the Stacy Williams homicide in date, location, and investigating detectives shows that at the time of Mr. Kelly's 1996 trial, all detectives in the PPD Homicide Unit knew about the drug organization, the drug territory disputes happening in the immediate area of both homicides, the names and faces of known members of the drug organization, and the color and types of vehicles commonly driven by each member and were therefore involved in the investigations of both murders.

61.     Thus, Detective Jastrzembski helped suppress information in the Hughston case through his work in the Williams case. He was the lead investigating detective in the Williams homicide, he knew how similar the cases were and he knew what the other detectives working on the Hughston case knew.  Yet, even though he knew the cases were almost exactly the same, Jastrzembski suppressed information about the Stacy Williams case.

62.     Even though prior to Mr. Kelly's conviction, all detectives in the Homicide Unit knew that Hughston had been killed by Lockwood, they were deliberately indifferent when they suppressed this evidence and failed to link the two homicides to each other.

63.     From the time of his arrest through the nearly three decades he spent in jail, Mr. Kelly steadfastly maintained his innocence.  It was only after the DAO produced the H files for the Hughston, Corbett and Stacy Williams murders, and the PPD files related to the criminal prosecutions of members of a Lockwood, Harris and other members and leader of a violent drug

gang that was attempting to control all drug sales in the area of the Hughston murder during

same time period, that counsel discovered that the Commonwealth had suppressed critical

exculpatory information that was known to law enforcement and the Commonwealth long before

Mr. Kelly's August 1996 trial, and some of which was known within months of the Hughston

homicide.

64.     On June 14, 2024, Judge Glenn Bronson of the Philadelphia Court of Common

Pleas granted Mr. Kelly's PCRA petition, vacated his sentence and ordered a new trial.

65.     On July 18, 2024, eight days after Mr. Kelly submitted an amended PCRA

petition requesting the dismissal of all charges against him, and seven days after the

Commonwealth agreed to the dismissal, the PCRA court entered a *Nolle Prosequi* in Mr. Kelly's

favor, allowing for Mr. Kelly's release from prison on that same day.

66.     The specific violations which make up the claims against the individual

Defendants herein include the following:

a.  Coercion and fabrication of Colie Baxter's statement by Defendants Snell and

    Vivarina, who took Baxter's 10/13/93 statement and excluded that Baxter had

    ALREADY identified Tommy Lockwood;

b.  Coercion and fabrication of testimony by Colie Baxter by all individual

    Defendants to ensure that he would make a "surprise" identification of Kelly at

    trial;

c.  Coercion and manipulation of Ernestine Williams in connection with harassment

    and other misconduct carried out by Defendants Lubiejewski, Gross, Collins, and

    the other individual Defendants, as described in Ms. Williams's statement to the

    defense investigator, attached as Exhibit "B";

     d.   Fabrication of statements attributed to Ernestine Williams by Defendants Reinhold, Hoffner, Lubiejewski, and Gross;

     e.   Fabrication of information in the Affidavit of Probable Cause by Defendants Gross and Lubiewjewski;

     f.   Deliberate suppression of exculpatory evidence, including evidence of Ms. Williams' connection to alternative suspect Tommy Lockwood, the close connection between the murder of Travis Hughston and Stacy Williams; the statements by witnesses in the Stacy Williams case which confirm that Lockwood was responsible for the Hughston murder; the fact that Colie Baxter was a confidential informant, and the fact that both Tommy Lockwood and Boonchie were alternative suspects – these violations were carried out by all individual Defendants.

67. All of the above conduct and constitutional violations described in this Complaint were committed by individual Defendants and other members of the PPD acting with deliberate indifference and under color of state law.

## Policies and Practices in the City of Philadelphia

     68.   The Philadelphia Police Department's pattern and practice of unconstitutional misconduct in homicide investigations, including the suggestion of false statements from witnesses, and the suppression of exculpatory and inconsistent evidence, dates back to at least the 1970's and continued beyond the timeframe that the individual Defendants investigated and prosecuted Mr. Kelly.

69.     From at least the 1970's, and continuing well beyond the timeframe that the individual Defendants investigated and prosecuted Mr. Kelly, the City of Philadelphia had in force and effect policies, practices, and customs of unconstitutional misconduct in homicide investigations, including but not limited to using coercive techniques in interviews to obtain false and misleading statements from witnesses, fabricating inculpatory statements from witnesses and evidence, coercing and suggesting false identifications of suspects through the use of unconstitutional identification procedures, withholding exculpatory and inconsistent evidence, ignoring eyewitness interviews, and fabricating incriminating statements from witnesses by feeding details about the crime to the witnesses.

70.     At the time of the investigation and prosecution of Mr. Kelly, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to make false statements by witnesses appear true and reliable, including but not limited to: providing a witness with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication; taking misleading investigative steps to make statements appear more credible; selectively documenting witness statements and not the preceding interrogation, interview, preparation, or rehearsal; selectively recording witness interviews; and misrepresenting that a suspect's formal statement was a verbatim statement in the suspect's own words, even when paraphrased or altered.

71.     At the time of the investigation and prosecution of Mr. Kelly, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to coerce false statements, including but not limited to: subjecting witnesses to needlessly prolonged interrogations and interviews; isolation; making promises, regardless of their truthfulness; threatening charges for unrelated misconduct; offering assistance in unrelated

criminal matters, including pending or recently dismissed criminal charges; interviewing witnesses while they are under the influence of mind-altering narcotics that made them more susceptible to coercion and the drugs' mind-altering effects; and asserting that the witness will benefit in some way from making a statement that assists the police, and suffer some sort of disadvantage if they do not assist.

72.     At the time of the investigation and prosecution of Mr. Kelly, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to suppress or withhold exculpatory or inconsistent statements and evidence, in violation of their known duty under *Brady*, including but not limited to: making false statements to prosecutors about the existence of evidence; failing to provide complete homicide files to prosecutors; coercing witnesses into keeping exculpatory and inconsistent information from prosecutors; refusing to testify at trial; discarding or deleting exculpatory and inconsistent information from homicide files; ignoring exculpatory and inconsistent information so that there is no record to be deleted from homicide files; farming out portions of Homicide investigations to police officers outside the Homicide Unit or other detectives assigned to the Homicide Unit so as to maintain a lack of evidence of their participation; and threatening witnesses in possession of exculpatory and inconsistent information to prevent them from coming forward to prosecutors or testifying.

73.     Furthermore, at the time of the investigation and prosecution of Mr. Kelly, the Philadelphia District Attorney's office had a policy, practice, or custom of withholding exculpatory or inconsistent statements and evidence, in violation of their known duty under *Brady*, including but not limited to: making false statements about the existence of evidence; allowing witnesses to provide false testimony; discarding or deleting exculpatory and

inconsistent information from their files; ignoring exculpatory and inconsistent information so that there is no record to be deleted from their files.

74.    At the time of the investigation and prosecution of Mr. Kelly's case, the Philadelphia Police Department had a policy, practice, or custom of detaining, arresting, threatening, and interrogating purported witnesses in criminal investigations without legal cause and with the intent of coercing statements from these persons, under threat of punishment or other sanctions, or for material benefits. These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel.

75.    At the time of the investigation and prosecution of Mr. Kelly's case, the Philadelphia Police Department had a policy, practice, or custom of maintaining a deliberately biased Internal Affairs Division that exonerated police officers and detectives, including Homicide Detectives, regardless of the evidence of misconduct.

76.    At the time of the investigation and prosecution of Mr. Kelly's case, the Philadelphia Police Department had a policy, practice, or custom involving the intentional use of untruthful affidavits of probable cause to support arrest warrants that, in violation of their constitutional duties, failed to recite the totality of circumstances, including exculpatory information, and cited fabricated evidence, statements from coerced witnesses, omitted mention of credible exculpatory witness statements, and mischaracterized the nature of unconstitutional identifications. The City of Philadelphia failed to train and supervise its officers and detectives to deter or end this policy, practice, and custom.

77.    These practices are well-known to the City of Philadelphia and its policymakers with respect to criminal investigations and prosecutions as a result of newspaper investigations, including the Philadelphia Inquirer's Pulitzer Prize winning reporting in 1977-78, governmental

investigations, including the Philadelphia Police Department's 39th District Corruption Scandal in the 1990's, complaints from the public, complaints from attorneys, complaints from whistleblowers, prior litigation, including employment complaints to the EEOC, and internal police investigations.

78.     The Philadelphia Police Department was deliberately indifferent to officers' misconduct, and credible complaints to the Police Department's internal compliance department were disregarded.

79.     Various cases involving the exoneration of individuals accused of murder, individuals yet to be exonerated, and individuals who were in fact guilty demonstrate that this misconduct was pervasive within the City of Philadelphia in both the Police Department and District Attorney's office both before and after it investigated and prosecuted Mr. Kelly, and, upon information and belief, the misconduct described in this Complaint was tacitly, if not expressly, permitted by, committed with, or deliberately ignored when committed in the presence of the Homicide Unit, Philadelphia Police Department, and/or District Attorney supervisors.Convictions that later resulted in exonerations demonstrate the rampant patterns, practices, and customs of official misconduct within the City of Philadelphia Police Department and a prior administration of its District Attorney's Office:

> a. **Matthew Connor**: In 1980, Connor was convicted of the 1978 rape and murder of an 11-year-old girl whose body was found in the stairwell of an apartment building in Philadelphia. The medical examiner determined that the victim's wounds resulted from an ice pick. In 1989, while Connor was serving a life sentence, a non-profit organization persuaded the Philadelphia District Attorney's Office to revisit the case. The prosecution then discovered that police failed to turn over exculpatory evidence, including a recording of a call with a prosecution witness that contradicted her trial testimony, and evidence that police considered the victim's half-brother, who had a history of assaulting young girls and was observed carrying an ice pick around the apartment complex, as an alternative suspect. In February 1990, Connor was granted a new trial, and the next month the charges were dismissed.

b. **Gerald Howell:** In late 1982 into the early months of 1983, Philadelphia Police Detectives coerced witnesses into inculpating Howell in a murder that was committed by Kenneth Parnell. PPD Detectives told Arlene Williams, a teenager at the time, that they would arrest Parnell, the father of her child, for the murder if she did not sign a statement inculpating Howell. PPD Detectives also threatened two other teenage witnesses with arrest if they did not come to court to testify against Howell, even though the police had reason to believe that Parnell was the real shooter. Additionally, PPD Detectives suppressed information given to them by the brother of the decedent that Parnell was the shooter. Years later, Parnell confessed to the murder for which Howell had been convicted. In 2022, the DAO conceded that the PPD had suppressed exculpatory evidence. In 2023, a federal judge granted Howell's habeas corpus petition and vacated his conviction. Howell was released in 2023 after being imprisoned for four decades for a crime he did not commit.

c. **Bruce Murray and Gregory Holden:** In 1983, Murray and Holden were convicted of a 1980 murder based on PPD Homicide Division detectives knowingly presenting fabricated trial testimony, coercing false witness statements, and suppressing exculpatory evidence. Murray and Holden were exonerated in April 2023 and January 2024 respectively based on the DAO's acknowledgement that numerous pieces of favorable evidence were suppressed during the original trial.

d. **Alen Lee:** In September 1983, Alen Lee was arrested in connection with the murder of 25-year-old restaurant manager Jade Wong. The murder was committed by three Asian men who announced that they were gang members from New York City and who tried to extort Wong for money. Philadelphia detectives secured a conviction of Lee by fabricating an informant statement to implicate Lee, despite having credible information pointing to alternative suspects. Ultimately, Lee's conviction was vacated in April 2004 after Lee presented evidence that at the time of his trial, Philadelphia police failed to disclose evidence of the true perpetrators.

e. **Willie Stokes:** In 1984, PPD detectives arrested a man named Franklin Lee on rape and related charges. After his arrest, homicide detectives interviewed him about a 1980 murder and falsely told him that another witness had identified Willie Stokes as the person who committed that murder. Detectives insisted that Lee knew that Stokes was the murderer and that he needed to cooperate with their investigation, or, otherwise they would "hang" him. Lee succumbed to the pressure and agreed to sign a false statement implicating Stokes in the murder. For years, Lee continued to have contact with the investigating detectives, who, in order to maintain control over their informant, arranged for him to have access to drugs and sexual encounters while incarcerated. Stokes remained wrongfully imprisoned for 39 years until December 2021 when a federal district court vacated his conviction based on the investigating detectives' pervasive misconduct.

f. **Curtis Crosland:** In 1987, PPD officers interviewed an informant with a long history of violent crimes who was seeking assistance from law enforcement to reduce his

sentence for a parole violation. The informant told officers that Curtis Crosland had at some undetermined time in 1986, confessed that he committed a 1984 robbery and murder at a neighborhood grocery store in South Philadelphia. Investigating detectives, including defendant Mangoni, knew that the informant's statement was false; the informant had provided inconsistent information to police, had failed a polygraph, and had told other family members that another person—that is, not Curtis Crosland—had admitted to the crime. Despite this knowledge, detectives persisted in bringing charges against Crosland and then suppressed all information in their possession showing the falsity of the informant's testimony. Further, detectives suppressed and concealed information pointing to an alternative suspect—information that was highly credible as the suspect matched the size and description of the perpetrator given by eyewitnesses to the shooting. Crosland was convicted as a result of these unlawful police tactics and remained incarcerated for 34 years until an investigation by the CIU located the referenced exculpatory information in police files. In 2021, a federal district court accepted the CIU's concession that Crosland was entitled to relief and was likely innocent, and, therefore, vacated the conviction.

g. **Andrew Swainson:** PPD Homicide Division detectives based their 1988 arrest of Swainson on the testimony of a single witness who had been taken into custody while running from the scene of the murder in blood-soaked clothes. The witness provided a facially unbelievable narrative of the shooting after PPD detectives coerced him into identifying Swainson as the perpetrator.  After this witness recanted his statements several times, PPD detectives pressured a different vulnerable young witness to support his false claims at trial. Based on this misconduct and the suppression of exculpatory evidence, in June 2020, Swainson's conviction was vacated and all charges were dismissed.

h. **Pedro Alicea**: In 1989, after failing for four years to resolve a 1985 double homicide of brothers Hector and Luis Camacho, PPD detectives fabricated a case against Pedro Alicea out of whole cloth. To build a false case against Alicea, detectives disregarded significant evidence demonstrating that two local drug dealers were responsible, and leaned on vulnerable individuals to obtain false identifications of Alicea as the shooter. The officers pressured Angel Fuentes, a longtime informant who had a close personal relationship with the lead detective, and who was facing significant prison time on a number of open charges, to endorse a fabricated statement identifying Alicea as the shooter. They then coerced Ray Velez, who had himself been implicated in the murders, to likewise falsely identify Alicea as the shooter, by detaining him and threatening to charge him with the murders if he did not submit. Detectives suppressed substantial exculpatory evidence, including a reliable eyewitness statement, pointing to the true perpetrators. Alicea was convicted as a result of the detectives' misconduct and wrongfully imprisoned for more than 31 years before the exonerating evidence was discovered by the CIU, resulting in the vacatur of his conviction and release in 2020.

i. **Donald Ray Adams:** PPD Homicide Division detectives coerced a witness to implicate Adams in a 1990 murder by threatening the witness and also offering to provide her financial support for her testimony. In securing the statement, detectives ignored the fact

that Adams's physical description was vastly different from the description provided by witnesses at the scene. Adams's conviction was later vacated, and he was acquitted at a retrial. His subsequent civil suit resulted in a financial settlement.

j. **Ronald Johnson**: Following a 1990 homicide, PPD Homicide Division took nine different statements from two witnesses who had initially exculpated Johnson and coerced them until they agreed to inculpate him. Johnson spent 34 years in prison before the DAO located suppressed evidence of the coercion in police files. Based on this buried evidence of police misconduct, Johnson's conviction was vacated in March 2024.

k. **James Dennis**: PPD Homicide Division detectives investigating a murder in 1991 coerced witnesses to identify Dennis while at the same time they intentionally concealed information which provided Dennis with an incontrovertible alibi. The detectives' conduct led to the Third Circuit's issuance of an *en banc* decision concluding that the concealment of evidence violated Dennis's due process rights. *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 307 (3d Cir. 2016). In 2024 an Eastern District of Pennsylvania jury found two investigating detectives liable for Dennis's wrongful conviction and awarded Dennis $16 million.

l. **Anthony Wright**: Wright was convicted of the 1991 rape and murder of an elderly woman based on Homicide Division detectives' fabrication of a confession and planting of evidence. DNA testing later confirmed Wright's innocence, and he was acquitted at a retrial. His subsequent civil rights action litigated in this Court resulted in a settlement of nearly $10 million.

m. **Troy Coulston**: In 1991, Coulston was convicted of a 1989 murder based on PPD Homicide Division Detectives knowingly presenting fabricated trial testimony, coercing false witness statements from a particularly vulnerable, teenage witness, and suppressing exculpatory evidence undermining the credibility of a key witness, that actual perpetrator of the murder. Mr. Coulston's conviction was vacated in 2021 based on the discovery of previously suppressed exculpatory evidence.

n. **Walter Ogrod:** In 1992, PPD detectives coerced and fabricated a false confession from Ogrod, a trucker with a low-average IQ, to the 1988 murder of a four-year-old girl. Ogrod had driven all night and had not been to bed in 36 hours when the lead detective interrogated him. Detectives interrogated Ogrod for hours, then wrote out a fabricated statement in Q-and-A form they falsely claimed was a verbatim record of a voluntary statement from Ogrod, and coerced Ogrod into signing it. At his first trial, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Ogrod has since been exonerated, the charges *nolle prossed*, and he was released from prison after serving more than 25 years for a crime he did not commit.

o. **Chester Hollman:** PPD detectives framed Chester Hollman for a 1991murder he did not commit. Detectives coerced a witness, Deirdre Jones, who had no knowledge of the crime, to provide a false statement implicating the innocent Hollman; they typed out a

statement implicating Hollman, falsely attributed it to Jones, and coerced her into signing it. Detectives also fabricated and coerced a statement from another witness, and buried evidence demonstrating Hollman's innocence. In 2019, Hollman was exonerated based on DNA testing excluding him and pointing to another perpetrator. He had spent 28 years wrongly imprisoned.

p. **Willie Veasy:** Veasy was convicted of a murder based on a 1992 confession secured by PPD Homicide Division Detectives' use of physical force. The confession was plainly untrue in light of a fully corroborated alibi that Veasy was working in a popular and busy restaurant at the time of the murder. Veasy's conviction was vacated in 2019 upon the motion of the Philadelphia District Attorney's Office, and his subsequent civil rights suit resulted in a multi-million-dollar settlement.

q. **Percy St. George**: A PPD Homicide detective coerced two people in 1993 to give false statements implicating St. George in a murder. When the detective was asked to testify about the allegations of coercion and fabrication, he asserted his Fifth Amendment privilege against self-incrimination and declined to answer questions. Despite that assertion, the detective was permitted to remain active in PPD Homicide Division investigations for several years.

r. **Johnny Berry**: PPD homicide detectives arrested 16-year-old Johnny Berry for a 1994 robbery murder based on the testimony of an eyewitness who was in the company of the murder victim and the testimony of an alleged accomplice, Tauheed Lloyd. At trial, the eyewitness claimed that detectives had pressured her into identifying Berry and Berry was convicted based solely on Lloyd's testimony. Several years later, Lloyd acknowledged that he had lied about Berry. In 2019, the DAO agreed to vacate Berry's conviction, after which Berry learned that detectives had suppressed information regarding multiple witnesses who had heard Lloyd admit that he, not Berry, was the shooter. Berry's civil suit settled for $5.65 million.

s. **Terrence Lewis**: PPD detectives fabricated evidence and committed other serious investigative misconduct to convict Lewis of a 1996 murder he did not commit. This included coercing and fabricating witness statements and identifications, and deliberately hiding key exculpatory evidence that would have demonstrated Lewis's innocence. In 2019, Lewis was exonerated after he spent 21 years wrongly imprisoned.

t. **John Miller**: In June 1997, Miller was arrested for the 1996 murder of Anthony Mullen based on a statement PPD detectives obtained from alleged witness David Williams. Williams recanted during a 1997 preliminary hearing and at trial in 1998. Investigating detectives knew Williams's statement was untrue as he had given them provably false information on other subjects, but they failed to disclose their knowledge of this information undermining Williams's credibility. They continued to withhold that information for years, even after Williams confessed that he was the person who had committed the murder. In 2019, a federal district court vacated Miller's conviction based on its finding that investigating detectives had suppressed critical information

undermining the inculpatory evidence presented at trial, and the DAO subsequently dismissed all charges, stating that Miller had "met his burden of proving his innocence."

u. **Eugene Gilyard and Lance Felder**: In 1998, Gilyard and Felder were arrested and subsequently convicted of the 1995 murder of Thomas Keal. During a cold-case investigation more than two years after the crime, PPD detectives fabricated and coerced witness identifications and statements and buried exculpatory evidence in order to secure charges against Gilyard and Felder. For example, after witness Keith Williams initially told detectives Felder was not a person he had seen at the time of the crime, detectives coerced Williams to identify Felder's photograph by visiting Williams's home multiple times, cursing and shouting at him, pushing on his head while pointing to Felder's photo. Similarly, after witness Patrick Harris to detectives he did not recognize anyone in the photo arrays he had been shown, detectives fabricated a report stating that Harris had identified Gilyard, when he had not. The true perpetrator confessed in 2011, confirming Gilyard and Felder's innocence, and in 2013 their convictions were vacated. In 2018, Gilyard and Felder reached a settlement with the City for compensation for their wrongful convictions.

v. **William Johnson:** In September 2005, PPD Homicide Division detectives arrested Johnson for the shooting of an off-duty Philadelphia police officer after he had solicited a sex worker. Detectives pressured two sex workers who had been in the area to identify Johnson and another man as the shooter. In 2023, after the CIU produced materials proving that at least one of the witnesses had been coerced to testify against Johnson, habeas relief was granted, and Johnson was released after 18 years' imprisonment.

w. **Recco Ford**: In 2007, detectives acting on an unsubstantiated anonymous tip detained two juvenile witnesses without their parents' knowledge and pressured them to identify 16-year-old Recco Ford as the perpetrator of a murder that occurred at a playground in southwest Philadelphia. Ford spent three years in pre-trial detention before his trial where, based on the testimony of two teenaged girls who had seen the shooting and called 911 to report it and who confirmed that Ford was not the perpetrator, he was acquitted. Ford later sued the detectives who caused his prosecution, and the City of Philadelphia settled his lawsuit for several hundred thousand dollars.

x. **Steven Lazar**: Lazar was convicted of a 2007 murder as a result of PPD Homicide Division Detectives, including defendant Verrecchio, fabricating witness statements from vulnerable individuals and securing a false confession by knowingly subjecting Lazar to more than 30 hours of interrogation while he was undergoing severe opioid withdrawal. Lazar's conviction was vacated in March 2023 based on the discovery of suppressed evidence after he had spent approximately 16 years in prison.

80.    As a result of the pattern and practice of police misconduct that was in effect at the time of the investigation of the homicide for which Mr. Kelly was charged, the United States District Court for the Eastern District of Pennsylvania entered a consent decree in the matter of *NAACP v. City of Philadelphia* requiring wide-ranging reforms in the Philadelphia Police

Department and, in particular, providing for specific limitations on the investigative practices

and policies of the within the City of Philadelphia Police Department.

81.    During the 1980's and 1990's, and concurrent with the time of the investigation of

this case by the Philadelphia Police Department, there was within the Department a pattern,

practice and custom of violating the constitutional rights of criminal suspects and others,

including systemic violations of the Fourth and Fourteenth Amendments.  On three separate

occasions in the 1980's, the United States District Court of Eastern District of Pennsylvania

issued orders enjoining the Philadelphia Police Department from engaging in these practices:

    a. *Cliett v. City of Philadelphia* (1985): consent decree arising out of "Operation
       Cold Turkey," which resulted in the unlawful arrest and detention of 1500
       individuals in drug sweeps;

    b. *Spring Garden Neighbors v. City of Philadelphia* (1985): enjoining police sweeps
       of Latinos in the Spring Garden neighborhood as a part of a Homicide Unit
       investigation; and

    c. *Arrington v. City of Philadelphia* (1988): enjoining unconstitutional stops,
       detentions and searches of Black men during the "Center City Stalker"
       investigation.

82.    More recently, the practice used in the present case, specifically involving off-the-

books informants was the subject of a lawsuit in *Frazier, et al. v. City of Philadelphia*, Eastern

District Docket No. 17-cv-5421. In that case, narcotics cops were suing over a policy that they

felt was illegal. This policy included the use of off-the-books informants as were used in the

present case. This practice is both illegal and prohibited by Philadelphia police procedures.

83.    At the time of the investigation and prosecution of Mr. Kelly, the Philadelphia

Police Department had a practice, policy, and/or custom of:

    a. engaging in unlawful interrogations of witnesses, witness detentions and
       interrogations, planting of evidence, fabrication of witness and suspect statements,
       coercing false identifications through the use of unconstitutional identification

procedures, coercing false confessions through the use of unconstitutional conduct and procedures, and failing to disclose exculpatory statements and evidence;

b. failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct;

c. failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search, and arrest powers;

d. ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police interrogations, searches and arrests, coercion of witnesses and suspects, falsifying and fabricating evidence, coercion of false identifications through the use of constitutionally defective identification procedures, coercion of false confessions through the use of unconstitutional conduct and procedures, and suppression of exculpatory evidence; and

e. failing to properly sanction or discipline Philadelphia Police Department officers, who are aware of and conceal or aid and abet violations of constitutional rights of individuals by other Philadelphia Police Department officers, thereby causing and encouraging Philadelphia Police, including the individual Defendants in this case, to violate the rights of citizens such as Mr. Kelly.

84.    At the time of the investigation and prosecution of Mr. Kelly, and for many years before and thereafter, the Philadelphia Police Department and the City of Philadelphia has been deliberately indifferent to the need to train, supervise, and discipline police officers.  The Internal Affairs Division of the Philadelphia Police Department has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a. the Philadelphia Police Department's internal investigatory process was riddled with excessive and chronic delays in resolving disciplinary complaints;

b. the Philadelphia Police Department lacked consistent, rational, and meaningful disciplinary and remedial actions;

c. the Philadelphia Police Department failed to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d. the Philadelphia Police Department's internal investigatory process fell below the accepted standards and practices and was arbitrary and inconsistent;

    e.    the Philadelphia Police Department's discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to their number of violations;

    f.    the conduct of Internal Affairs' investigations demonstrated that the Philadelphia Police Department internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

    g.    a global analysis of Internal Affairs' investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

    h.    the Philadelphia Police Department lacked an effective early warning system to identify, track, and monitor "problem" officers; and

    i.    Internal Affairs failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, and interviews that were conducted were below acceptable standards of police practices and failed to address key issues.

## **DAMAGES**

85.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Philadelphia caused Mr. Kelly to be improperly arrested and subjected to the horrors of imprisonment, unfairly tried, wrongfully convicted and forced to serve almost thirty years in prison for a crime he did not commit.

86.    As a direct result of Defendants' conduct and omissions, Mr. Kelly sustained injuries and damages, including loss of freedom for more than twenty-nine years, loss of his youth, loss of his relationships with family members, pain and suffering, mental anguish, emotional distress, countless indignities, degradation, permanent loss of natural psychological development, loss of life's pleasures, and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity,

athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, voting, travel, enjoyment, and freedom of speech and expression.

87.     As a direct result of Defendants' conduct and omissions, Mr. Kelly sustained economic injuries and damages, including loss of income from the employment he maintained before his wrongful arrest and incarceration and the loss of career opportunities.

88.     As a direct result of Defendants' conduct and omissions, Mr. Kelly sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

## COUNT I
### 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments
### (Against all Individual Defendants)

89.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

90.     The individual Defendants, acting with malice individually and in concert, and knowing that probable cause did not exist to prosecute Mr. Kelly for Travis Hughston's murder, intentionally caused Mr. Kelly to be arrested, charged, and prosecuted for those crimes, thereby violating Mr. Kelly's clearly established right, under the Fourth and Fourteenth Amendments of the U.S. Constitution, to be free of prosecution absent probable cause.

91.     The individual Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and prosecution without probable cause.

92.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Kelly's clearly established constitutional rights.  No reasonable officer in 1993-1995 would have believed this conduct was lawful.

93.    The prosecution finally terminated in Mr. Kelly's favor on July 18, 2024, when the DAO requested the Philadelphia Court of Common Pleas to *nolle pros* all charges against James Kelly in connection with the murder of Travis Hughston.

94.    The acts and omissions by the individual Defendants described in the preceding paragraphs were the direct and proximate cause of Mr. Kelly's injuries as these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Mr. Kelly.

## COUNT II
### 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation (Against All Individual Defendants)

95.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

96.    The individual Defendants, acting individually and in concert, and within the course and scope of their employment with the Philadelphia Police Department deprived Mr. Kelly of his clearly established constitutional right to due process of law and to a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain inculpatory witness statements, including without limitation the false statements of witnesses.

97.     The individual Defendants deprived Mr. Kelly of his right to a fair trial by intentionally withholding, concealing and/or suppressing material exculpatory and impeachment evidence, including without limitation, withholding information regarding Tommy Lockwood having been identified by Colie Baxter, Ernestine Williams' living in a home owned by Tommy Lockwood, the fact that Lockwood was part of a violent drug organization that had committed similar acts of violence, and Ernestine Williams's having provided coerced testimony.

98.     The individual Defendants deprived Mr. Kelly of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by failing to obtain complete witness statements and conduct a complete investigation.

99.     The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Kelly's clearly established constitutional rights.  No reasonable officer in 1993-95 would have believed this conduct was lawful.

100.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Kelly's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Kelly's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT III
### 42 U.S.C. § 1983 Civil Rights Conspiracy
### (Against All Individual Defendants)

101.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

102.    The individual Defendants, acting within the course and scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Kelly of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and his right to a fair trial.

103.    In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

    a.    Suggesting, coercing, and/or fabricating inculpatory evidence in the form of witness statements;

    b.    Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* and impeachment material during the pendency of the case;

    c.    Wrongfully prosecuting Mr. Kelly while knowing that they lacked probable cause; and

    d.    Committing perjury during hearings and trials.

104.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Kelly's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Kelly's wrongful arrest, prosecution, conviction, and incarceration.

**COUNT IV**
**42 U.S.C. § 1983 Municipal Liability Claim**
**(Against Defendant City of Philadelphia)**

105.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

106.    The City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Mr. Kelly's wrongful arrest and conviction, and for many years preceding and following this investigation, a policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations, including in particular the use of coercive techniques in interviews and interrogations to obtain confessions; the fabrication of inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of exculpatory evidence.

107.    Final policymakers for the City of Philadelphia had actual or constructive notice of these practices, policies, and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions; withholding exculpatory evidence; fabricating inculpatory evidence; and, particularly, fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime, and failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

108.    Mr. Kelly's injuries and damages were further proximately caused by policies and practices on the part of policymakers with responsibility of administration of the District Attorney's office to allow the withholding of exculpatory and/or inconsistent evidence, allow witness to provide false testimony, and to pursue profoundly flawed investigations and prosecutions.

109.    The widespread practices described in the preceding paragraphs, of which the City of Philadelphia had actual or constructive notice, were allowed to flourish because the Police Department and District Attorney's office declined to implement sufficient training and/or any legitimate mechanisms for oversight or punishment.

110.    Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Mr. Kelly's arrest, prosecution, and conviction and over twenty-nine years of incarceration, as well as all the other injuries and damages set forth above.

## COUNT VI
### Malicious Prosecution Under Pennsylvania State Law
### (Against All Individual Defendants)

111.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

112.    The individual Defendants initiated or continued proceedings against Mr. Kelly, without probable cause, with malice or specific intent to injure, and the proceedings ultimately terminated in Mr. Kelly's favor on July 18, 2024, when the DAO asked the Court to nolle prose all charges.

113.    As a result of this malicious prosecution, Mr. Kelly sustained the injuries and damages set forth above.

## PUNITIVE DAMAGES

114.    The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

115.    The conduct of the individual Defendants was outrageous, malicious, wanton, willful, reckless, and intentionally designed to inflict harm upon Plaintiff.

116.    As a result of the acts of the Defendants alleged in the preceding paragraphs, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff requests the following relief:

a.  That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

b.  That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

c.  A declaratory judgment that the practices and policies complained of are unconstitutional;

d.  For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

e.  For such other and further relief as appears reasonable and just.

MARRONE LAW FIRM, LLC

By:___s/ Michael D. Pomerantz_____
        Joseph M. Marrone, Esquire
        PA Atty ID# 64920
        Michael D. Pomerantz, Esquire
        PA ID# 83415
        Keir Bradford-Grey, Esquire
        PA ID# 87054
        Attorneys for Plaintiff
        200 South Broad Street, Suite 610

Philadelphia, PA  19102
(215) 732-6700
jmarrone@marronelaw.com
mpomerantz@marronelaw.com
kbgrey@marronelaw.com