# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

JAMES KELLY, :
Plaintiff, :
-vs.- :
CITY OF PHILADELPHIA, :
et al., :
Defendants. : NO. 2:24-cv-06701-JFM

- - -

Thursday, July 23, 2026

- - -

In-person/Zoom oral deposition of ERNESTINE WILLIAMS, taken pursuant to notice, was held at the law offices of Nathan & Kamionski, 1515 Market Street, Suite 1200, Philadelphia, Pennsylvania 19102, at 10:00 a.m., on the above date, before Lisa DePascale, a Court Reporter and Notary Public of the Commonwealth of Pennsylvania.

Job No. MDLG8327268
GOLKOW, A VERITEXT DIVISION
877.370.3377 ph / 917.591.5672 fax
calendar-golkow@veritext.com

APPEARANCES:
MARRONE LAW FIRM, LLC
BY: MICHAEL POMERANTZ, ESQUIRE
KEIR BRADFORD-GREY, ESQUIRE
EMILY BARKANN, ESQUIRE
200 South Broad Street
Suite 610
Philadelphia, Pennsylvania 19102
215.461.3699
MPomerantz@marronelaw.com;
KBGrey@marronelaw.com;EBarkann@marronnelaw.com
Representing Plaintiff

NATHAN & KAMIONSKI, LLP
BY: JAMI L. GALBRAITH, ESQUIRE
KIMBERLY MANN, ESQUIRE
(In Person)
NATALIE Y. ADEEYO, ESQUIRE
BRIAN WILSON, ESQUIRE
(Via Zoom Videoconference)
575 S. Charles Street
Suite 402
Baltimore, Maryland 21201
410.846.0053
JGalbraith@nklawllp.com
Representing Defendants, City of Philadelphia, Walter Hoffner, Richard Reinhold, Leon Lubiejewski, James Collin, Steven Vivarina and the Estate of Robert A. Snell

ALSO PRESENT: OROBOSA ENAGBARE, PARALEGAL
Marrone Law Firm

KADIN GINKINGER, INTERN
Marrone Law Firm



INDEX

WITNESS:
ERNESTINE WILLIAMS

| | PAGE NO. |
|---|---|
| MS. GALBRAITH | 5 |
| MS. BRADFORD-GREY | 78 |
| MR. POMERANTZ | 160 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE NO. |
|---|---|---|
| EXH D-1 | Transcript, Bates stamped NK DEFS 004265 through NK DEFS 004444 | 45 |
| EXH D-2 | Investigation Interview Record, Bates stamped Kelly00159 through Kelly00161; NK DEFS 36099-36012, 4 pages | 58 |
| EXH D-3 | Investigation Interview Record, Bates stamped Kelly00094 through Kelly00099 | 64 |
| EXH D-4 | Investigation Interview Record, 9-14-93, 2 pages | 68 |
| EXH D-5 | Investigation Interview Record, 9-15-93, Bates stamped KELLY00115 through KELLY00116 | 72 |
| EXH D-6 | Investigation Interview Record, 10-31-1995, Bates stamped KELLY00156 through KELLY00158 | 74 |



| | | |
|---|---|---|
| EXH P-1 | Deed, March 5, 1991, 15 pages | 81 |
| EXH P-2 | Deed, August 23, 1993, 4 pages | 92 |
| EXH P-3 | Activity Sheet, Bates stamped AL (HF) 000865 through AL (HF) 000866 | 96 |
| EXH P-4 | Continuation of Probable Cause for Arrest Warrant Number 213995, 2 pages | 178 |
| EXH P-5 | Transcription of Tape Recorded Statement taken on Thursday, July 20, 1995, 23 pages | 214 |
| EXH P-6 | Investigator's Aid to Interview, 3-21-93, Bates stamped NK DEFS 021711 | 214 |
| EXH P-7 | Black and White photo, 1 page | 252 |
| EXH P-8 | Color photo, 1 page | 254 |



(It is hereby stipulated and agreed by and among counsel for the respective parties that signing, sealing, certification, and filing are waived; and that all objections, except as to the form of the question, are reserved until the time of trial.)

\- - -

ERNESTINE WILLIAMS, after having been first duly sworn, was examined and testified as follows:

\- - -

MS. BRADFORD-GREY: Ms. Galbraith, just making sure we know the usual stipulations would be, for us, if it would just be to form and we'll save all other objections for trial?

MS. GALBRAITH: Yes.

MS. BRADFORD-GREY: Okay.

\- - -

E X A M I N A T I O N

\- - -

BY MS. GALBRAITH:

Q. Good morning, Ms. Williams.

A. Good morning.

Q. I know we previously met, but my name is Jami

Page 6

Galbraith. I represent the City of Philadelphia, as well as individual defendant officers who are being sued in this litigation. I'm here with my colleague, who is also an attorney, Kimberly Mann. And on the Zoom is two of my other colleagues, Brian Wilson and Natalie Adeeyo.

I just would like to start --

MS. BRADFORD-GREY: Does Plaintiff want to put their name on the record?

MR. POMERANTZ: Let's go around and identify ourselves for the record.

MS. GALBRAITH: Sure.

MS. BRADFORD-GREY: Keir Bradford-Grey.

MS. BARKANN: Emily Barkann.

MR. POMERANTZ: Michael Pomerantz, also on behalf of plaintiff.

BY MS. GALBRAITH:

Q. Ms. Williams, can you just state and spell your name for the record.

A. Ernestine Williams. E-R-N-E-S-T-I-N-E, W-I-L-L-I-A-M-S.

Q. Okay. And have you ever had a deposition taken before?

A. No.

Page 7

Q. Okay. So I just want to go over just how a deposition works, just so you understand.

So the first thing is, you're not a party to this case in any sort of way. You're not being sued. You're not being investigated. This is a civil case that's been brought by Mr. James Kelly against the City of Philadelphia, as well as some individual defendant officers.

A deposition is basically just an opportunity for one party to learn information from a witness. So I'm going to be asking you questions, and you're going to be responding. If the answer is I don't know or I don't remember, because you don't know or you don't remember, feel free to respond that way. If you don't understand a question I ask, just ask me to rephrase the question.

Further, you're going to hear objections throughout this deposition today. When you hear an objection, you still do have to answer the question. There is no judge here to, obviously, rule on the objection.

The Court Reporter is transcribing our conversation. So it's just really important that we don't talk over one another. And that's also

Page 8

something I have to watch myself for. But make sure we don't talk over one another. And we also want to make sure everything is verbal. So respond to things like yes, no. And try to watch for saying things like mm-hmm or nodding your head.

Okay?

A. Can I ask a question? Why am I here? Why do I have to go through this? Whatever this man is suing these people for, I don't have nothing to do with that. I don't even understand why is they bringing me back into this.

Q. Okay.

A. What I seen, it's a nightmare. It was a nightmare then and it still is and I don't want to relive it.

Q. Okay. Unfortunately, with the way the deposition works, I have to ask you the questions and you're going to respond. However, the reason that we have to depose you is because you were a witness in this case. You are listed as a witness, so we do have to go through and ask you questions.

A. All right.

Q. I hope that helps a little bit with understanding?

Page 9

A. Yeah, I guess so.

Q. We're going to go through and we're going to -- everything that you just mentioned, we'll talk about.

Okay. So the last thing I just want to say is basically, if at any point you want a break, we can take a break, if you need water, you need to use the restroom, any --

A. I'm fine. I just want to be done with this.

Q. I understand.

I just want you to know at any point you can take a break. Similarity if I need a break or counsel needs a break, we can, obviously, take a break, just if there is a question pending, we ask that you answer it first.

A. All right.

MS. BRADFORD-GREY: And just so we understand.

This is full day, right?

MS. GALBRAITH: Yes.

THE WITNESS: She was at my house, harassing me. And I'm going to take a lawsuit out on her and her family too.

I want you to mark that down.

Page 10

BY MS. GALBRAITH:
Q. The Court Reporter is getting everything you say, just so you know?
A. Okay. Thank you.
Q. That's just for clarity, as I said. But we want to make sure we don't talk over each other.
So I have a couple of questions I do have to ask. I have to ask everybody these questions. I don't mean to pry with them. It's just to make a clear record to make sure that we know that the proceedings were understood today.
So have you taken any medication today that would prevent it or make it difficult for you to recall a fact, circumstance or event?
A. No.
Q. Okay. Have you had any alcohol or other substances that would prevent or make it difficult to recall facts, circumstances or events?
A. No.
Q. Okay. Do you have any physical, psychological or psychiatric condition impacts the way you perceive something or otherwise that impacts your ability to recall facts, circumstances or events?
A. No.

Page 11

Q. All right. And just make sure I finish my question. And that's just for the record.
And do you have any other diagnosed or suspected memory issues or concerns that would impact your ability to recall facts, circumstances or events?
A. No.
Q. And do you have any other reason, besides the fact that these events occurred over 30 years ago, why you cannot truthfully today?
A. Repeat that again.
Q. Okay. Is there any other reason, minus I just asked you a bunch of questions, is there anything, minus the fact that we obviously know this happened 30 years ago, it's very old, that would impact your ability to testify?
A. No.
Q. Okay. So, Ms. Williams, are you aware that James Kelly has filed a federal civil rights lawsuit?
A. No.
Q. Okay.
A. And I really don't care.
Q. Okay. Well, that's what we're here for today. And I represent to you that that's what we're here for today and that we are going to discuss the murder of

Page 12

Travis Houston on January 1st of 1993.
So sitting here today, what do you remember about January 1st of 1993?
A. Do you want me to tell you exactly what happened that day?
Q. I want you to tell me what you remember from that day.
A. What I remember? I remember everything. That day, it was New Years Day. I think it was New Years Day. I was going to a New Years Day party over my mothers. My car got stuck in the middle of the street. I got out the car. I went in the house. I was talking to my boyfriend I came back out the outside and looked for somebody to give me a jump. I seen James Kelly and another guy coming down the street. They was across the street, next to where the speakeasy, where the lady sell beer and stuff at. I walked over there and I asked him could he give me a jump. And he said, don't I know you from somewhere? And I said, no. I said, my car is broke down, I need a jump. And he said, I know you. And he said, where you live? I said, across the street. And then I walked away. I walked away after that, I went in the house.

Page 13

I think my boyfriend was calling me or something, I went back in the house. I went upstairs. Then I heard, I thought I heard a car coming, so I looked out the window. That's when I seen James Kelly give the dark skinned guy the gun. Then I was standing there, I was just looking at him. And then the guy next door, Miss, I forget her name, but her granddaughter's boyfriend came outside, which he lived two doors from me. The dark skinned guy that James gave the guy the gun came up the street. They was in front of my door then. The guy was -- he was going to get in his car or something -- no. He called him.
One way or another, they met up. And he shot him in the head, layed him down in front of my -- laid him on the ground, still -- and he kept right on shooting him in the face. Then they took off running, both of them James Kelly. And I started screaming. And my friend said, what's the matter? What's the matter? And I said, he's dead. He's dead. He's dead. And he's like, who is dead? And I say, he killed him. He killed him. He killed him.
And then this guy, his girlfriend came outside, she was screaming. Then the police came. And they said, who car is this? Who car is this? And

Page 14

they pushed my car out the way so the paddy wagon can come, and they just threw the guy up in the truck, that was dead on the ground. They just picked him up and threw him in the back of the police truck.

And about 10 minutes later, five minutes later, the police was knocking on the door, so my friend said, don't say nothing. But I was crying. I was screaming. I was still screaming. He said, don't stay nothing, you ain't seen nothing, don't say nothing. And next thing I knew, the neighbors had said -- the police told me that the neighbors had said I seen him, seen what happened. I said, I ain't seen nothing. But the guy family that got -- the guy that got killed, his family, when I was coming home from work, they was harassing me, they said, you seen my brother get killed. I said, I didn't see nothing.

Q. Okay. Can I ask you some followup questions just on what you said?

A. (Shaking head.)

Q. Okay. So you said that you saw James Kelly and another guy. Do you recall who the other guy was?

A. I don't know neither one of them. James Kelly or the other guy. I never knew them. I don't know them people. I just seen them that day.

Page 15

Q. Okay. You mentioned that he said, I know you --

A. Yeah. James Kelly said he knew me.

Q. Okay. Let me finish my question, just so we can get the record.

I was just going to say, who said he said you. So you're saying James Kelly said, he said he knows you -- sorry. Let me rephrase I phrased that really poorly. Can I restate that.

When you said, he said I know you, you were referring to James Kelly, correct?

A. Yes.

Q. You said you went in the house and you went upstairs. Do you remember what room you were in?

A. In the front room, my bedroom.

Q. And is that where you were looking out the window?

A. Mm-hmm.

Q. Is that a yes?

A. Yes. I'm sorry.

Q. As a reminder try to say yes or no.

A. Yes.

Q. You also said, when you were referring to the person's granddaughter or boyfriend who came outside,

Page 16

is that you referring to the victim?

A. Yes.

Q. Okay. Who you saw -- you saw the victim get shot that night?

A. Yes. And he had on a black shirt and a gold chain. He was dressed up. They were all -- everybody was dressed up. James Kelly had on a beige long, cashmere, beige coat. He was dressed up too. But the other guy that shot him wasn't dressed up. I remember, he wasn't dressed up, he was...

Q. Do you recall anything else he was wearing besides -- James Kelly was wearing, besides a beige cashmere coat?

A. No.

Q. Okay. Now, you mentioned a friend of yours said don't say nothing to the police.

Who was that?

A. My boyfriend.

Q. And who was your boyfriend?

A. I can't tell you that. No, he not in it. I'm not putting him in it.

Q. Okay.

A. As a matter of fact, he died any way.

Q. Was that Kevin Mathis?

Page 17

A. Yeah. He died.

Q. And did you talk to him before the police arrived.

A. Mm-hmm. Yeah. I told him he -- he seen the guy standing -- he seen the guy laying out there on the sidewalk. Because he looked out the window and he seen the man out on the sidewalk. But he didn't see him kill him. I seen him kill him. But he didn't see that, he just seen me screaming. And he told me, don't say nothing.

Q. Okay. So I'm correct that Kevin Mathis told you not to say anything to the police?

A. Yeah.

(Interruption. Phone ringing.)

I forgot to turn off my phone.

Sorry.

Q. That's okay.

A. I'll put it on do not disturb.

(Phone ringing.)

(Witness answers phone.)

MS. GALBRAITH: Just go off the record for one moment.

(Discussion was held off the record.)

THE WITNESS: Sorry about that.

Page 18

BY MS. GALBRAITH:
Q. That's okay.
A. Again, I'm going to put this on do not disturb. Sorry about that.
Q. That's okay.
Now, you said the -- I'm hoping I'm quoting you correctly on this. But you said that the guy's family, they were harassing you?
A. Yeah. They was, Oh my God, I had to leave my house.
Q. So I just want to break that down. So when you say the guy's family, are you referring to the victim Travis Houston?
A. Yes.
Q. And what do you mean when you say the family was harassing you?
A. They wanted me to tell them who killed their brother. That's what he said, you know who killed my brother. I said, I don't know who killed your brother. When I got off from work they'd be outside waiting in front of my door. I just moved.
Q. So do you know who it was in the family?
A. No.
Q. Like what their relationship was?

Page 19

A. He just said it was his brother. He said it was his brother.
Q. And when -- do you remember how close to when the shooting happened that they were harassing you?
A. The next day.
Q. Okay. And --
A. Just like the police was harassing me the next day. They kept coming back. They -- the police had knocked on my door that night when he got killed and they were saying the neighbors told them -- the detective said the neighbors told him that I seen what happened. I said, I didn't see anything.
Q. Okay. When you -- when the person who said that it was their brother who was killed, did they approach you outside of your home?
A. Yes.
Q. Okay. Did they talk -- just talk to you?
A. Yes.
Q. Okay. But you felt intimated by that?
A. Yes.
MS. BRADFORD-GREY: I'll object to the form.
These are open-ended questions, and very leading.

Page 20

BY MS. GALBRAITH:
Q. What -- just for your memory, even if counsel objects, you still do have to respond to the question. You already responded though.
MS. BRADFORD-GREY: I'm sorry. Can you repeat the question.
MS. GALBRAITH: I just said, she had already responded to my question.
MS. BRADFORD-GREY: And what was your question?
MS. GALBRAITH: Can you read back the question.
(The Court Reporter read the record as requested.)
THE WITNESS: Yes, very intimidated.
BY MS. GALBRAITH:
Q. Were you afraid to get involved once the police showed up?
A. Yes.
Q. Okay.
MS. BRADFORD-GREY: I'm sorry. Can you ask a direct exam question. You're leading her in a way, and I'm just going to object to the form, because when you're -- you can ask her

Page 21

how she felt, but suggesting how she felt is leading.
BY MS. GALBRAITH:
Q. Do you -- strike that.
A. Can I say something? Can I just say this? I felt the same way when you came to my house, threatening me that I have to go to court and the way you and his wife, James Kelly's wife, came to my house and threatened me and started telling my neighbors that I put away a innocent man. I felt the same intimidation that I felt that night, that same day. And I have a police report to prove that you was at my house.
MS. BRADFORD-GREY: I'm sorry, Ms. Williams --
THE WITNESS: I feel the same exact way that day.
MS. BRADFORD-GREY: I understand how you feel, if you don't want to be here --
THE WITNESS: But you did come to my house and harass me, just like that man's family did.
MS. BRADFORD-GREY: And Mr. Kelly doesn't have a wife. She's deceased.

Page 22

THE WITNESS: Well, she said she was married to him -- no, to his brother. I'm sorry. She said he was married -- yeah, well you should know. You said she was with you. She was married to his brother. I -- forgive me for that.

BY MS. GALBRAITH:

Q. It's okay, Ms. Williams. I'm going to ask you some more questions about that.

A. Go ahead.

Q. Okay?

A. Yes.

Q. So --

A. I just had to put that out there. I felt the same intimidation that she gave me when she came to my house.

Q. So just because you're saying she, I just want to clarify, are you talking about Ms. Bradford-Grey?

A. Yes.

Q. Okay. So you mentioned that she had come to your home?

A. Yes.

Q. Do you remember when that happened?

A. (Reviewing document.)

Page 23

Q. Can you just let us know what you're looking at.

A. I'm trying to look for the date on this subpoena -- court thing, they gave me -- the report when she came to my house.

(Reviewing document.)

He didn't put the date. He just put the docket number that I have to get the report.

Q. Okay. Just --

A. That was the date. That's when they came to my house. James Kelly's sister-in-law and her. Them two.

Q. Okay. So let's --

A. I have to get the report, the police report. They just gave me the docket number.

Q. Okay. Who -- you said a sister-in-law, can you explain who was that person?

A. I don't know. I known Ms. Swain is her mother.

Q. Ms. Swain? Is that S-W-A-I-N?

A. I guess so. She said that Ms. Swain was her mother and she was James Kelly's sister-in-law.

Q. Okay.

A. That was her brother-in-law that I had -- I had locked up for no reason at all.

Page 24

Q. Okay.

A. And they wanted me to change my testimony.

Q. Okay. I'm going to try to break this down.

MS. BRADFORD-GREY: I'm sorry. So we're aware -- so we've been -- I'm going to have to (INAUDIBLE) the witness for something she said --

THE WITNESS: Yeah, you was there.

MS. BRADFORD-GREY: No. You're saying that --

MS. GALBRAITH: Hold on, counsel. If we want the witness to just step out for a minute we can talk --

MS. BRADFORD-GREY: Yeah. We do.

MS. GALBRAITH: -- I don't want to do back and forth in front of the --

MS. BRADFORD-GREY: We do. We should have that, because I'm trying to figure out words that you're doing here.

MS. GALBRAITH: Could you step outside just for a few minutes?

THE WITNESS: Sure. No problem. Because she need to be dealt with.

(Witness left the room.)

Page 25

MS. BRADFORD-GREY: So Jami, are you eliciting information about me harassing her?

MS. GALBRAITH: I'm just trying to elicit what she's talking about.

MS. BRADFORD-GREY: Yeah. Because I know in a police tape where she felt there was new girl harassing her, you suggested that it was us who was harassing her. So I'm just trying to understand what it is you're getting at here.

MS. GALBRAITH: Just for clarity, I said that to the police, I never said that to her.

MS. BRADFORD-GREY: Regardless, I'm just saying, this is like a theme. So I'm trying to make sure -- I'm trying understand is this -- what are you doing with respect to counsel?

MS. GALBRAITH: I'm just asking questions on what the witness is saying, which I have a right to ask her followup questions on.

MS. BRADFORD-GREY: You do. But, I mean, she's basically saying that we're trying

Page 26

to get her to change her story, these things. I mean, that's --

MS. GALBRAITH: I, kind of, have to ask about that, though --

MS. BRADFORD-GREY: Okay.

MS. GALBRAITH: -- if she's saying it.

MS. BRADFORD-GREY: Okay. That's fine. Go right ahead.

MS. GALBRAITH: I mean, I think I have to -- Brian, did you have something?

MS. ADEEYO: This is Natalie Adeeyo here.

I just wanted to interject that my understanding of the purpose of this deposition is to fully explore Ms. Williams' memory regarding the incident, but also any and all contact that she had with counsel, investigators, whomever concerning this incident. She freely volunteered about a negative interaction. She characterized it as harassment. I think we're well within our right to explore what she's referring to.

MS. BRADFORD-GREY: Okay. I have no problem with that.

Page 27

We can also explore that she characterized your interaction as harassment as well.

MS. GALBRAITH: Of course.

MS. BRADFORD-GREY: All right. Just to make sure we are not trying to do something interesting here. That's why I'm trying to figure this out. I don't mind exploring what she's saying. I mean, she says a lot of stuff, so that's why.

MS. GALBRAITH: I just, you know, obviously, have to respond to this on what she's saying.

MS. BRADFORD-GREY: That's fine.

MS. GALBRAITH: Are we good to have the witness come back in?

MS. BRADFORD-GREY: Sure.

MS. GALBRAITH: Okay.

(Witness comes back in the room.)

BY MS. GALBRAITH:

Q. Sorry about that, Ms. Williams.

A. No problem.

Q. It's just better if, you know, we have any sort of discussion that we need to have, that we just ask you to step out.

Page 28

A. Okay. No problem.

Q. So I want to just go back to what you were talking about.

So you said that it was -- there was someone present who said that they were James Kelly's sister-in-law?

A. Yes.

Q. Okay. Have you met the sister-in-law before?

A. No.

Q. Okay. And --

A. Well, I met this girl that came to my house, I met her a long time ago, but I didn't know she was James Kelly's sister-in-law.

Q. Okay.

A. Because her mother lived across the street from me.

Q. Were you friends?

A. No, we weren't friends. I wasn't friends with nobody around there. I used to go to work and come home. I didn't deal with those people around there.

Q. Okay. And you mentioned that when she came to your house, Ms. Bradford-Grey was with her?

A. Yes. Yes, she was. And they was loud talking, screaming, hollering all to my neighbors. Oh, it was so embarrassing. It was so embarrassing. I closed the door. And I was talking to my auntie on the phone and my auntie said, just call the police. And I called the police. And I said the police is coming. And they left like five seconds before. They had this guy on the phone with them. She did. She pulled up my statement, what I had said at the police that interviewed me. And they pulled up my statement and they was saying I need to change my statement. Oh, it was just a mess. It was a mess.

Page 29

Q. Okay. Just so the record is clear, at one point Ms. Williams said she did and pointed to counsel.

A. She called some guy to tell her to send my statement over the phone to her.

Q. Okay. Did you know who that guy was?

A. No. They was on the phone. She was on the phone talking to them.

Q. When it comes to the statement, did you ever see the statement?

A. Yeah. She had to show the police -- he sent it over to her phone and she was reading it, showing it to me. Ain't this your signature? Showed me my

Page 30

signature, where I signed and put the statement and everything.
Q. And who is she?
A. Her (indicating).
Q. Okay. Are you referring to Ms. Bradford-Grey?
A. Yeah. She going to act like she don't know me. She know me. She came to my house. She know exactly who she is, what she did. She know exactly what she did. I know what she did. You was standing on my porch, talking about, open the door, when I closed the door on you.
Q. Okay. Did -- how did they approach you --
A. First, the short -- her friend or whoever she is to her, she just said, oh, Ernestine, you know me, you remember me. I said, I don't remember you.
Q. And they were on the porch at this point?
A. Yeah. First they was banging -- I mean, they was banging on my window. Banging on the door. So I come downstairs, I opened the door. I said, why is you all banging on my door like that. Oh, it's so -- it was so embarrassing and.
Q. And is it accurate that the sister-in-law is the one who said, I remember you?
A. Yes. Yes.

Page 31

Q. Okay. How long were they banging on the window and door?
A. Oh, my God, before I answered? I guess about a half an hour. Because I was upstairs in my room. And they -- I have COPD and asthma. I don't come downstairs once I go upstairs. But I was on my oxygen, so I was just sitting there. Whoever know me know to call me before they come to my house. So I was like, who is banging on my door like this. So I just kept sitting there, you know. And when they started banging on my picture window, I thought they was going to break the window the way they was banging, so I came downstairs. And when I came downstairs to open the door, the sister-in-law was like, oh, Ernestine, you know me, we was friends. I said, I don't know you. Why is you banging? Why is y'all banging on my door? What do you want? Oh, we need you. You going to court. You're going to have to go to court and you're going to have to change your statement and your testimony because, you know, my brother-in-law, you know, James Kelly he didn't kill nobody. And you going to jail because you lied. And it was just a big mess.
Q. Okay.

Page 32

A. You had the police. The police made you say all this stuff. I'm like, how can the police make me say something?
Q. Was it Ms. Bradford-Grey who said you were going to have to go to court and change your statement?
A. Yes. It was her. Her (indicating). And she pulled it, she said, I'm going to show you what you have, your statement was, and this is your signature, and you lied and you're going to jail.
Q. Who told you that you lied?
A. This woman, right here (indicating), right there (indicating).
Q. For the record, the witness is pointing at Ms. Bradford-Grey.
So for clarity, Ms. Bradford-Grey said you're going to jail?
A. I said, well, you all going to jail today. And I called the police.
Q. Okay.
A. I said, because I called the police and the police said, describe them. I said, there was a big one and a little one. And she was the big one and James Kelly was the short, little one.

Page 33

Q. Were they -- was Ms. Bradford-Grey and the sister-in-law, were they present when the police arrived?
A. No. They had left like five seconds -- it was like they knew the police was coming. Because as soon as they left, the police had pulled up. There was two of them. And I explained to them about the situation, where the guy got killed and everything, and they trying to make me change my statement.
Q. What exactly in the statement were they asking you to change?
A. I have no idea. They just told me that I had sent this man to jail, he didn't do nothing. And they said, this is your signature. They showed me a signature that I had signed a paper where I had gave the statement to the police. And I seen my signature where I had signed some paper. I don't know what it was, but. She knows. She had pulled it up on her phone.
Q. Okay. Do you recall the date of when that statement was?
A. This all happened last month, like last -- this was, like, around May.
Q. Okay. And who said you needed to change

Page 34

your --
A. May or June. I think it was in May.
Q. Who specifically said you need to change your statement?
A. This lady right here (indicating).
Q. When --
A. You know what you did. Why you acting like you don't know what I'm talking about?
MS. BRADFORD-GREY: Do you want to go off the record for a second, or do we want to stay on? I mean, I don't think I need to respond to this actually, so go ahead.
BY MS. GALBRAITH:
Q. Was there any point where the sister-in-law and Ms. Bradford-Grey were separated?
A. No. They both were standing on the porch together the whole time and they got in the car and drove off. I think they was parked, like, across the street. I couldn't really see their car because I got a tree in front of my house.
She know. She know I have a tree in front of my house. She know exactly what they do when they parked their car so I wouldn't see them. That's why I said, I need to be suing them for harassment.

Page 35

Q. Can you define what you mean when you say harassment?
A. The way they were hollering and telling my neighbors that I sent some innocent man to jail. And they was screaming. Oh my God. My neighbors came to door. My neighbor came -- come to the door and my neighbor across the street called me on the phone she's like, Ernestine, are you okay? She's like what is this girl -- what is them people doing over there? I said, Nettie don't pay her no mind. I got this. I'm getting ready to call the police.
Q. Who was --
A. I can call my neighbor right now and she'll tell you that these two women was on my porch, screaming and hollering, saying that I sent an innocent man to jail. I can call her right now and she'll tell you the same thing I'm telling you, that these two women -- and she probably describe her too.
Q. Were both women yelling?
A. Yes.
Q. Okay.
A. Yes, both of them was screaming. They was loud and screaming, embarrassing. It was really disturbing. Very disturbing. Both -- all my

Page 36

neighbors came to the door. They -- my neighbors right to this day is watching me to make sure I'm okay. And my auntie, she was on the phone.
Q. How many neighbors said something to you about it?
A. Three.
Q. What are their names?
A. One is Miss Niecie (ph) next door to me. Ms. Niecie and Ms. Nettie (ph) and Pumpkin.
Q. Do you know their last names?
A. No, I don't know their last name.
Q. Do you know if any of the neighbors called the police?
A. No. I called the police. That's why I have the report. The thing from the police, he told me to just -- at the 14th Police District, to come and get the police report from them. They gave me a docket number to get the police report if I need it.
Q. And I'm just going to break this down by neighbor.
When did Ms. Niecie say something to you?
A. The same, when they was -- they left.
Q. It was after they left that Ms. Niecie said

Page 37

something to you?
A. Yes. After they had left. And Pumpkin -- I mean, Pumpkin had talked to me the day after. And Ms. Nettie, she called me the same day when they was outside on the porch. Nettie called me on the phone and was talking to me. She was saying, are you okay? Why is they there? Why they acting -- why they doing that to you? I said, because they think I had sent some innocent man to jail and he's a killer. I said, he ain't hardly innocent. And she goes like, well, what's going on? When was this? And I said, it was when I like 25 years old. So you gotta be kidding me.
Q. When you use the term killer or say that he's hardly innocent, who are you referring to?
A. James Kelly.
Q. Okay. And can you clarify what you mean when you say he's a killer or hardly innocent?
A. Because he gave the guy the gun to kill that man. Both of them is killers, to me. They bad people. They bad. They terrible people. Both of them.
Q. So you -- it would be correct to say that you saw James Kelly hand a gun to an individual who shot and killed Travis Houston?

Page 38

A. Yes.
Q. Okay. And how many times -- let me rephrase that. Sorry.
How many times has someone come to your door to talk to you about this case?
A. Oh my God. Oh my God. Since it's been over, in my house where I live now?
Q. How about we start with just this year, 2026?
A. Oh, wow. Between -- after -- before them two? There was this other lady, this white lady. Oh my God. It was so many times. About four -- about four or five times.
Q. Okay.
A. That's why when you came and the guy, I was very angry. I was so angry. And I said, why you all keep harassing me? You see when you came to my house that day how angry I was, because I thought you was a part of them too. I didn't know who you were. Because I had so many of them harassing me.
Q. So it's kind of --
A. I called the police on you too.
Q. Correct.
It is correct that I was also someone who came to your house to serve you with a deposition

Page 39

subpoena?
A. And I called the police, didn't I?
Q. You can't ask me questions.
A. I'm sorry.
Q. Is it correct that you called the police on a time at which I was present at your house?
A. Yes.
Q. And when you're talking about the statement that you made to police, when you made you statements to police -- sorry. I'm trying to figure out how to phrase this. Strike that for a moment.
When you spoke to the police, were you truthful?
A. Honestly, yes, very truthful.
Q. And when you testified at your trial, were you truthful?
A. Yes.
Q. Or at Mr. -- let me rephrase that.
When you testified at Mr. Kelly's trial, were you truthful?
A. Yes.
Q. Okay.
A. It's something, I can't make up this. I wouldn't make up nothing like that on nobody,

Page 40

especially somebody I don't even know. I don't know those people. I don't know James Kelly. I don't even know her (indicating). I know she came to my house. And I know you (indicating). I know you came to my house.
Q. Okay.
MS. GALBRAITH: Can we go off the record for just a couple of minutes. I just want to potentially make some changes to my outline. So can we go off the record.
I'm just going to take a brief break. Okay.
(A short break was taken.)
BY MS. GALBRAITH:
Q. Can we go back on the record.
A. Something else, I forgot to tell you about this lady too. She had threatened me, her and her friend, threatened. She told me, oh, we know where your daughter live, we know you go to the center, we know everything about you. That's what you said to me too, that's another thing you said.
MS. BRADFORD-GREY: All right. Well, I'm going to go on. First of all, that's absolutely untrue --

Page 41

THE WITNESS: Oh my God, honest to God on everything I love, I would never make up a lie like that on you lady.
MS. BRADFORD-GREY: Ms. Williams, I did not tell you I know where your daughter lives, I know where your center is. I did not say that. So I'm just -- I just want to put that out.
MS. GALBRAITH: Keir, I don't think that's appropriate.
MS. BRADFORD-GREY: I know. All right.
THE WITNESS: Where I get it from?
MS. BRADFORD-GREY: We'll keep going. Keep going.
THE WITNESS: I said, you can know where my daughter live if you want to. You mess with her. My daughter crazy.
MS. BRADFORD-GREY: Move on.
BY MS. GALBRAITH:
Q. Ms. Williams, can you -- you said -- I was to phrase this correctly.
You said that someone said something to you about the fact that you attend the center. What is the center?

Page 42

A. A day center for senior citizens. That's what day center is, the senior citizen center.
Q. How did you perceive being told that you go to the center?
A. She said, I know where you -- I know all about you. You don't change your statement, I know where your daughter live, I know you -- I know everything about you. We know where you go to the center at, we know everything about you.
Q. How did that make you feel?
A. Very uncomfortable. That's why I called the police and I -- I even told the police. It's in the statement. When I get that statement from the police district, all that's in there. Where they said I know where the center I go to, they know where my daughter live, and I need to change my statement. I'm changing nothing.
Q. Do you remember specifically who told you they know where your daughter lives?
A. It was her (indicating). Her and her friend. Both of them were saying that, we know everything about you.
Q. And when you say her, are you referring to Ms. Bradford-Grey?

Page 43

A. Yes. Whatever her name is. Yes.
Q. Did you interpret the comments about where your daughter lives and the facts that you go to the center as threats?
MS. BRADFORD-GREY: Objection.
THE WITNESS: I never discussed anything with those people.
MS. BRADFORD-GREY: I'm objecting to this.
THE WITNESS: I don't even talk -- I don't even know them. They was at my house harassing me, showing me this information about a statement that I gave to police, that the police made me say. That's all they kept saying to me, oh, the police made you say that. you need to tell them that the police made you say that. The police can't make me say nothing. The police wasn't even there when they was out there killing that man.
BY MS. GALBRAITH:
Q. Did the police make you say anything?
A. No, ma'am. No.
Q. Did any police officer make any suggestions to you --

Page 44

A. They asked me questions just like you are. And I answered them, just like I am today.
Q. Did you ever feel 5threatened by the police?
A. Never.
I felt threatened by James Kelly. I felt threatened by the guy that got killed family.
Q. Why did you feel threatened by James Kelly?
A. Because the way he said, I know you -- no, he said, when I walked away, he said, have a good day. Like that. Have a good day. He pointed his finger at me like a gun (indicating), have a good day.
Q. When did he say have a good day?
A. After I said, you ain't got no car? He said, no I ain't got no car to give you no jump. After he finished asking me all these questions, where you live? And he said where you work? And I said, I work at Seafood Shanty.
Q. Did that make you feel fearful for your life?
MR. POMERANTZ: Object to the form.
THE WITNESS: Not then, no. Because we was just talking. We was just talking then. I didn't know they was going to go kill somebody. I was talking to him before they killed that man. I didn't know they came to kill that guy.

Page 45

They waited until that man came out the house and just killed him.
BY MS. GALBRAITH:
Q. Okay. So not -- you said not now. Do you feel fearful for your life -- you said not then?
A. Not then, no.
Q. Do you feel fearful for your life now?
A. Yes. Because they keep coming to my house. Her and his sister-in-law, all these people keep coming -- yes, I feel threatened. Very. Just like I said when you came to my house, I didn't know who you were, I called the police. I felt threatened because I didn't know who you were.
Q. Okay. Do you --
A. Just like when you they kept coming to my house.
Q. Do you trust the police?
A. Oh, yes. Yes. That's why I called them.
Q. Okay. I'm showing you what's going to be marked as defense Exhibit-1.
MS. GALBRAITH: I'm passing out a copy to all counsel.
\- - -
(Exhibit D-1, Transcript, Bates stamped

NK DEFS 004265 through NK DEFS 004444, was marked for identification.)

- - -

MS. BRADFORD-GREY: Is this just the direct? This is all direct?

MS. GALBRAITH: It's direct and cross.

MS. BRADFORD-GREY: Okay.

BY MS. GALBRAITH:

Q. Okay.

A. He got a lot of nerve --

Q. Ms. Williams, why do you -- who are you referring to when you say --

A. James Kelly. He got a lot of nerve to be trying to sue the police. That just take too much nerve to me.

Q. What do you mean by that?

A. Because they out there on New Years Day to kill somebody, then you have to sue the police. For what? I can't understand that. I really can't. I mean, if you went to jail and did time, he should be glad they let him out. Y'all shouldn't have even let him out because he probably come to hurt me. They coming to my house. I'm telling you, I need protection. This man is out on the street.



Q. So it would be accurate to say that you are scared?

MR. POMERANTZ: Object to the form.

MS. BRADFORD-GREY: Right. Jami, would you please ask open-ended questions.

THE WITNESS: This is scary. This is very, very scary.

BY MS. GALBRAITH:

Q. Why do you say that it's scary?

A. Because he's out of jail and he trying to sue the police and they want me to testify again what I seen. I mean, come on, put yourself in the same position that I'm in. You have to relive this nightmare again and this man is walking around. And then he got his people coming to my house, oh my -- telling me to change my statement.

Q. All right. Ms. Williams, I'm going to change gears here. I put an exhibit in front of you. I don't want you to -- I'm going to tell you what pages to look at, okay, just because I don't want you to get distracted by the entire thing.

So I'm going to represent to you that you testified at the trial of James Kelly in August of 1996.



Do you recall that, testifying at his trial?

A. Yes.

Q. Okay. When you testified, did you testify truthfully to the best of your ability?

A. Yes.

MR. POMERANTZ: Objection; asked and answered.

BY MS. GALBRAITH:

Q. Do you recall at trial identifying Mr. Kelly?

A. Yes.

If I seen him walking down the street, I still know who he is.

Q. Do you recall testifying to the police what you saw on the night of January 1st of 1993?

A. Yes.

Q. Were you truthful --

MR. POMERANTZ: I'm sorry testifying to the police, or testifying at trial?

MS. GALBRAITH: Testifying -- I'll rephrase.

BY MS. GALBRAITH:

Q. Do you recall testifying at the trial that you saw -- or strike that.



Do you recall testifying at trial what you saw on the night of January 1st of 1993?

A. Yes.

MS. BRADFORD-GREY: Jami, what page are you referring to, please?

MS. GALBRAITH: I did not refer to a page, I just asked a general question.

BY MS. GALBRAITH:

Q. Did you testify truthful and accurately when you testified to what you saw on the night of January 1st of 1993?

MR. POMERANTZ: Objection; asked and answered.

MS. BRADFORD-GREY: Form.

MR. POMERANTZ: You can answer.

BY MS. GALBRAITH:

Q. You can still answer.

A. Yes. I keep telling y'all, I told y'all what I know and what I remember. Yes, I testified.

MS. BRADFORD-GREY: What was that last --

MS. GALBRAITH: Counsel, I just ask that only one person object.

MS. BRADFORD-GREY: Sure.

Page 50

What was the last statement that she just made?
MS. GALBRAITH: Court Reporter, can you please read it back.
(the Court Reporter read the record as requested.)
BY MS. GALBRAITH:
Q. Okay. Ms. Williams, if you can go to -- I'm sorry.
MS. GALBRAITH: For the record, first of all, Defense Exhibit 1 is the NK DEFS, 004265 through NK DEFS 004444.
BY MS. GALBRAITH:
Q. Ms. Williams, if you look at the bottom of your page, it has like an NK DEFS number, really the top it also has a number though, where it says, in the right corner. Can you turn to page 117 in the top right corner, which would be NK DEFS 04304.
A. (Reviewing document.)
I got you.
Q. Okay. Looking at the bottom one, starting at line 20.
A. Who is Calvin's lawyer?
Q. So I want you to look at the bottom of 117.

Page 51

Starting at paragraph 20. And I want you to look through page 118, through paragraph 15. Do you see the little numbers on the side, that's what I'm referring to when I say paragraph?
A. Mm-hmm.
Q. Okay. So 117, paragraph 20, through 118, paragraph 15, and I just have some questions for you on that.
A. Okay.
Q. Okay. Do you recall testimony that you did at trial referencing James Kelly's brother?
A. I don't even know James Kelly's brother.
Q. Okay. So I'm going to have you -- I just want to tell you where to stop.
I'm going to have you read through 119 to paragraph 8.
A. What?
Q. So turn the page -- so go from 117, paragraph 20. All of one page --
A. So all --
Q. Just read it to yourself. And then page 118 and the beginning of page 119. And I can --
A. (Reviewing document.)
Q. Just let me know.

Page 52

A. Johnson project?
Q. Okay.
A. (Reviewing document.)
I don't remember that.
Q. Okay. Would you say that your testimony back on August 14th of 1996, were you truthful?
A. Yeah.
MS. BRADFORD-GREY: Objection; this is asked and answered.
BY MS. GALBRAITH:
Q. The additional --
A. Yeah that was then, '96. That was so long ago. I don't remember all the step by step.
Q. Would you think that your memory was better in 1996 than it is today?
A. Yeah. Way better. Way better. All I remember is they killed that guy that lived two doors from where I lived. I don't remember word for word, but we was talking about what we said. I don't hardly remember all that from back then.
MS. BRADFORD-GREY: Jami, do you want to refresh her recollection with something or?
MS. GALBRAITH: Just one moment, counsel.

Page 53

THE WITNESS: Do you remember what you said in '96? Do you remember when you was on my porch saying what you said to my neighbors? I bet you don't remember that, do you?
I bet you don't remember when you said you know where my daughter live and what center I go to. And that was only last month. I remember that.
No, I don't remember from no '96. I'm 64 years old. Do you know how much stuff I experienced from then to now. I know I told the truth that day, that's for sure. Whatever I said in these statements, is the truth and it was the truth and it still is the truth. I might not remember word for word what I said, but what I said it's the truth. I wouldn't make up no lie on nobody. That's not me.
And since you all know everything about me, you should know I go to church every Sunday and Wednesday nights. So I tells the truth.
MS. GALBRAITH: I'm going to take a five-minute break. I just need to find something in the testimony that I thought I had marked and I clearly made a mistake.

I'm going to take a break.
MS. BRADFORD-GREY: Five minutes?
MS. GALBRAITH: Yeah. Just five minutes.
(A short break was taken.)
BY MS. GALBRAITH:
Q. Ms. Williams, do you recall identifying Mr. Kelly at trial?
A. Yeah. I don't recall it, but I if you say I did, I did.
Q. Okay. I'm going to direct your attention to page -- can you move to page 211.
A. (Reviewing document.)
Q. Which is NK DEFS 04398.
A. Okay.
Q. On this -- do you recall --
A. Listen, can I interrupt? I gotta interrupt. So listen, you're taking me all the way back to when this case happened, to all -- to all my testimony? No, I'm not going through that, because I don't remember it. I don't know. I'm not doing that. We not doing that today. No. I'm not doing that. Uh-uh. We not doing that. I'm 64 years old, you want me to remember word for word what I said them. That



ain't going to happen.
Like I said, I told the truth then. What I told them then was the truth. I didn't hold that stuff in my memory to remember word for word what I said. I told them the truth what I seen and that's it. I didn't keep that in no log in my head. I don't remember no more of that. And don't want to. I'm not going to put that back in my brain like that. No, that's not going to happen today or no other day.
MS. BRADFORD-GREY: Jami, moving on from this?
MS. GALBRAITH: We're going to move on from this exhibit.
BY MS. GALBRAITH:
Q. So just --
A. You gotta be kidding me.
Q. Just based on your testimony that you just made, everything you said back in 1996 was truthful?
A. Yes, absolutely.
Q. Okay.
MS. BRADFORD-GREY: When you're talking about everything she said, at the trial?
MS. GALBRAITH: At the trial --
THE WITNESS: Whatever I said at that



trial was the truth.
MS. BRADFORD-GREY: That's what you asked her, Jami?
MS. GALBRAITH: Yes. I was clarifying what she just said.
THE WITNESS: Yes. I didn't have to lie on that man. I don't even know him. Whatever I said back then, that's what I meant, that's what I said, that's what I seen. I'm not changing anything.
I'm not going to read word for word what I said either and try to remember that. That's crazy. You all got issues if you think I'm going to remember that. That's crazy. He know what he did.
BY MS. GALBRAITH:
Q. At the trial, I have one more question about the trial. Do you recall testifying that the detectives never suggested to you anything?
MS. BRADFORD-GREY: I'm sorry. Jami, where are you?
MS. GALBRAITH: 179, line 15.
THE WITNESS: I don't remember none of that. All I know is what I said --



MS. BRADFORD-GREY: We can refresh your recollection.
THE WITNESS: -- when they locked his behind up. Because just what he did. Him and his fried, whoever he was, they killed that man. I don't remember exactly what I said. I really don't. I don't even remember the trial, I don't even remember that trial. I really don't. I don't even remember where the trial was held at. I don't know where we was at. All I know is the trial happened. It happened and it's over, to me, in my mind. It's done. It happened. I seen the man give him the gun and the guy shot and killed him. That's all I remember. I don't remember nothing else, word for word what I said, I don't remember that. Whatever I said it was the truth.
BY MS. GALBRAITH:
Q. Okay. So you have no independent recollection of the trial?
A. No. I don't even remember where we held it at.
Q. However, there is -- you have no dispute that everything you said at the trial was accurate?
MS. BRADFORD-GREY: Objection. If she

has no memory, how can she answer that?

THE WITNESS: Whatever I said was the truth. I have no reason to lie because I didn't -- I don't know that man. I never met James Kelly.

BY MS. GALBRAITH:

Q. This is going to be marked as --

A. Only that day, New Years day.

Q. -- Defense Exhibit 2.

- - -

(Exhibit D-2, Investigation Interview Record, Bates stamped Kelly00159 through Kelly00161; NK DEFS 36099-36012, 4 pages, was marked for identification.)

- - -

BY MS. GALBRAITH:

Q. All right. Ms. Williams, I'm going to represent to you that this is one of the statements that you made to the police. This does not have a date on it.

A. This is just what she showed me on her phone. If I signed this, yes, I told the truth. It's what I said, is this. Yeah, I said it. If I signed it, I said it.



Q. Okay.

A. My signature is right there.

Q. Okay.

A. Just like I told her when she showed it to me, if you see my signature there and they write on it, I said it. Yes, this is what I said. And I'm sticking to that.

Q. Who showed it to you on the phone?

A. She did (indicating).

Q. For the record you're pointing to Ms. Keir Bradford -- Ms. -- I'm failing. Sorry.

MS. BRADFORD-GREY: Ms. Bradford-Grey.

MS. GALBRAITH: I know. I'm sorry. I was just failing.

BY MS. GALBRAITH:

Q. Ms. Bradford-Grey?

A. Yeah. She showed that to me. She had one of the guys or whoever she called on the phone to pull it up, and he showed me this. And she said, that's your signature? I said, yes it is.

Q. Okay.

A. The same I'm telling you guys. Yes, that's my signature. Yes, that's my statement. And I'm not changing it.



Q. Okay. Did the police force you to say anything in this statement?

A. Oh, God, no. They can't tell me -- never mind.

No, the police didn't force me to say anything. They just asked me some questions like you are, and I answered them.

That don't even make sense, the police forced me to say -- that don't even make sense.

That don't even sound right. Who do you think I am?

Q. Okay. Still looking at Exhibit Number 2, in this statement -- just look at this one for a minute. On the first page, which is marked Bates number Kelly 000159. You told the police that you were upstairs in your bedroom with your -- well, I'm going to read specifically what you said.

"I was upstairs in my bedroom with my boyfriend Kevin Mathis. I heard gunshots and said, Kevin, what was that? And he looked out the window. After he looked out, he turned to me and said there was somebody laying out there. Then I looked out the window and saw a man laying on his side in the sidewalk and I saw a woman standing against the house. She was crying and screaming. I didn't recognize her" --



MS. BRADFORD-GREY: I'm going to object to the form of this. Are we -- is there a question? You can't just read her the statement. You might ask her to read that and then you ask her a question --

THE WITNESS: I'm not reading that because I don't want it in my mind again.

MS. BRADFORD-GREY: I'm going to object to the form of this question, Jami. I'm just objecting to you just reading it.

Do you have a question?

MS. GALBRAITH: This is my deposition. And I didn't ask a question yet.

MS. BRADFORD-GREY: Well, no, I understand. I think what I'm objecting to -- this is not -- I'm not -- this is not -- we're being legal colleagues.

I'm saying is there -- you can't just read the entire statement. Is there a question you have?

MS. GALBRAITH: You're not letting me get to my statement. If you're objecting to form, it's noted on the record.

THE WITNESS: What is the question?
BY MS. GALBRAITH:
Q. Was that information, when you told the police that, accurate?
A. If I said that, it's accurate.
MS. BRADFORD-GREY: What information are you referring to, Jami?
THE WITNESS: Whatever I signed it said, it's the truth.
MS. BRADFORD-GREY: What are you talking about?
MS. GALBRAITH: We're on Exhibit 2.
MS. BRADFORD-GREY: So we're going back to the first?
MS. GALBRAITH: Yes. I said we were going back to Exhibit 2.
MS. BRADFORD-GREY: All right. So you told -- she -- you asked her was everything in the statement truthful?
THE WITNESS: Yes.
MS. GALBRAITH: I asked if the thing I just read was truthful.
THE WITNESS: Everything is truthful.
MS. BRADFORD-GREY: I just want to



clarify for the record.
Are you asking if the entirety of the statement is truthful or just the little piece that you read? What are we doing with this?
BY MS. GALBRAITH:
Q. Ms. Williams, the section I just read, was that truthful?
A. Yes, ma'am.
Q. Okay.
A. To my knowledge, to -- I guess. Whatever. Because I can't remember everything right exactly how it happened. I'm trying to, but. I'm trying to work with you guys, but, look, all I keep telling you, whatever I told them then, it was the truth.
Q. I want to direct your attention to Kelly 00161, which is the third page of your statement. There is a question there from police that says:
"Did you see who shot him?"
And you responded, "no."
A. Say that again.
Q. There is a question here that says:
"Did you see who shot him?"
And you responded, "no."
A. No.



Q. Was that accurate?
A. Yeah, I guess it was accurate. I don't know who shot. All I know the little guy shot him. I know James Kelly didn't shoot him.
Q. What do you mean by that?
A. I didn't see him shoot him. I seen the little guy -- James Kelly gave him the gun. The black guy shot him. That's what I said in my statement who shot him.
I say he laid him on the ground and he shot him a lot of times. He shot him one time in the head and laid him on the ground and kept right on shooting him.
Q. Okay. So everything you told the police in this statement was true?
A. Yes.
Q. Okay. Moving on to Exhibit Number 3.
\- - -
(Exhibit D-3, Investigation Interview Record, Bates stamped Kelly00094 through Kelly00099, was marked for identification.)
\- - -
BY MS. GALBRAITH:
Q. This will now be Exhibit Number 3.



A. Why you all keep giving me this stuff? I told you everything I said is in there and I signed it and it's the truth. And it is what it is. I mean, I can't go back and forth with that. I don't remember actually accurate whatever. Whatever I signed, if my name is on it, I signed it and it's the truth.
Q. Ms. Williams, I'm almost done. I just have to get -- I have to go through some of this and confirm the information.
A. You can go -- yes. Go ahead. Ask me the questions you need. But I don't -- I'm not trying to read all that in my mind like that.
Q. I very much appreciate you being here.
So Exhibit Number 3, which I believe is dated 3/21 of 1993, it's a little difficult to read.
A. 3/21?
Q. Of 1993.
A. (Reviewing document.)
Q. Okay.
A. Oh, my God, Y'all gotta be kidding me. '93, you -- never mind.
Q. Is everything that you would have told the police in this statement on March 21st of 1993 accurate and true to the best -- to what you believe

Page 66

was the best of your ability in 1993?
A. Yes. To the best of my ability, it's the truth.
Q. Okay.
A. What I remember, yes.
Q. Okay. At the bottom of Kelly 0095, the police ask you to describe the man who was with the shooter.
A. And I described him, right?
Q. Who was the man that was with the shooter?
A. I don't -- whatever is on that paper. Y'all gotta leave me alone. Y'all getting me all sick. This is getting on my nerves.
Q. Okay. I'm going to read your answer out loud to you --
A. Oh God. This is '93. Remember '93, I was 25 or 26 years old.
Q. Okay. Ms. Williams, I understand. I just, like I said, I just have to get some of this out.
You described a black male, who had real -- he had real big lips, box hair cut, about 33 years old, brown skin, medium mustache, 5-11, thin, box haircut. He may even be a little taller, maybe 6-1 and he was wearing a beige cashmere full-length coat and dress shoes.

Page 67

Is that accurate information?
A. Yes. If I said it, yes.
Oh, my God. This is crazy. Yeah. It's accurate. If I said it and wrote it and signed it, it's the truth. To the best of my knowledge, yes, it's the truth.
Q. Did anything in this statement, did the police make you say any of this?
A. No, ma'am. No, the police didn't make me say anything.
Q. Okay. And no Police Officer threatened or coerced you to give that statement?
A. No.
Q. Okay. Moving -- I'm getting confused by my own set of papers here, which is why you are here.
A. That's a waste of time. I don't even know why they brought me down here with this nonsense. But the police can't make me say nothing. They can't make me do it, do anything or make me get involved in something I don't know about. That don't even make sense.
Q. I think, Ms. Williams, you might have said mm-hmm at one point. I don't know if the Court Reporter can clarify that. If so, I just want to know

Page 68

if that means yes?
MS. BRADFORD-GREY: The mm-hmm refers to which question?
MS. GALBRAITH: To the last question I just asked.
THE WITNESS: Mm-hmm on what?
BY MS. GALBRAITH:
Q. To the last question I just asked.
A. The police make me say something? No, they didn't make me say anything.
Q. Okay. Did the police threaten or coerce you? It was that question.
A. Oh God, no.
MS. GALBRAITH: This is Defense Exhibit 4.
- - -
(Exhibit D-4, Investigation Interview Record, 9-14-93, 2 pages, was marked for identification.)
- - -
BY MS. GALBRAITH:
Q. Okay.
A. I don't need to see it. I really don't. I remember what everything I said. If I said it and I

Page 69

signed it, it's the truth. I don't need to see none of that.
MS. GALBRAITH: For right now can you mark it and we'll make a copy of it. Defense Exhibit 4.
MS. BRADFORD-GREY: That one is my copy, it has the highlight, so we're just seeing it and then we'll get you a clean copy.
MS. GALBRAITH: It's the correct first page, it's the wrong second page, that's why.
BY MS. GALBRAITH:
Q. Okay. Ms. Williams, I need -- I know you don't want to. But can you please look at Defense Exhibit 4.
A. And?
Q. We're going to get through this in the next few minutes, hopefully.
A. And what you want me to do with it?
Q. Okay. The first question I have for you is, this statement that you made to police --
A. My signature is on there, right?
Q. -- September 15th of 1993 truthful and accurate?
A. Yes, it's truthful and accurate.

Page 70

Q. Looking at this statement, looking at page one of that statement, which is Kelly -- let me make sure I'm looking at the right thing, it should be 115.
MR. POMERANTZ: Your first page has 114.
MS. GALBRAITH: It does?
MS. BRADFORD-GREY: Your first page. The first page of that statement is 114. And the second page would be 115.
THE WITNESS: I can't believe I gotta be here because I'm mighty sick. Oh my God.
MS. BRADFORD-GREY: This is the statement from 9/14.
MS. GALBRAITH: I know. I have the wrong report here. I'm just trying to fix myself.
THE WITNESS: So why I'm here? I have to go through all this statement again? That's why y'all got me here, to go through this, relive this whole thing again? That's why I'm here.
BY MS. GALBRAITH:
Q. Ms. Williams, I just need to ask you a couple questions.

Page 71

Is your signature on that statement? Can you look at it, please.
A. Yes. It's my signature.
Q. Just can you look at it, please.
A. I am looking at it. It's my signature.
Q. Okay.
MR. POMERANTZ: Just for the record, I don't think the signature is on the first page.
THE WITNESS: It's right here (indicating). That's my signature right there (indicating).
MR. POMERANTZ: Okay. For the record.
BY MS. GALBRAITH:
Q. So everything in this statement --
A. Accurate and true? Yes.
Q. So everything in the statement is accurate and true?
A. Yes. To the best of my knowledge, right now.
Q. Did the police -- did the police coerce you or threaten you to say anything in that statement?
A. No.
Why would the police threaten me or force me to say anything about this -- y'all keep asking me the same dumb questions. It's dumb. No,

Page 72

the police didn't ask me to say anything, but they asked me what happened and I told them. Whatever I signed, it's the truth. It's the truth. The man is dead, y'all know that. You know somebody killed him. It happened on my street, in front of my house.
Q. I'm --
A. Go ahead.
- - -
(Exhibit D-5, Investigation Interview Record, 9-15-93, Bates stamped KELLY00115 through KELLY00116, was marked for identification.)
- - -
BY MS. GALBRAITH:
Q. Defense Exhibit 5, which is Kelly 115 to 116, was a statement taken on -- I'll represent to you is a statement that you made to police on September 15th of 1993.
Ms. Williams, do you -- if you please look at that copy of that statement, Ms. Williams.
A. (Reviewing document.)
Q. Is that your signature at the bottom?
A. Yeah.
Q. Is everything that you said to the police on

Page 73

9/15 or 1993 true and accurate?
A. Yes.
Q. Okay. In this statement, you did a photo display of eight males. And you identified an individual named Larry.
Do you see that?
A. Yeah. I don't remember who Larry is, from all that time. I don't remember those people.
Q. I want to refresh your recollection. There is a question that says, "Who is Larry?"
And the response says, "That's the man who shot and killed Travis."
A. It probably was. If I say it was, it was him.
Q. Okay.
A. I just don't remember today. I might have -- back then, I remembered; today, I don't.
Q. The very next question says, "Ernestine, I'm showing another photo display" -- well, strike that.
It's not the next question.
The last question on page Bates number Kelly 000115, the question is, "Ernestine, I'm showing you another photo display of eight males, do you recognize anyone?" And the answer is, "That's him, number 4. He's the guy with Larry that killed Travis

Page 74

Houston."
A. If I said it, it's the truth.
Q. Do you recall doing a photo identification of James Kelly?
A. Not today, I don't. No, I don't remember.
Q. Did the police tell you who you identified, when they showed you the photo array of James Kelly?
A. No.
MS. BRADFORD-GREY: Objection to the form. Jami, I think that you are really leading her on.
BY MS. GALBRAITH:
Q. Did the police tell you -- did the police -- strike that.
A. Because it sounds stupid. No, the police didn't tell me to do nothing.
Q. Did the police threaten or coerce you when you made the statement?
A. Oh, jesus. No. You couldn't even get it out because it sounds stupid. My God. No. The police didn't coach me to do anything.
\- - -
(Exhibit D-6, Investigation Interview Record, 10-31-1995, Bates stamped KELLY00156

Page 75

through KELLY00158, was marked for identification.)
\- - -
BY MS. GALBRAITH:
Q. This will be Defense Exhibit Number 6.
Ms. Williams, I'll represent to you this is a statement you made to police on October 31st of 1995.
A. '95. Oh my God.
Q. Do you see your signature on that statement -- do you see a signature on that statement?
A. Yes.
Q. Whose signature is that?
A. Mine.
Q. I'm going to direct your attention to the second page. It's Kelly 00157.
A. (Reviewing document.)
Q. The second page, so it's the back of the first page.
A. Okay.
Q. The very last question, that says, "Has anyone threatened you about this case?" And your response was, "The big lips guy's brother is Calvin. He came to my girlfriends a week" -- I'm not entirely positive

Page 76

what that says, "A week after the -- they picked up his brother up and he told me I had to go see the big lips guys lawyer. I said no."
Is that accurate and true?
A. Yeah. Yes.
Q. Do you recall that incident?
A. Today? No. Then if I said it and I signed it, it's the truth.
Q. Looking at the next page, Kelly 158, you continue with your answer, and you said, "And he said I had to, he took me there, somewhere on Broad Street" --
A. Do we really have to go through this word by word?
Q. Ms. Williams.
"He told me his brother's life was in my hands. They tape recorded a statement. I didn't want to go but they made me. I told the lawyer that too. He said I would be all right and he gave me candy and cigarettes" --
A. Who?
Q. -- is that true?
A. I don't know. If I signed it, it must be true.
Q. Did the police --

Page 77

A. I don't remember none of that. Y'all telling me some stuff -- I don't remember none of this.
Q. Did the police force you to say anything in that statement?
A. No. The police never forced me to say anything. I do know that. But I don't remember that stuff. I don't want to remember that stuff. And I know the police didn't force me to do anything.
Q. Ms. Williams, I'm just going to take a couple minute break just to consult with counsel, but I believe I'm almost done.
A. I hope so.
Q. If you need to use the restroom --
A. No, I need get up out of here. I need to get out of here, that's what I need to do.
(A short break was taken.)
MS. GALBRAITH: Ms. Williams, I do not have any further questions for you. I want to thank you for all of your time. Plaintiff's counsel is going to have some questions for you and it's possible I might have some follow up, but I have nothing right now.
THE WITNESS: Okay.
MS. GALBRAITH: And I really do

Page 78

appreciate you being here.
THE WITNESS: Thank you.
- - -
E X A M I N A T I O N
- - -
BY MS. BRADFORD-GREY:
Q. Ms. Williams, we do have to ask you some questions. And it's going to be -- we're going to go through some documents with you. So if you can bear with us and just answer to the best of your ability.
First, I'm going to ask you, did you prepare with anyone before you came here today to give your deposition.
A. No. I already told you I wasn't --
MS. GALBRAITH: Objection to form.
THE WITNESS: No.
MS. BRADFORD-GREY: Wait.
Whose form?
MS. GALBRAITH: I was objecting to you I just wasn't fast. I'm sorry. My apologies.
For the record, objection.
You can still answer.
BY MS. BRADFORD-GREY:
Q. You said you did not prepare with anyone?

Page 79

A. No.
Q. All right. And before you came here, did you have a chance to look at any other information regarding the case?
A. Yes. You showed me on your phone, my name and my signature and some statements that I did.
Q. And how many statements were you shown?
A. You showed me some stuff on your phone. You were scrolling up. Two, I think it was two or three.
Q. Okay. And are those the only things that you looked at to prepare for today?
A. What you seen, what you showed me, yeah.
Q. Did any other lawyer or anyone show you any other documents before today?
A. No. Just you.
Q. All right. Now, I want to just go back to 1993.
A. You gotta be kidding me. I don't remember.
Q. Ms. Williams, did you live -- the house was it -- what was your address at that time? Can you just state your address?
A. I don't remember.
Q. Was it 223 [sic] Bambrey Street?
A. It might have was. That was so long ago, I

Page 80

don't remember that address, ma'am.
Q. And was that your mother's house prior?
A. No. That was my house.
Q. Did you acquire that via co-op from the City of Philadelphia --
A. I don't remember. All I know it's my house.
Q. Ms. Williams, you have to let me ask the question and then you can answer. But I have to finish the question so the record is clear.
Did you acquire that house through a co-op through the City of Philadelphia?
A. No. I don't think so. I don't remember. I don't know. It was so long ago, I don't know.
Q. Well, I'll just refresh your recollection.
A. I know it was a dollar house that I purchased.
Q. You say it was a dollar?
A. I paid 500 for it.
Q. I'm sorry. Let me just go back.
A. Yeah. I paid 500 for it.
MS. GALBRAITH: Jami, we don't have a -- I'm sorry. I don't have a copy of it so I'll let you see it --
THE WITNESS: What my house got to do with this anyway?

Page 81

MS. GALBRAITH: Do you have the Bates numbers for that?
MS. BRADFORD-GREY: We don't have any Bates numbers on it. It's a deed. We didn't Bates number this.
THE WITNESS: My house ain't got nothing to do with you.
- - -
(Exhibit P-1, Deed, March 5, 1991, 15 pages, was marked for identification.)
- - -
BY MS. BRADFORD-GREY:
Q. Ms. Williams, you were able to acquire your house on March 5th, 1991 for a dollar, correct? And that's the house that you were in when the incident happened, when the murder happened. And that was 223 [sic] Bambrey Street; is that correct?
A. Yes.
Q. And that was from the City of Philadelphia?
A. Whatever. I don't know. Yeah. It's whatever.
Q. Is that a yes?
A. Yes.
Q. So is that something you remember or do you need to see this --

Page 82

A. What do you want to know about -- I mean, what has that got to do with this?
Q. Do you want to see the deed or is that something --
A. No, I don't want -- you got my deed too?
Q. Do you want to see this or is that something --
A. No. Go ahead. Whatever you got. You keep it to yourself.
Q. Okay. So at the time you acquired it, there was -- you got it from the City of Philadelphia, correct?
A. Yes.
Q. And did they have a mortgage attached to it?
A. No.
Q. So not a -- a $30,000 mortgage wasn't on this house?
A. No, not that I remember.
Q. Were you the mortgage holder from the group?
A. I didn't have a mortgage.
And what the heck do that got to do with a man killing somebody?
Q. Just give me a minute.
A. You asking stupid stuff.
Q. All right. Did you have a $30,000 --

Page 83

A. No, I did not.
Q. -- mortgage on this?
A. No, I did not.
Q. I'm going to show you, I think it's page --
MS. BRADFORD-GREY: I don't have the page numbers, but we're going to just go through this, Jami, and we'll deal with it. This is the mortgage, and it has her signature on the bottom.
MS. GALBRAITH: (Reviewing document.) Just since you don't have copies of it, can you please provide me or whatever.
MS. BRADFORD-GREY: We will. We will do that.
That's the same.
We'll make you a copy of everything. And I'm so sorry we did not bring it, so I apologize for that.
MS. GALBRAITH: Okay.
MS. BRADFORD-GREY: Can you please pass this to the witness.
BY MS. BRADFORD-GREY:
Q. Ms. Williams.
A. I'm good. I'm good. I'm good.

Page 84

Q. Well, I have to ask you the question.
Is that your signature?
A. Yes.
Q. Okay. So is that your signature on the mortgage to the home of 223 [sic] Bambrey Street?
A. Yes, that's my signature.
Q. All right. So you signed a mortgage for $30,000 on that home?
A. Okay.
Q. Is that a yes?
A. Yes.
Q. All right. So do you recall that you had a mortgage on that home?
A. Yes.
Q. All right. Did you pay that mortgage yourself?
A. Yes. I paid all my bills myself.
Q. All right.
A. Up to this date, in my house where I own right now.
Q. Okay. So now, with respect to 223 [sic] Bambrey Street, when did you pay your mortgage off?
A. I don't know. That was 199- -- I don't even live there no more, ma'am. If you know when I paid my mortgage, you refresh my memory, because I don't know.

Page 85

Q. All right.
A. I don't remember.
Q. Now, living over there. You lived over there pretty much all your life?
A. No.
Q. When did you live at 223 [sic] Bambrey Street --
A. I have no idea. I don't remember.
Q. Was your mom -- was that your mom's home?
A. No. That was my house. My mom had her own house.
Q. Okay. And how did acquire it from the City?
A. None of your business.
Q. Well, you have to answer the question.
A. None of your business.
Q. You have to answer the question.
A. I don't remember.
Q. All right. Now, with respect to the mortgage --
A. What in the heck is you worrying about my mortgage for? Do you want to pay the mortgage I live at now? I got a mortgage on that.
Q. Ms. Williams, with respect to the mortgage on 2023 Bambrey Street, it says it was just paid off in

Page 86

June of 2024. And that was the original $30,000 mortgage.
Did you pay that?
A. None of your business.
Q. Well, you have the answer.
A. I don't remember.
Q. You have to answer?
A. I don't remember.
Q. So you don't remember, it would have been two years ago?
A. I don't remember.
Q. You don't remember if you paid the final payment of the mortgage --
A. No, I really don't. I don't remember.
Q. All right. Now, at some point -- well, let me ask you before I go back to this.
Do you know a person named Tommy Lockwood?
A. No. I don't remember nobody named that name.
Q. Have you ever known a person named Tommy Lockwood?
A. No, I don't.
Q. Do you know a person named Danny Lockwood?
A. Oh God, no.

Page 87

Q. Did you ever tell anyone that you used to date Danny Lockwood?
A. Never. Why would I -- no.
Q. Did you talk to a District Attorney by the name of Ms. Carrie Woods --
A. No.
Q. -- in 2024 or 2023?
Do you remember talking to a District Attorney?
A. No.
Q. Ms. Carrie Woods?
A. No.
Q. Do you remember Ms. Carrie Woods calling you at all about this case --
A. I don't even know a Carrie Woods.
Q. Let me finish.
Do you remember anyone calling you and saying they were a member of the Philadelphia District Attorney's Office?
A. Yes, I do remember that.
Q. Okay. Was it a woman or a male?
A. It's a lady.
Q. It was -- do you recall her name was Ms. Carrie Wood?

Page 88

A. I don't know what her name was, but I know in '23, yeah.
Q. She asked you --
A. So another one harassing me.
Q. Okay. She asked you questions about the case and the incident and your statements, correct?
A. Yeah. She told me he was out of jail.
Q. In 2023 --
A. I think --
Q. -- she told you he was out of jail?
A. Yeah. I think she said he was out of jail.
Q. All right. But at that time she was asking you questions about what happened that -- during that time, correct?
A. Yeah.
MS. GALBRAITH: Objection.
THE WITNESS: Another one harassing me.
MS. BRADFORD-GREY: What's the objection?
MS. GALBRAITH: Just about time. Can you clarify.
MS. BRADFORD-GREY: Sure.
BY MS. BRADFORD-GREY:
Q. About time of the homicide, and the time that

Page 89

you had to testify, and the time that you were giving statements, she asked you about all of that, correct?
A. No. No.
Q. She didn't.
What did she ask you, from your memory?
A. I don't know. I forget what she asked me. All I know is she was telling me something about he was getting out of jail soon.
Q. She told you that?
A. I think that's what she said.
Q. Okay.
A. I'm not sure. I'm not going to make up nothing. I don't know. I can't remember exactly.
Q. Do you recall talking to her about Tommy Lockwood?
A. No.
Q. Did you ever mention the name Tommy Lockwood at any time?
A. I don't even know who that is.
Q. Okay. Did you know that he was -- you don't know who Tommy Lockwood is you're saying?
A. No, I can't remember now. Ain't he dead? Did they say somebody died? I don't know.
Q. Who said that he died? Can you tell me?

Page 90

A. I don't know. I don't remember.
Q. But you just don't --
A. I don't know. Don't confuse me.
Q. Ms. Williams?
A. Don't confuse me.
Q. I'm not. I'm trying to make sure I'm not confused?
A. No, I don't know Tommy Lockwood.
Q. Hold on. I'm just going to ask you a question.
When you say, they said he died, who is they?
A. I was asking you a question, ma'am.
Q. Who insinuated that he died?
A. I don't know. I was asking you, did he die.
Q. How would he -- why would you think he's dead?
A. I was asking you the question. You know everything about them. You came to my house with his sister-in-law, so I'm -- you probably know him better than I do.
Q. We're talking about Tommy --
A. I'm asking you, do you know did he die.
Q. We're talking about a Tommy Lockwood.
A. You know him. I don't.
Q. You never knew a Tommy Lock- --

Page 91

A. No. I'm asking you. Did he die? What you want to know? What are you trying to tell me?
Q. So the house of 2023 --
A. You know him better than I do.
Q. Let me finish, please.
The house at 2023 Bambrey Street, did you sell that to Thomas Lockwood in August of 1993?
A. I sold my house, but I don't remember who I sold it to.
Q. So who would you have sold your house to at that time --
A. I don't remember. It was a long time ago. I been sold that house. I don't remember who I sold it to.
Q. So when you --
A. Do you know who I sold it to?
Q. Sure. I'm going to show you.
A. You ain't got to show me. Just tell me. You know who I sold my house to?
Q. Yeah. That's the sale of the house to Thomas Lockwood?
A. Oh, okay. I well, sold it to Tommy Lockwood. So what is your -- what's your question?
Q. How did you come to have that deal with Tommy

Page 92

Lockwood --
A. Well, you all -- they was harassing me --
Q. Let me finish the question.
How did you come to --
MS. GALBRAITH: Is this being marked?
MS. BRADFORD-GREY: Yes. I'm sorry. Did I have the first one being marked? So the first one is --
THE WITNESS: I didn't want to live there no more, so I sold it. What you think.

- - -

(Exhibit P-2, Deed, August 23, 1993, 4 pages, was marked for identification.)

- - -

BY MS. BRADFORD-GREY:
Q. Ms. Williams?
A. Yes.
Q. Can you look at that paper, please?
A. Yeah. I'm looking at it.
Q. And do you see that's the sale of your house --
A. Yes. I know I sold my house.
Q. Ms. Williams, I have to finish the question.
The sale of your house, 2023 Bambrey Street, to Mr. Thomas Lockwood --

Page 93

A. Okay.
Q. -- in August of 1993 --
A. Okay.
Q. -- do you recall that?
A. Yes.
Q. How did you come to sell him your house?
A. Because I sold it to him. Because I didn't want to stay there no more. And he said he would buy it. And I sold it to him.
Q. When did he approach you to talk about your home --
A. I have no idea. I don't remember.
Q. Where did the two of you talk about it?
A. I don't remember. All I remember is I sold him my house and I moved.
Q. So when you sold him your house, you say in August of 1993 --
A. I had to get from down there. I couldn't stay down there no more.
Q. Where did you go?
A. I don't know. I moved somewhere. I don't know. I think I moved to Willingboro, New Jersey.
Q. Were you by yourself or --
A. No, I wasn't by myself.

Page 94

Q. Who did you live with --
A. None of your business.
Q. Ms. Williams, you --
A. None of your business. You asking to much questions. No, that's none of your business who I lived with. That's none of your business.
Q. Did you live with any of the Lockwoods?
A. Oh, God, no. Oh, Lord. I told you. I don't know even know them.
Q. You don't know them at all --
A. No.
Q. -- but when you settled in your home, how --
A. Why would I live with him when I sold him my home?
Q. Okay. We'll get there.
A. You sound stupid as hell.
Q. Okay. We'll get there.
With respect to -- do you know a guy Anthony Lockwood?
A. No.
Q. Do you know if Mr. Lockwood or his family had an issue with selling drugs in the area?
A. No.
Q. Did you know any drug dealers in the area --

Page 95

A. I don't know nothing about them. No.
Q. Did you know any drug dealers in the area?
A. No.
Q. Were you yourself addicted to drugs --
A. Never.
Q. -- in 1993?
A. I never was addicted to anything.
Q. Okay.
A. I never was addicted to anything.
Q. Now --
A. I lived my life. I had fun, but I wasn't addicted to anything.
Q. Did you use drugs?
A. I used before.
Q. Were you using drugs during this time?
A. No. I don't know. I don't think so. I don't remember. I don't remember.
Q. Could you recall any of the dates in which you were in what we would call, maybe, a drug addiction home?
A. No. Never. I wasn't never addicted to anything.
Q. Okay.
A. I had a job. I worked. I had a car. I had a

Page 96

house. I had money. I wasn't addicted to anything.
Q. All right. And the house you're talking about was 2023 Bambrey Street?
A. Yes.
Q. Okay. But after you sold it, did you acquire another house?
A. No.
Q. All right. So you just stayed with someone?
A. I don't know what I did. I was young. I don't know what I did.
Q. All right. Now, in 1994, do you recall the police coming to your home or the home of Tommy Lockwood looking for him to serve a warrant for a homicide?
A. No, I don't remember none of that.
Q. And so if --
MS. BRADFORD-GREY: Let's mark this as Plaintiffs-3.
- - -
(Exhibit P-3, Activity Sheet, Bates stamped AL (HF) 000865 through AL (HF) 000866, was marked for identification.)
- - -
THE WITNESS: Oh, you know what, I do

Page 97

remember you was on my porch and you did say that wasn't my house I was living in. That's where you I got that from?
BY MS. BRADFORD-GREY:
Q. I don't know anything --
A. Because what you said now, it's starting to ring a bell --
Q. Ms. Williams --
A. -- when you said --
Q. Ms. Williams --
A. I'm asking a question.
Q. No, you don't ask the questions.
A. Well, one thing about it, you said to me, that this not your house, this is your mother house or something.
Q. Okay. We're going to move on.
A. That's where you got that from, that I be living with somebody. Because my mother passed away.
Q. I'm not sure what we're talking about.
A. You didn't even know that -- you didn't even know that, did you?
Q. Let me finish with the questions.
So I'm going to show --
MS. GALBRAITH: Counsel, I just ask

Page 98

that when you get the one with the Bates number that you do get a Bates number and provide it to me.

MS. BRADFORD-GREY: Sure. This is actually from someone else's. This is not a Bates number, this is another H file --

THE WITNESS: She got a whole lot of stuff she not saying.

BY MS. BRADFORD-GREY:

Q. All right. I'm going to show you what's been passed to us by Defense and marked as AL HF 000865. And AL, looks like it would be Anthony Lockwood homicide file.

All right. So I'm going to show you this. And you can read, just quick, if you want. There is some highlights. You can read the highlights.

A. I'm not read nothing. How about that. No, I'm not reading it.

Q. Well, I'll read it to you. Let me see it.

A. I'm not reading none of that. Because you know more than I do. You already said what you had to say when you came to my house.

Q. So police detectives were looking for another,

Page 99

I guess, a fugitive Thomas Lockwood?

A. I don't know nothing about them people.

Q. Did you know there was another man --

A. No.

Q. -- named Stacy Williams that was murdered around your neighborhood?

A. I don't know nothing about --

MS. GALBRAITH: Objection.

MS. BRADFORD-GREY: What is it?

MS. GALBRAITH: Just foundation.

THE WITNESS: -- none of that. Why don't you ask me about somebody else.

MS. BRADFORD-GREY: What is the objection, foundation? I mean, I don't understand what you mean by -- did you know if there was another man murdered in your --

THE WITNESS: Yeah. We don't -- I don't got nothing to do with that. I'm not even involved in that. Why is you putting me with something I don't even know about?

BY MS. BRADFORD-GREY:

Q. Well, this happened in your neighborhood?

A. And I'm supposed to know what's going on in the neighborhood?

Page 100

Q. You live there, right?

A. I live right in that same neighborhood. I don't know what going on in there.

Q. And during 1993 --

A. You know what's going on in your neighbor?

Q. And during 1993, were there a number of shootings --

A. I don't know.

Q. Ma'am, I have to ask the questions --

A. And I'm telling you, I don't know.

Q. First, you have to me let finish asking the question and then you answer --

A. You crazy as hell.

Q. -- because we're going to have a complete record. So, in 19- --

A. If you don't know how to ask me a question, you need not to ask me none. Because you asking me something that I have no knowledge to.

Q. In 1993 --

A. No, I don't know nothing about that.

Q. Can I finish the question?

There was another shooting of a man by the name of Stacy Williams and Mr. Thomas Lockwood was a suspect.

Page 101

MS. GALBRAITH: Objection.

THE WITNESS: You ain't kidding. Thank you.

MS. BRADFORD-GREY: What was the objection? I'm reading it. I'm reading it.

THE WITNESS: What that got to do with me?

MS. BRADFORD-GREY: I'm sorry. Jami, I'm reading this from here. She won't look at it, I have to read it.

THE WITNESS: But what I got to do with that, ma'am? I don't know these people.

MS. BRADFORD-GREY: Miss -- Jami, I am reading this, so that is a part of what I have to do.

MS. GALBRAITH: Fine. I understand. I understand what you're saying.

MS. BRADFORD-GREY: Okay.

BY MS. BRADFORD-GREY:

Q. So Detectives came to 2023 Bambrey Street looking for Mr. Tommy Lockwood as a suspect for a homicide of Stacy Williams that occurred in February of 1993 right in your neighborhood.

Do you recall that?

Page 102

A. No.
Q. Do you recall answering the door --
A. No.
Q. -- for a Detective Richardson --
A. No.
Q. -- in 1994 on a Wednesday --
A. No, I don't.
Q. Let me finish the statement.
"On Wednesday, June 15, 1994, when the Detectives came to serve a warrant, Detective Richardson went to 2023 North Bambrey Street and were admitted in the premises by Ernestine Williams."
Do you recall that?
A. No.
Q. Do you recall them -- do you recall telling them -- I'm sorry. Matthews, which is the -- was Kevin Matthews also present in 1994?
A. No, ma'am.
Q. So the Detective says, "Also present was Kevin Matthews, black male, date of birth 2/19/60 and a search warrant of the premises was made."
Did they come and search the home?
A. You need to ask Kevin Matthews that. Because I don't know nothing about it.

Page 103

Q. Well, they say you were present too --
A. No, I wasn't present at that.
Q. So if the Detective --
A. That's a lie.
Q. That's a lie --
A. Did I sign that paper?
Q. Let me finish --
A. Is my signature on there?
Q. It's not.
A. Oh. Well, don't ask me nothing if my signature ain't on it.
Q. I have to ask it.
MS. GALBRAITH: I just want to make a standing objection on foundation.
You can keep going if you're reading everything.
MS. BRADFORD-GREY: Sure.
In any event -- and I don't know -- I'm trying to understand your foundation. Because this is what --
THE WITNESS: Because you asking some dumb questions that I don't even have nothing to do with.
MS. BRADFORD-GREY: Can we step

Page 104

outside. Let's step outside.
THE WITNESS: You really don't know what to ask me.
MS. BRADFORD-GREY: Let's step outside.
THE WITNESS: You really trying to get this man's a lawsuit over something he don't need to be suing. He need to be back in jail, if you ask me.
He's full of shit.
(A short break was taken.)
BY MS. BRADFORD-GREY:
Q. We're going to move forward.
Did you recall a woman by the name of Eileen Moss (ph) coming to your home in 2012 about Mr. James Kelly?
A. No.
Q. It was a white woman.
A. I remember two white ladies, but I don't know their names.
Q. Okay. Did you talk to one of them inside your home --
A. I didn't talk to nobody. I told the people to get off my person. Like I told you, like I told her. I didn't let none of y'all in my house.

Page 105

Did I let you in my house, Jami? No -- I mean, whatever your name -- what's your name again? What's her name?
I didn't let you in my house, did I? I kept shutting the door on you. All of y'all coming to my house.
Q. Do you remember a man by the name of William Stanton?
A. No.
Q. He was an investigator for Mr. Kelly?
A. I have no idea who you talking about.
Q. African-American gentleman?
A. No. I talked to a lot of African-American gentlemen.
Q. Okay. Do you remember talking to Mr. William Stanton about Mr. Kelly's case?
A. No.
Q. How many people did you talk to about Mr. Kelly's case --
A. I have no idea.
Q. Let me finish the question and then you can answer.
How many people did you talk to about Mr. Kelly's case? Let's just go through.

Page 106

You mentioned you talked to the DA, right, you gave -- you answered her question --
A. What is -- when is you talking about? What is the time period? When is you talking about?
Q. We're just talking about you speaking with the District Attorney.
A. When?
Q. In 2024 -- or 2023.
A. I didn't talk to no District Attorney in no '24.
Q. I'm sorry. September 8, 2023. You just said you remember talking to the woman?
A. That came to my house, on my porch?
Q. No. This one said -- I don't know where the conversation took place --
A. I don't know who you talking about. I didn't talk to nobody.
Q. -- September 6, 2023?
A. No, I didn't talk to nobody. I don't remember.
Q. You just said that the woman told you --
A. I don't remember, Miss.
Q. Let me finish the question, please.
You just said the woman told you that she was -- you said that she told you that Mr. Kelly

Page 107

had gotten out or was going to be released?
A. I don't -- yeah, her.
Q. Her.
Do you remember talking to her about --
A. No, I don't. I didn't talk to her about anything. I just told her to get off my porch, like I told you. She was talking through the screen door.
Q. Do you remember saying that, to her, that you used to go with her -- with Tommy Lockwood's brother, Danny?
A. No. She didn't ask me nothing. I ain't never said nothing like that.
Q. Okay.
A. Is my signature on that? No. I ain't never said no mind like that.
Q. Do you remember telling her anything with respect to a Christopher Swain (ph)?
A. No.
Q. Did you -- do you remember her asking you about a Christopher Swain?
A. No, I only remember when you and her -- Ms. Swain daughter came to my house. And I told her I don't know her. And she -- to get off my porch, you and her. That's the only time I talked to Ms. Swain

Page 108

daughter is when you and her came to my house.
Q. Do you know Christopher Swain?
A. I don't know none of y'all.
Q. So you're saying no --
A. I keep telling you that. I don't know y'all.
Q. You don't know Christopher Swain?
A. No. No, I don't remember him.
Q. Did you tell the District Attorney that you didn't say you were afraid to come forward with information because you were afraid about Tommy Lockwood --
A. Oh my God, no.
Q. -- and Mr. Christopher Swain?
A. You making up stuff now. You just making up shit.
Q. It's a question?
A. No.
Q. No?
A. No.
Q. Okay.
A. You making up stuff. Only one time I talked about Ms. Swain is when you and that girl and her daughter came to my house.
Q. Did you also know --

Page 109

A. And you said I was going to jail.
Q. Did you also remember, basically, saying that Tommy and his cousin, Anthony Lockwood got locked up for a long time, but you didn't know what it was for?
A. I never had a conversation with nobody, Miss, and you know I didn't.
Q. This was the woman you just said you talked to?
A. She didn't ask me about nobody and I didn't talk to her about nobody.
Q. You talked to her about no one at all?
A. No one.
Q. Okay. Did you talk to her about going to New Jersey to the home of Elaine Taylor (ph), nee Patterson?
A. I never knew nobody in no New Jersey named that.
Q. Okay. Ms. Patterson lived in a condo in New Jersey. Is that --
A. I don't even know Ms. Patterson. Who is Ms. Patterson?
Q. You don't know her at all either?
A. No, I don't even know who you're talking about.
Q. Okay.
A. I don't know no Ms. Patterson.

Page 110

Q. Did Ms. Patterson know Travis Houston?
A. I just told you, I don't know no Ms. Patterson, Miss, so how would I know if she know Travis?
Q. All right.
A. Oh, God. You don't know what to ask me. How about asking me some of the stuff you said to me on my porch.
Q. Can we finish. Now, you said that you don't remember, but you do remember talking to a white lady that came to your home, right?
A. Nope. I don't remember talking to nobody. I don't talk to you people. I didn't talk to you when you came to my house. You was trying to make me talk to you. I don't talk to you people. You was trying to make me talk. You showed me some pictures --
Q. Did you --
A. -- with my signature on there. I told you to get off my porch.
Q. Did you tell --
A. That's the shit you should be asking me, what you said to me.
Q. We're going to talk about what happened with the homicide.

Page 111

Did the woman show you a picture of Mr. Kelly --
A. No, she did not.
Q. Did the woman show you a picture of Boonchie (ph)?
A. No, she did not.
Q. Do you know who Boonchie is?
A. No, I do not.
Q. Do you know a Diandre King (ph)?
A. No.
Q. When she showed you the picture of Boonchie, did --
A. I just told you she didn't.
Q. Okay. So you're saying she didn't at all. Did you ever tell her that the --
A. Something wrong with you.
Q. Did you ever --
A. It really is.
Q. Did you ever tell her that the police offered to --
A. Didn't I just tell you I don't even know the lady. Why you gonna keep saying that? And I just told you I don't know her.
Q. Earlier you said you did know --

Page 112

A. I told you I don't know the lady. I didn't have no conversation with nobody.
(Discussion was held off the record.)
MS. GALBRAITH: And I just want to add, Ms. Williams, too, if you pause for a second, it would also, if I do have an objection, give me an opportunity, if you just -- it's a little smoother.
THE WITNESS: Okay. But she keep asking me the same thing I keep telling her I don't know.
(Discussion was held off the record.)
BY MS. BRADFORD-GREY:
Q. All right. The woman that you did admit that you said you spoke to, the white woman that was with Mr. Kelly's team, do you recall telling her that the police offered to protect you and offered you money for a cashmere coat and dress?
A. Oh my God, no.
Q. So you said no, you didn't tell her that?
A. No.
Q. Okay. Did you --
A. Are you serious? No.
Q. These are questions you can admit or deny.

Page 113

That's fine. Now, Mr. Kelly's brother-in-law, Calvin Kelly, you knew him?
A. No, I have no idea who he is.
Q. Did you attend his wedding?
A. No. What wedding? When was this?
Q. Calvin Kelly's wedding?
A. When.
Q. In 1990 --
A. No. I didn't attend nobody's wedding.
Q. Okay. Did you remember catching the bouquet at the wedding?
A. I ain't never caught no bouquet in my life.
Q. Okay. And at the wedding, did you recall seeing Mr. James Kelly?
A. I just said I didn't go to no wedding, ma'am.
Q. Okay. That's your story.
(Discussion was held off the record.)
So with respect to P-3, this is what I'm going to ask you. Did you ever tell -- and this is going back to the detectives that came to 2023 Bambrey Street, on June 15, 1994, looking for Tommy Lockwood. All right. I'm going to just go back because I'm not sure what's on the record.

Page 114

Did you admit Officers into the home of 2023 Bambrey Street on June 15, 1994?
A. No.
Q. Was Kevin Mathis at the home of 2023 Bambrey Street on June 15, 1994?
A. I don't know. I don't remember.
Q. Would he have been there if you were not there?
A. I don't know. I don't remember.
Q. If he was able to gain access to that home after you say you left, when -- how would he have done that?
MS. GALBRAITH: Objection; speculation.
MS. BRADFORD-GREY: I'm not sure what we're doing here. I thought we were doing form. What is the speculation -- I don't -- I think we have to take a pause.
Can we excuse the witness because we need to talk about something, please.
MS. GALBRAITH: Okay.
Ms. Williams, can you just step out for one second?
THE WITNESS: I'm going home. I'm going to call my ride. I'm done. Okay.
MS. BRADFORD-GREY: She cannot go home.

Page 115

THE WITNESS: I'm done. I'm done, right?
MS. GALBRAITH: Ms. Williams, you can't go home.
THE WITNESS: I already showed up. I answered your questions. It's time for me to go home. I'm so done.
(Witness left the room.)
MS. BRADFORD-GREY: Okay.
So, Jami, when we started this, we asked if we were going to have the standard objections. And I said are we doing objections to form and saving the rest for trial. Now, you're making objections for foundation, as well as speculation.
I'm not sure what we're doing here with this deposition because it just keeps seeming to go all over the place.
Are we doing form or are we not?
MS. ADEEYO: So. Sorry. This is Natalie Adeeyo. I'm an attorney here. My apologies for not being present in person.
The objections that Jami is making are perfectly within the bounds of the Federal

Page 116

Rules. There is nothing that states that we cannot state our basis for our objection aside from form. And the case law in the Third Circuit supports that position.
MS. BRADFORD-GREY: I don't think --
MS. ADEEYO: If she's making a speaking objection that you believe is improper, that's one thing. You can note it for the record and if you need to, we can call the Court to clarify that speaking objections are improper. But it's my understanding she's not making a speaking objection. She's simply stating her basis. She's not saying relevance or hearsay, which Third Circuit case law does say is improper to make in a deposition. But form, foundation, speculation are well within the bounds.
If you believe those are improper, I think you can make a note on the record. But to continuously stop the deposition when we clearly are preserving our record, I think is improper at this point --
MS. BRADFORD-GREY: I'm sorry. Who is this?

Page 117

MS. ADEEYO: -- especially because the witness is frustrated and wants to go home, I think what makes the most sense is to get through this.
MS. BRADFORD-GREY: I thank you for your, I guess, commentary. But what I'm saying is, we had an agreement on the record starting that we were going to object to form and save all the other objections until later.
Are we no longer making that agreement?
MS. ADEEYO: Well, I think that during that --
MS. BRADFORD-GREY: Who is this?
MS. GALBRAITH: Ms. Adeeyo can speak if she wished to speak. She is an attorney in this case.
MS. BRADFORD-GREY: I understand. Then Mr. Pomerantz can speak too.
MS. GALBRAITH: He did as well, just not when we were objecting --
MS. BRADFORD-GREY: No, we're going to keep -- then we're going to have a free for all. If Mr. Pomerantz wants to follow up, then he will. The way that you --

Page 118

MS. GALBRAITH: That's the same thing you're doing.
MS. BRADFORD-GREY: I'm not understanding what's happening here.
MS. GALBRAITH: We're having just a conversation right now.
MS. ADEEYO: Correct.
MS. GALBRAITH: At that point she can speak, Mr. Pomerantz can speak, anyone can speak, we're just having a conversation, just like we did out in the hall.
MS. ADEEYO: I just want to clarify, that I have not made a single word on the record. This is a meet and confer, which counsel --
COURT REPORTER: Everyone, I'm making a record and you're all talking, but I really can't hear her.
MS. BRADFORD-GREY: I don't even know who she is, so.
COURT REPORTER: She's on the zoom.
MS. BRADFORD-GREY: As I'm talking she interjected. So I think we need to just allow me to finish with my question to Jami.

Page 119

Are we making -- are we no longer doing form? Are we doing any objections? That's fine. Just let us figure out which one we're doing and that's fine.
MS. GALBRAITH: We're also going to do foundation and speculation objections, like the rules allow. And I am just making it for the record. We can fight it out later.
MS. BRADFORD-GREY: We will. And that's fine. All right. That's fine.
So we're doing more than form.
No worries.
Thank you.
MS. GALBRAITH: Okay.
MS. BRADFORD-GREY: We can bring her back.
MS. ADEEYO: I think that this also needs to be noted, maybe I missed it, but I'm not aware of a stipulation --
MS. GALBRAITH: There was a stipulation at the beginning.
MS. ADEEYO: -- that it was purely going to be form objections --
MS. BRADFORD-GREY: There was a

Page 120

stipulation. There was.
MS. ADEEYO: -- I don't think that's on the record and maybe that --
MS. GALBRAITH: That's okay. No, it is at the beginning of the dep. It's okay.
MS. ADEEYO: Okay.
MS. GALBRAITH: I think you missed it.
MS. BRADFORD-GREY: All right. So that agreement is off the table now?
MS. GALBRAITH: All right.
MS. BRADFORD-GREY: Right?
MS. GALBRAITH: Yes.
MS. BRADFORD-GREY: Fine. All right. We can bring her back.
(Witness entered the room.)
BY MS. BRADFORD-GREY:
Q. Okay. Ms. Williams, we're back on the record.
All right. Now, I think I'm just going repeat the last question because I don't think I really got to fully formulate and get your answer.
Did you tell the police that Heinz (ph) had moved from there a couple of years ago --
A. No.
Q. -- meaning 2023 Bambrey Street?

Page 121

A. No.
Q. Did you say that you owned that property and not Tommy Lockwood at that time when they came?
A. I don't remember.
Q. Okay. Did you further state that Lockwood's mother lives around the corner, and she has not seen him in the area since he was wanted for murder?
A. I don't even know his mother -- no.
Q. And when I say she, that would be you. That you didn't see Tommy Lockwood since he was wanted for the murder. Did you tell detective Richardson that?
A. No.
Q. All right. Do you remember a guy named Anthony Heinz (ph)? Do you recall a guy named Anthony Heinz?
A. No.
Q. Do you remember being arrested --
A. Arrested?
Q. Yes.
In -- arrested February 12, 1992. Do you remember being arrested and your codefendant was Mr. Anthony Heinz? Were you arrested for aggravated assault, simple assault, robbery, possession of instrument of crime, theft of unlawful taking --
A. You got the wrong person, honey. No.

Page 122

You got a picture of me being arrested?
Q. Are you saying you were never arrested?
A. No, not for nothing like that.
Q. No.
Were you arrested --
A. No.
Q. -- for anything else regarding burglary --
A. Oh God, no.
Q. -- robbery?
Never?
A. Never. I ain't never robbed nobody in my life. Never.
Q. I understand you said you never robbed, but were you arrested for that?
A. No.
Q. Never. Okay.
A. Not that I remember. No, I don't remember none of that.
Q. What were you arrested for?
A. A DUI.
Q. Is that it?
A. Yes.
Q. I want to show you --
A. Or either -- or fighting my brother.

Page 123

Q. Fighting your brother -- so when were you arrested for that?
A. My brother Kevin Williams.
Q. And what was that --
A. He stole something out of my house, I beat him up.
Q. What were you arrested for? What charge were you arrested for?
A. Assault and battery.
Q. So you were arrested for assault?
A. For my brother, Kevin.
Q. Okay. And was somebody arrested with you named Anthony Heinz, was he -- did he, I guess, defend you or --
A. I don't know if he was arrested. I know I was for fighting my brother.
Q. All right.
A. I don't know about nobody else. Just me, when my brother stole from me.
Q. And that person --
A. And my dad bailed me out.
Q. Do you know of a person named Sarah Click (ph)?
A. No.
Q. Okay. Did you -- were you ever accused of

Page 124

burglary --
A. Oh God, no.
Q. Let me finish the question.
-- against a complainant Sarah Click by producing a crowbar and attempting to strike her, grabbing her and dragging her into a hallway and assaulting her --
A. Oh God, no --
Q. -- and producing a cannister of mace and spraying her?
A. Oh God, no.
Q. Were you ever accused of that?
A. Not that -- I don't even know nobody named that.
Q. No?
A. Where this was at?
Q. Philadelphia.
Do you want me to show you?
A. What's the address?
Q. What's the address of what? I'm sorry.
A. Of whom I had a crowbar or whatever you're talking about.
Q. Do you want me to show you your complaint file --

Page 125

A. No. I want you to tell me. You the one reading the questions over here. Tell me what are you talking about.
Q. I'm going to let you see. I'm just going to let you see your --
A. Just tell me what are you talking about, Miss.
Q. I'm going to show you, let you see.
A. She's so full of shit, didn't make no sense.
Q. Ms. Williams, you can read and write, correct?
A. No, I can't. I really can't.
Q. You can't read?
A. No.
Q. So when you made your statements to the police, were you able to read them before you signed them?
A. I can't read right now, today, as of now.
Q. But you could read and write back then, 1993?
A. Yeah. I'm older now. I'm 64.
Q. What is impairing your ability to read?
A. You.
Q. Anything other than that?
A. You.
Q. Okay. Well, in terms of me impairing your ability --
A. Let's talk about -- let's talk about what's

Page 126

really important, threats that you made to me about this case.
Q. I'm sorry.
A. How about that.
Q. I'm sorry.
A. Can we talk about that? That's very important to me.
Q. Let's show her --
A. That's very important to me. That we talk about the truth that you made some threats to me.
Q. Ms. Williams, I understand you're upset that you have to be here --
A. How about let's talk about that, ma'am. Why we can't talk about that?
Q. I understand what you're saying --
A. Ask me the questions that you and James Kelly sister-in-law --
Q. I am asking you questions --
A. I don't -- this is irrelevant to me.
Q. Listen --
A. What's important to me right now is what we are -- what we going through today.
Q. Ms. Williams --
A. You asking me stuff that don't make sense.

Page 127

Q. Are you refusing to answer the question about your threats --
A. Yes. I'm refusing. Yes, I am. Yes, I am.
Q. So you're --
A. I'm refusing to answer that question because it's not relevant to me to what's going on right now.
Q. It's not about what's relevant to you, it's about the case and what's relevant to the case.
A. Well, it's not relevant to me.
Q. All right.
A. Let's talk about the stuff that you, when you came to my house.
Q. I'm just trying to make sure you under- --
A. That's what we need to talk about what you said when you came to my house, ma'am.
Q. Ms. Williams --
A. You need -- you asking me questions irrelevant to this case. This isn't relevant to this case, the threats that you made to me.
Q. Ms. Williams, we are asking questions about what happened --
A. And you're not asking me the right questions.
Q. Well, you will have to --
A. Ask me about what you said to me --

Page 128

Q. Ms. Williams --
A. -- you and James Kelly's sister-in-law.
Q. Ms. Williams --
A. When you came to my house.
Q. Ms. Williams, we're going to finish this. Okay?
A. I want to finish it. I want it to end today. I need everything to come out on the table today.
Q. So let's just get through it so we can end it.
A. Yeah. So let's talk about what you said to me.
Q. Ms. Williams, I still have many questions for you, so if you --
A. Oh, man. You not even asking me the questions that you need to ask me. You asking me some shit about what my house is, who bought my house --
Q. Ms. Williams, I'll ask you the questions --
A. That ain't even nothing to do with James Kelly.
Q. I'll ask you the questions and you can say whether you can answer or whether you're not.
Okay?
A. Go ahead. Keep going.
Q. All right. Mr. Anthony Heinz, I'm going to ask you just -- do you know who that person is?
A. No, I don't.

Page 129

Q. Okay. And you never knew that he was a codefendant of yours in a case?
A. No, I don't remember that.
Q. All right. And Ms. -- I did say the woman's name -- Sarah...
(Reviewing document.)
A. You wasting my time. I'll tell you.
Q. Levin (ph) Williams --
A. I don't remember that.
Q. Levin Williams, is that your brother?
A. No.
Q. Who is Levin Williams?
A. I have no idea.
Q. And you were arrested for committing a crime against Mr. Levin Williams. You don't know who that is?
A. I have no idea what you're talking about.
Q. Now, they have the same last name as you. Is that --
A. Yeah, I don't know him. Because my brother's name is not that.
Q. Okay. What is your brother's name?
A. None of your business?
Q. Are you refusing to answer that?

Page 130

A. Yes.
Q. All right.
A. They have nothing to do with this case. You ain't going after my brothers like you came after me.
Q. Do you know -- you said you don't remember.
Is your brother's name Kevin Williams?
A. My brother passed away, so we're going to leave him out of that. Okay.
Q. Understood. Sorry to hear that.
Is your brother's name --
A. None of your business.
Q. Are you refusing to answer that?
A. Yes.
Q. Okay. Now, it is your testimony that the only thing you've ever been arrested for was DUI; is that your testimony today?
A. Yes.
Q. All right. Have you ever been in a drug rehab program?
A. No.
Q. You never went to Genesis 2?
A. No.
Q. In August 9th of 1995 --
A. I don't remember.

Page 131

Q. You don't remember what?
A. What you saying, what you asking me, I don't remember.
Q. I didn't finish the question. I said August 9th of 1995.
A. Well, finish your question.
Q. Is it -- are you not remembering if you were in --
A. Finish your question, ma'am.
Q. I am.
Are you not remembering if you were in a drug rehab in 1992?
A. No, I don't remember.
Q. Okay. Is it possible that you were ever in a drug rehab --
A. Never.
Q. -- in 1993?
A. No.
Q. You said never. You were never in one?
A. I don't remember, ma'am. I just told you, I don't remember.
Q. But you said two different things. First --
A. I don't remember.
Q. Let me finish.

Page 132

You said two different things. First, you said you were never in one and then you said you don't remember, so I'm trying to make sure I understand which is this.
Were you never in a drug rehab, an in-patient program in Genesis 2?
A. I don't remember.
Q. Okay. I'm going to go through -- I'm just going to go through your statements, because I want to just kind of go through a few things on here with you.
Now I'm going to go back through D-1, 2, 3, 4 and 5. All right. And let's just start with D-1.
A. You really wasting my time.
Q. Now, I'm going to show you --
MS. BRADFORD-GREY: Jami, do you -- you have your copy, right?
MS. GALBRAITH: Yes, I do.
MS. BRADFORD-GREY: And you have the full pages of D-1, because I have four pages for D-1, the Bates stamp would be NK DEFS 36001 to 36102.
MS. GALBRAITH: We can find specifically what you're looking at and I'll make sure it's there.

Page 133

THE WITNESS: What time is it? It's almost 1 o'clock. I gotta go. I got another appointment.
BY MS. BRADFORD-GREY:
Q. Ms. Williams, we just have to get through the questions.
A. You ain't even asking me the regular questions that you should be asking me.
Q. Understood that you don't think so.
A. You just worrying about what I did with my life, you need to be worrying about what Jami -- I mean, whatever that man name that killed this boy, what he did in his life.
MS. GALBRAITH: For a clear record, D-1 is the trial.
MS. BRADFORD-GREY: And then you said D-2, so that's why I have it here. So I'm looking at -- I looked at as D1.
MS. GALBRAITH: And then you said it was the undated one?
MS. BRADFORD-GREY: Yes. The first statement -- well, you only have two pages of that.

Page 134

THE WITNESS: She don't know what to ask me. She need to be asking me what she said to me on my porch. That's what we need to be talking about.
BY MS. BRADFORD-GREY:
Q. I'm going to give you --
A. Can I ask you a question? Do I need to get protectin between you and your sister-in-law to keep y'all from coming to my house? That's the question I need to ask, do I need to get protection from you guys?
Q. All right. Ms. Williams.
A. What?
Q. This D-2, that you were shown by defense, and you said that that's your signature and everything you said in that is true, correct?
A. Are you asking me a question?
Q. Yeah.
A. Yeah, it's true.
Q. Okay. So it was true when you told the police you didn't see anybody?
A. If I signed and said that, that's on the paper. Whatever on that paper.
Q. All right. I want you to look at it, because I

Page 135

want to go through a few things.
A. Go ahead.
Q. Can you follow along with me, please.
A. (No response.)
Q. I'm going to show you. You can look at page three of the statement.
A. (No response.)
Q. All right. I'll just read it then, if you don't want to look at it.
Remember telling the police that you had no idea who shot Travis Houston?
Do you remember saying that?
A. No, I don't remember that.
MS. BRADFORD-GREY: Jami, just to make sure.
MS. GALBRAITH: Was I missing a page?
MS. BRADFORD-GREY: Yes, you are.
MS. GALBRAITH: Okay.
MS. BRADFORD-GREY: I'm sorry. We want to make sure we enter the full statement in the record.
MS. GALBRAITH: Correct.
MS. BRADFORD-GREY: I do have a full statement there.

Page 136

Mike, can I see her D-2.
Wasn't that like a supplement, D-2?
MS. GALBRAITH: That's fine.
MS. BRADFORD-GREY: Her D-2 was the first statement, but it's missing a page.
COURT REPORTER: So you're just going to add the page?
MS. BRADFORD-GREY: Yes.
BY MS. BRADFORD-GREY:
Q. All right. Now, I just want to go through this.
Did you know Tamika Ledbetter (ph), Travis Houston's girlfriend at the time?
A. I don't remember.
Q. Do you remember --
A. I might have, I don't know. I don't remember. This happened so long ago.
Q. She would have lived right next door to you?
A. If she lived next door to me, I knew her.
Q. Okay. And that was the woman whose boyfriend was murdered, correct?
A. I guess.
Q. And you said that she did your hair?
A. I don't remember.

Page 137

Q. Do you remember telling the police that?
A. I don't remember.
Q. All right. Do you remember if Travis Houston was involved in selling drugs?
A. I don't remember none of that.
Q. All right. Do you remember if you ever said you bought drugs from him?
A. I -- I don't remember that.
Q. Who would you procure your drugs from in that area?
A. I have no idea.
Q. So if there was a drug dealer -- if Tommy Lockwood was a drug dealer, would you have gotten any drugs from him?
A. I don't know nothing about no Tommy being a drug dealer. No. I don't do drugs.
Q. Did you know about him being a murderer?
A. No. I don't know nothing about that.
Q. And you said you don't do drugs?
A. No.
Q. And I'm not talking about now, I'm talking about then?
A. Oh, back then, I probably did a little of everything, drink, drugs. I was 25 years old. I had

Page 138

a good time. What you did when you was 25 years old?
Q. Okay. So what --
A. Was you an angel at 25? I wasn't an angel at 25.
Q. What in time --
A. I did a whole lot of things at 25.
Q. When you gave the statement --
A. I might have even prostituted at 25. Who knows. I don't know. I don't remember.
Q. Were you ever arrested for prostitution?
A. Never.
Q. Were you ever arrested for --
A. Never.
Q. For --
A. For drugs? No.
Q. -- for possessing drugs?
A. No. I never was arrested for none of that.
Q. Did you ever get picked up by the police for those things --
A. Never. Nope.
Q. No?
A. Never.
Q. Who put you into the rehab?
A. I never went to the rehab.

Page 139

Q. Did the police ever come to the rehab to get you?
A. Never. They came to my job, when I was doing housekeeping on -- at the Days Inn Hotel.
Q. Did they ever come to your job at the seafood restaurant?
A. Nope.
Q. Did they ever come and get you from your home and bring you to the police station to give statements?
A. Nope. They asked me to come down there and I came.
Q. And how did you get there?
A. I had a car.
Q. Okay. So you drove voluntarily?
A. Yes.
Q. And where -- how did they connect with you?
A. I don't remember.
Q. You don't remember how they contacted you?
A. No.
Q. All right. So the first statement that you gave was at your home, right?
A. I don't remember, ma'am. This happened so long ago.

Page 140

Q. It's right there on the first page --
A. If I signed it, I did.
Q. It's not about signing it, just making it right.
A. I don't remember, it happened so long ago.
Q. The first page says 4811 North 9th Street. That was your mother's address?
A. That's my foster mother's address.
Q. Okay. And that was Joyce Williams?
A. No. Her name is Dorothy Mayfair. My mom's name is -- no.
Q. All right. But the place of the interview that the police --
A. They never came to no 4811 North 9th Street.
Q. I understand. I'm not finished asking the question. I'm reading what's on the top page, so you'll know where we're at.
The place of the interview said it took place on 2023 Bambrey Street. Do you remember when the police came --
A. No.
Q. -- and talked to you at your home?
A. No, I don't remember.
Q. You don't remember that.

Page 141

But you looked at your statement, right?
A. Yes.
Q. So if it's on there, would that be accurate?
A. Yes.
Q. All right. And your read through everything in your statement, right?
A. No. I didn't reading all of that. No. I'm not reading through none of that.
Q. At the time that you signed it, you read through it, correct?
A. I don't remember.
Q. Were you under the influence of drugs or alcohol?
A. I don't remember. I might have. I might have was. I don't know.
Q. All right. Did the police ever ask you those questions --
A. I don't remember.
Q. Let me finish the question.
Did the police ever ask you any questions about whether or not you were under the influence of drugs or alcohol --
A. I don't remember.

Page 142

Q. Let me finish the entirety of the question, please.
A. You did finish it.
Q. No, I didn't.
A. You asked me did the cops ask me was I under the influence of alcohol or drugs --
Q. Let me finish the entirety --
A. -- no, they did not.
Q. Let me finish the entirety of the question.
A. Oh, jeez.
Q. Did you ever -- did the police ever ask you if you were under the influence of drugs or alcohol at the time that they were interviewing you --
A. I told you already.
Q. So not at any time, they never asked you that?
A. Never.
Q. Okay. Now, the second statement, which was marked D-3 --
A. I don't remember. I don't know if they asked me or not.
Q. Okay. The second statement, which is marked D-3.
Now you say, the police, after they came to you that night, they came back, correct?

Page 143

A. (No response.)
Q. Did they come back?
A. I don't know, ma'am. I don't remember.
Q. You just said this when you were asked on direct, you said the police harassed you, they came back the next day.
A. Did I sign something like that?
Q. You just said it?
A. I don't remember?
Q. It was about, maybe, 45 minutes ago.
A. I don't remember.
Q. All right. Well, do you need it to be read back?
A. You can read it back. I still don't remember.
MS. BRADFORD-GREY: Is that possible, for you, Court Reporter, to read it back?
(Court Reporter read the record as requested.)
BY MS. BRADFORD-GREY:
Q. You just said that the police came back the next day to your home?
A. Oh, yeah, they came back.
Q. Okay. And did they ask you to give a statement?

Page 144

A. No.
Q. What did they come back for?
A. I don't remember.
Q. All right. And when they came back, how long did they stay?
A. I don't remember.
Q. All right. And then when's the next time they came back to your home?
A. I don't remember.
Q. All right. So then you give another statement. How do you -- I mean, I take it you didn't like the police coming to your home?
A. I didn't like you coming to my house either.
Q. I take it that you didn't like the police coming to your house --
A. No, I didn't. I didn't like you coming to my house either.
Q. I'm asking you a question.
Did you not like the police coming to your home --
A. No, I didn't. Just like I didn't like you coming to my home.
Q. How many times did they come to your home before you went back down to the station?

Page 145

A. I don't remember.
Q. Was it twice?
A. No, I don't think so. I don't know. I don't remember.
Q. Okay. The next time you give a statement is three months later -- well, three months and 20 days later. And that is at, it looks like the police station, I would say the Round House at 8th and Race. Do you remember that place?
A. No.
Q. Do you remember giving a statement and signing your name on March 21, 1993?
A. Not a clue.
Q. Okay. So when you look at this statement, you see your name at the bottom. Just making sure. You said that was your signature, right?
A. Where is that?
Q. At the bottom.
A. (Reviewing document.)
Nope. My signature not on there.
Q. That's not your signature?
A. Nope. I don't even see no signature. It's not even on there.
Q. All right. And are you saying, did you not

Page 146

make another statement to the police --
A. I don't remember.
Q. -- in March of 1993?
You don't remember now?
A. Mm-mm.
Q. Okay. We'll move on to the next statement.
Now --
A. No, I don't remember.
Q. Okay. Now, March 21, 1993, were you living, still living at 2023 North Bambrey Street?
A. I don't remember. I don't know where I was living by then.
Q. Were you living in Jersey?
A. I don't remember.
Q. Did you remember testifying that you were in South Philadelphia?
A. No.
Q. Were you ever in South Philadelphia?
A. I don't remember. I was all over the place when I was young.
Q. Okay. So let's just talk about the time of that murder that you remember so well.
A. I don't remember.
Q. You don't remember anywhere you were?

Page 147

A. Nope. Not a clue.
Q. How long did you stay at 2023 North Bambrey Street after the shooting?
A. I don't know. I don't remember.
Q. You don't remember if it was a day or a week?
A. I don't know. I don't know. Everything happened so fast. I don't remember.
Q. Okay. But you did say you had to leave, correct?
A. Correct. Yeah, I did leave.
Q. And when did you leave?
A. I don't know. I left -- I don't know, I left.
Q. Was it --
A. I don't remember what year. I don't remember how long it was. I just know I moved.
Q. Okay. Would it have made sense that you left in 19 -- right around the time that this would, I guess, Mr. Travis Houston's brother came to talk to you?
A. It can be around that time, I guess.
Q. Okay. And that would have been a couple days after the homicide?
A. Yeah, it could have been.
Q. All right. And you say, you left that time and

Page 148

you never came back?
A. Never came back.
Q. Okay. How did police know how to get in touch with you?
A. I have no -- same way you know how to get in touch with me. I asked you, how did you know my address. You gotta ask them. How did you know where I live. Because I don't know.
Q. How did the police --
A. You got to tell me the same thing.
Q. Did they call you on the phone?
A. Did you call me on the phone?
Q. Did the police call you on the phone?
A. No. Ain't nobody called me. All I know that y'all showed up at my house.
Q. The Judge?
A. No. You and the police and everybody else and Jami, everybody. All I know is you just showed up.
Q. Did the police at this time know a phone -- have a phone number for you?
A. No.
Q. Okay. So you would have been gone from 2023 Bambrey Street --
A. And I don't know how they got in touch with me.

Page 149

Q. All right.
A. Just like I don't know how you got in touch with me.
Q. You ended up going to the homicide detective division yet again in September, right?
A. I guess.
Q. Did the police ever ask you about why you sold your home to Tommy Lockwood?
A. No. They ain't never asked me nothing like that.
Q. Did they ever even talk about Tommy Lockwood?
A. No. You should know. You even said the same thing when you came to my house, about my house wasn't mines and I sold my house. You know.
Q. I'm asking did the police --
A. The same questions you asking me, you need to answer that.
Q. Did the police ever ask you anything about Tommy Lockwood at any time?
A. No.
Q. Did you ever mention Tommy Lockwood's name to the police at any time --
A. Nope. I didn't mention his name. And I ain't never mentioned it to you either.

Q. Did you ever mention anything about Boonchie Diandre King to the police at any time?
A. Nope.
Q. Did they ask you about him?
A. No.
Q. Did they ask you about -- did they ask you anything about a Mr. Adele Corbit (ph)?
A. No.
Q. Never heard any -- never heard that name?
A. Never heard the name.
Q. All right. Now, D-4 where -- I'm sorry. I'm going to go back to D-2, because I know you said -- although you said this is not your signature.
MS. BRADFORD-GREY: I think, Jami, you do know that she did admit this is her signature, on D-3?
MS. GALBRAITH: Yes.
MS. BRADFORD-GREY: Okay.
BY MS. BRADFORD-GREY:
Q. I'm just going to go through a few things. All right. I want to just ask you a few questions.
MS. GALBRAITH: Counsel, may I just ask you to tell me the date of that statement, because I kind of made a mess of things.



MS. BRADFORD-GREY: 3/21/93, that's D-3.
BY MS. BRADFORD-GREY:
Q. Do you remember Detective Reinhold and Collins at all?
A. No.
Q. All right. And do you remember Delphine (ph)?
A. No.
Q. Do you remember she had a speakeasy on Page Street?
A. No.
Q. Do you remember telling police that you, the males went into the speakeasy?
A. I don't remember none of that, Miss. That was a long time ago.
Q. Okay.
A. I'm trying to forget all of that.
Q. Understood.
Do you remember that --
A. I just told you I don't.
Q. Understood. I just have to go through it and you can either say you don't remember or you do remember.
The male that you say shot Travis, do



you remember identifying him as a Larry Mullins?
A. No, I don't remember.
Q. Do you remember saying that you knew Larry Mullins?
A. I don't remember.
Listen, everything is in the statements. I signed it. It was stated. I did it. I said it. It's over. I'm done. Whatever I said and signed, I keep telling you, that's what happened then. I don't remember no more.
Q. Understood. That's why I'm trying to ask --
A. You keep asking me the same thing. I told you.
Q. We have to get through --
A. I already signed and stated whatever I remember back then.
Q. We have to ask you --
A. Let's talk about you coming to my house and threatening me. How about that. Let's do that.
Q. Ma'am --
A. We need to talk about that. We need to put that on this file, that you and this man, the killer, or whatever, came to my house and you said you know where my daughter live and you know what center I go to. I don't want to have to be looking over my



shoulder after you, because I'm telling you, I'm a woman just like you, you come after me, I got something for you.
Q. Ms. Williams, no one is coming after you.
A. I just want to make that clear.
Q. No one is coming after you.
A. Because you already been to my house once.
Q. No one is coming after you. So let me finish going through this.
A. That's what we need to talk about.
Q. We did. You did. You got a chance to do that. So let's just go back to what we were saying.
Now, with respect to --
A. The rest of it I don't remember.
Q. You don't remember anything now?
A. No, I don't.
Q. Okay.
A. It's been so long ago, I don't remember.
Q. All right. Now, again, you were brought -- you went down to the police station --
A. I said I don't remember.
Q. Let me finish. You can say that, I still have to ask the questions whether you remember or not.
Did you go willfully to the police

Page 154

department at this point?
A. Yes.
Q. Okay. And because they called you or did they come to your home?
A. I don't remember.
Q. And I guess you didn't have a cell phone back then, right?
A. No I didn't have no cell phone then.
Q. Okay. So I guess wherever you moved --
A. You don't know what to ask me. You really don't know what to ask me.
Q. All right. So in this, when you went down, and you said you went down because you don't remember how you were contacted by the police?
A. (No response.)
Q. Is that correct?
A. Are you asking me a question?
Q. Yes.
A. I don't remember.
Q. All right. Now Mr. Mullins, Larry Mullins --
A. I don't know him.
Q. You don't know him?
Do you know a Devyn Collier (ph)?
A. No.

Page 155

Q. Do you remember telling the police that Devyn --
A. I just told you I don't know no Devyn.
Q. I'm going to show you your statement, so you can just read it --
A. Look it, whatever I signed, I already told you, I signed it, I made that statement then. I don't remember.
Q. In this statement, you said that you saw a young man, and I think he was about 14 or 15 years old and you know -- your daughter knew him. Did your daughter know a Devy5n Collier?
A. I have no idea who she know.
Q. Well, you said this in your statement.
A. Well, that's back then. I don't remember that.
Q. Okay. Did you know that your daughter was, I guess, friends with a Devyn Collier, who you said sold drugs on Page Street in --
A. Oh, you gotta be kidding me. You don't know what to ask me, do you.
Q. Did he --
A. No. I don't know nothing about that.
Q. Okay. So if you said it, you didn't know -- you wouldn't know that?

Page 156

A. That was a long time ago, Miss. I was 25 years old. I'm 64. I don't remember that. Okay.
Q. Okay. But if it's in here, you said it, correct?
A. If I signed and said it, I said it.
Q. All right. And Devyn Collier, at trial, do you remember someone saying he was deceased?
A. I don't remember that.
Q. We can refresh your recollection if you need us to?
A. No, I don't remember that.
Q. Do you know that Devyn Collier is alive today?
A. I don't know. Don't care.
Q. Have you ever seen him?
A. I don't know. Don't care.
Q. Have you been back around to the area --
A. I don't know. I don't go around there.
Q. Let me finish the question.
A. I don't go nowhere near North Philly.
Q. Have you been back towards the area of Bambrey Street or any of that -- any of those, the neighborhoods where Johnsons Projects homes were?
A. No. You ain't never seen me down there. You came to my house. You know I ain't been down there.

Page 157

Q. So you haven't been down there?
A. No.
Q. All right. You haven't had any contact with anyone from that area since --
A. Just you.
Q. Anyone from the Johnson --
A. Just you.
Q. -- Homes Projects, you haven't had any contact --
A. Just you and the killer's sister-in-law.
Q. May I finish?
A. (No response.)
Q. May I finish?
A. Yeah. I already -- you said the question, did I have any contact with anybody down in that area and I said yes, you and his sister-in-law.
Q. Okay. All right.
A. You the only two people I talked to since then, when you was on my porch threatening me.
Q. All right. So let's move to the next whatever it is. We were on 9 -- 1494, I think.
A. She should have never came to my house if she going to be asking me questions. That's don't even make sense. How you going to ask me some questions

Page 158

and then you come to my house and threaten me and I got to sit here and look at you and answer some questions from you.
Q. Would you like someone else --
A. That don't even sound right.
Q. Would you like someone else to ask you questions?
A. I don't even want to be around -- I don't even want to be in the same room with you.
Q. That's fine. Would you like Mr. Pomerantz to --
A. I don't want to deal with none of y'all because I don't know what you told these people.
Q. So we're going to finish and continue with me. All right?
A. That don't even make sense that I have to sit here and talk to you after what you said to me on my porch.
Q. 9/15, you do make D -- going to D-5, which is 9/15. Now, in one day -- so you're going back to the police station on two -- back to back, on two days. Was that something you willingly wanted to do?
A. You know what she asking me some really dumb questions. Why, like I said, I didn't even want to

Page 159

deal with you, why would I want to deal with the police?
Q. Right. So you didn't want to deal with them?
A. I didn't want to deal with you either.
Q. Understood.
But you didn't want to deal with the police right? Is that correct?
A. (No response.)
Q. But in terms of going back down there the day --
A. I didn't go back down nowhere.
Q. Well, in the next statement you make on September 15 --
A. I don't remember none of that.
Q. I'm going to show you.
A. You really need to stop talking to me.
Q. Would you like Mr. Pomerantz to ask you questions?
A. Yeah. I rather him. Because your voice is really bothering me.
Q. Go ahead.
A. Because I hear your voice when you was talking that trash on my porch. And it's coming out of the same voice that really pissed me off that day. You

Page 160

really don't know how you making me feel.
Q. All right. Well, I'll let Mr. Pomerantz finish --
A. I don't even want to be -- I don't even want to see you. It's just like I'm looking at James Kelly's face. You a troublemaker. You is not right. There is something wrong with you. You can't even tell the truth that you came to my house.

- - -

EXAMINATION

- - -

BY MR. POMERANTZ:
Q. Ms. Williams, you previously testified that your signature appears at the bottom of D-5?
A. Yes.
Q. Do you remember that testimony? And you also testified that if your signature is on there, everything in that statement was true at the time that you said it, correct?
A. Yes.
Q. Okay.
A. Sick. Something wrong with her. She need to talk to a psychiatrist. I want a lawyer. You need to check yourself. You need to stop coming to people

Page 161

house making threats before you stand in front of somebody talking about a deposition. Crazy ass.
Q. And, Ms. Williams, you also testified earlier that your signature appears at the bottom of D-4, which is a statement given to the Homicide Division on September 14, 1993.
Do you remember that testimony?
A. No, I don't remember none of that.
Q. Okay.
A. When I do that, today?
Q. Yes.
A. Oh, yeah. If I signed it, it's on there. Whatever I signed, sir.
Q. So these two statements are a day apart, one is on September --
A. I don't remember exactly what I said. All I know I signed some statements. Okay. I don't remember. So you could read it to me a thousand times, I don't remember.
Q. And they take you to the Homicide Division on consecutive days, once on 9/14 and once on 9/15.
Do you know why you had to go back the next day?
A. No, I don't remember, sir.

Page 162

Q. All right. Do you remember if the --
A. No, I don't remember.
Q. Every time you went to the police you told them everything you knew, right?
A. I guess.
Q. But they kept bringing you back time and time again, correct?
A. I don't remember that.
Q. Prior to the trial, you gave statement after statement to the police. You don't have any recollection of that?
A. I don't remember that.
Q. Okay. And if there are changes in the statement where there are inconsistencies, you have no explanation as to why that's the case, right?
A. No, I don't remember.
Q. So if you said one thing on one day and you said something different on another day, you can't explain why that happened?
A. No, I can't.
Q. And for each of these statements, in connection with the two days that you went, one right after the other, do you know -- you don't have any recollection of anything that went on there?

Page 163

A. No. I can't remember none of that, sir. That happened so long ago. I done been through so much since then, I don't remember none of that. I don't remember none of it word for word, what I said. No, I don't remember.
Q. Okay. As we sit here today remembering as much -- do you remember anything about your life in the year 1993?
A. Yeah. I had fun.
Q. Okay. And when you say you had fun, does that include using illegal drugs?
A. Yeah. Drinking too.
Q. And it's possible --
A. I wasn't addicted though.
Q. And it's possible that you were under the influence --
A. I had a job. I had a J-O-B. I had a child. I had bills to pay. I wasn't under the influence all the time. You act like I was high every single day. No.
Q. But you don't remember if you were high when you made these statements to the police?
A. I remember. Yes, I do remember. And I wasn't.
Q. Okay. And did they --

Page 164

A. They probably came right after work. I don't know.
Q. Well, for both of these statements, the police say that you were brought in by Detective Denbeck (ph) do you have any reason to think that that's not true?
A. I have no reason to think that's not true.
Q. So a detective brings you to the Homicide Division on one day and you give a statement and then the same detective brings you back to the Homicide Division and --
A. Did I sign some papers saying that?
Q. You did.
A. Well, that's what happened then.
Q. Okay. And looking back, as we sit here now and we talk about these things, do you remember being upset that they kept coming to you day after day, to make you come back to the --
A. No, I don't know.
Q. -- Homicide Division to give statement after statement?
A. No, I don't remember.
Q. But --
A. I might have. I might have. I don't know.
Q. You might have been upset about that?

Page 165

A. I don't know. I get upset all the time. Y'all upsetting me right now.
Q. Did you ever express -- or do you remember ever expressing any concerns about being upset to the police?
A. No, I don't remember that.
Q. And as you say that you got upset all the time, is it consistent with, sort of, who you understand yourself to be, that if they're coming on consecutive days, that that is something that would upset you, kind of like you're upset about being here today?
MS. GALBRAITH: Objection to form.
THE WITNESS: Thank you.
BY MR. POMERANTZ:
Q. You can answer.
MS. GALBRAITH: You still have to answer.
THE WITNESS: (No response.)
BY MR. POMERANTZ:
Q. We didn't get an answer.
But knowing how you are, knowing what you're like, this is the kind of thing that would have upset you, they're coming on two consecutive days dragging you away from your work, away from your

Page 166

family --
A. What you mean somebody dragging me?
MS. GALBRAITH: Objection to form.
THE WITNESS: Now you assuming shit. You assuming things.
BY MR. POMERANTZ:
Q. It says here that Detective Denbeck brought you in on the 14th --
A. You said dragging me.
Q. Okay. So --
A. Ain't nobody drag me or did anything to me that I didn't want to happen to me. Okay.
Q. So you wanted to go and --
A. I went on my own free will. I made a statement. I signed it. It's done. Ain't nobody drag me to do anything.
Q. Did you know that they were going to come back the next day and bring you back to the Homicide Division after you --
A. I didn't know y'all was going to call me here for this shit this time of year either.
Q. I understand that.
But when they had you --
A. So why would you ask me a stupid question like

Page 167

that. I didn't know what they was coming to get me for or when they was coming to ask me a question, just like I didn't know y'all was going to bring this mess up again in some 60 years now.
Q. Did the detective ever do or say --
A. Y'all ask the dumbest questions.
Q. -- anything to make you feel better about having to come to the police headquarters so many times?
A. What did you just say?
Q. Did the police ever do or say anything to make you feel better about having to come to police headquarters to give statements?
A. What kind of question is that? That don't even make sense.
Q. Do you remember being reinterviewed by a Detective Leon Lubiejewski and a Detective Gross, on July 2, 1995?
A. No, I don't.
Q. Do you remember at any time interacting with either of those two detectives?
A. No, I don't.
Q. And in the Affidavit of Probable Cause for the arrest of James Kelly, which is based on your

Page 168

statements to police, it says that you were reinterviewed by those two detectives on July 2, 1995, and that at that time they went over with you a statement you gave on 3/21/92 -- I'm sorry, '93, a statement you gave on 9/14/93, and a statement you gave on 9/15/93. As I read you that portion of the Affidavit of Probable Cause, does that help refresh your recollection about giving -- about being reinterviewed by those detectives on July 2, 1995?
A. No. It don't refresh my own --
MS. GALBRAITH: Objection.
THE WITNESS: No. It don't refresh my memory. Like I said, if I told them anything about James Kelly, it's the truth. He's a killer and he need to be in jail again instead of walking around on the street. And y'all need to leave me alone.
BY MR. POMERANTZ:
Q. Is there any reason why, in your previous statements before 1995, you didn't say anything about James Kelly or the person that you later found out or believed to be James Kelly, was passing a gun to another person?
MS. GALBRAITH: Objection to form.

Page 169

BY MS. BRADFORD-GREY:
Q. Do you know why that's not in the statements that you gave before 1995?
A. Why you asking me stupid question like that? Why -- how do I supposed to know why these people didn't write what's in the statement or not. That's a dumb question. Please stop asking me dumb shit. My grandchildren know how to ask a question better than that.
Q. So when you --
A. You asking me some nonsense now. You just reaching, you reaching for stuff. That's all you doing is reaching.
Q. When you were --
A. Stop that.
Q. When you were giving multiple statements to the police, prior to 1995 --
A. Oh, Jesus.
Q. -- you were completely truthful and told them everything you knew back then about this case, right?
A. Yes.
Q. And yet, you have no explanation as to why this particular fact, about one person handing another person a gun, was omitted from all those prior

Page 170

statements, correct?
A. You know what, I can't answer no more stupid questions that you saying to me, I really can't do it. It's starting to get on my nerves. I can't answer no more of your stupid questions. Read the statement. Read the paper. You see my name. It's signed. Read it. Deal with it. I'm done. I can't do it no more. You asking me stuff. You reaching for stuff that ain't even there.
Q. And in 1993 --
A. I mean, you're still saying the same thing.
Q. In 1993, you were able to read and write the English language?
MS. GALBRAITH: Objection; asked and answered.
THE WITNESS: What you think?
BY MR. POMERANTZ:
Q. And in 19- --
A. What you think?
Q. And in 2026, you are unable to read the English language?
A. What you think?
Q. Is it true that today you're unable to read the English language?

Page 171

A. I'm not reading and writing. I'm just saying it's stupid stuff that you trying to explain to me that I already done dealt with before. No, I'm not comprehending this. No. I'm done.
Q. So are you able to read the highlighted portions of --
A. Yes, I can read all this, yes, I can read that but I'm not.
Q. All right. Please read that --
A. I'm not. No, I'm not. I refuse. No, I'm not.
MR. POMERANTZ: All right. Let's take a break --
THE WITNESS: I'm going home.
MR. POMERANTZ: -- to lower the temperature.
Your deposition is not yet complete. We will seek a Court order to have you come back and finish your testimony if you choose to leave.
THE WITNESS: You know what, I'm not coming back because I'm getting ready to have my surgery and I don't have a doctor's note, I can't come back. I can't deal with this no more. It's irrelevant. It's unnecessary. The

Page 172

man had did something wrong. Y'all need to understand that. You're trying defend somebody that needs to be in jail.
MR. POMERANTZ: Let's take a break to let our temperatures go down.
MS. BRADFORD-GREY: Just two minutes.
THE WITNESS: I don't need a break. I don't need a break. I need to be done with you guys.
MS. GALBRAITH: Can we go off the record.
(A short break was taken.)
BY MR. POMERANTZ:
Q. Ms. Williams, I know you testified that you don't remember being reinterviewed by Detective Lubiejewski and Detective Gross and reviewing your previous multiple statements with them. And I just -- I mean, I can predict what the answer will be, but I need to ask the question. In July, July 2, 1995, when the Affidavit of Probable Cause, which is a sworn document by a Police Officer, it does indicate that you were reinterviewed. Do you have any reason to believe that that's not true?
A. I don't even know what you're talking about.

Page 173

Q. Okay. And then in connection with that July 1995 instance, where you were reinterviewed, do you have any idea where that took please --
A. No.
Q. -- whether it was in your home?
A. I don't remember.
Q. Okay. I mean, as we sit here today, do you remember being interviewed by police multiple times in connection with this case, prior to the trial?
A. I don't. I really don't. I have no idea.
Q. And if there is documentation that shows that they interviewed you again and again over a period of almost three years --
A. Three years? Oh my God.
Q. Yeah. Three years.
A. I really don't remember.
Q. Three years between the time of the incident and the time of the trial, you have no recollection of them interviewing you over and over again?
A. No.
Q. You have no recollection of where those interviews took place?
A. No, I don't.
Q. You have no recollection of how you were

Page 174

contacted in connection with any of those interviews, right?
A. Not a clue. I don't remember none of that. I'm completely blank on the interviews and where it took place or how I -- I don't even know where it was tooken at. I don't remember. That happened so long ago. Do you know how many years ago. Oh my God.
Q. Well, when things have happened a long time ago and there are records created contemporaneously with those events, does it have the potential to help refresh your recollection --
A. That don't refresh none of mine.
Q. Okay. And do you know why that is?
A. No, I don't.
Q. So --
A. Because I had a lot of tragedy in my family. I had a whole lot of things going on, sir. I'm sick. I'm worrying about my health right now. I got a lot going on with me. I don't remember that. I don't want to remember that.
Q. In the Affidavit of Probable Cause, there is a statement that is -- or there is information that's attributed to you where the Police Officer who has signed this sworn statement, which is the support for

Page 175

the arrest of James Kelly, one of the things in there, it says, "She," referring to you, "was afraid mostly because the male who controls the drugs in that immediate area, Christopher Swain" --
A. I don't remember all of that.
Q. Please let me finish.
-- "lived in the speakeasy at 2552 West Page Street."
A. I don't remember none of that.
Q. So you don't remember a speakeasy at 2552 --
A. I don't remember none of that.
Q. Please let me finish the question.
You don't remember there being a speakeasy at 2552 West Page Street, correct?
A. I don't remember none of that.
Q. Okay. And if the police are saying that you said that Christopher Swain lived in that speakeasy, is that -- you're saying the police are lying about that, or are you saying --
A. I don't know, sir. I don't remember. He might have lived there. I don't know. He might have, he might have not. I don't remember. It was a long time ago. I don't know where Christopher Swain lived.
Q. Okay. And when I read that you told the

Page 176

police, and that they swore that this is something you said, that he was in control of drugs in the immediate area, is that a true statement?
A. I don't know. He might have was. I have no idea. I don't remember.
Q. And how would you know --
A. I don't know none of that. That's how -- I didn't know what you I know. I don't know nothing about them people.
Q. Okay. But --
A. How do I -- I don't know nothing about none of that.
Q. I understand that.
But are the police making up this --
A. I don't know. Why would I say the police making up something? You answer that question.
See what I mean, you asking me some of the dumbest. Wow. They reaching. Y'all reaching hard.
Q. So if you were interviewed numerous times before the Affidavit of Probable Cause was signed in this case and you never mentioned Jim Kelly prior to that, you're saying that's not because you were afraid of Chris Swain?

Page 177

A. Sir, I don't remember if I remember James Kelly or Christopher Swain. I don't remember none of that.
Q. And has anyone ever shown you a written statement signed by you, dated July 2, 1995?
A. She did, when she came to my house (indicating).
Q. So you've seen a written statement?
A. She showed me on her phone, with my signature on these papers.
Q. And it was dated July 2, 1995?
A. She showed me that, yes, when she came to my house.
Q. So you believe there is a written statement, signed by you, that's dated July 2, 1995?
A. I don't believe nothing. All I know, she said she got a statement with my signature on it. And she showed me my signature.
Q. Right. And we've looked at several statements with your signature today --
A. And you're showing it to me now, too. Same thing that she showed me.
Q. Sure.
So one thing I can represent to you is, that no one in this case has ever seen a signed

Page 178

statement from you, dated January 2nd, 1995 -- July 2, 1995?
A. I don't know if they did or not. I don't know. She said she had that. She had it. I don't know what she had.
Q. Well, if I represent to you the defense --
MS. BRADFORD-GREY: Just leave it.
MS. GALBRAITH: Counsel, are you marking that as an exhibit?
MS. BRADFORD-GREY: We will.
MR. POMERANTZ: This is only the second page. I can make copies.
So let's make a note on the record that we will -- the next Plaintiff's exhibit will be the Affidavit of Probable Cause.
COURT REPORTER: So that's 4?
MR. POMERANTZ: This will be 4.
- - -
(Exhibit P-4, Continuation of Probable Cause for Arrest Warrant Number 213995, 2 pages, was marked for identification.)
- - -
BY MR. POMERANTZ:
Q. Ms. Williams, I now want to turn your attention

Page 179

to a document that you did not sign. It is dated July 20, 1995. And it purports to be a transcript of a statement that you gave to a man named Jerry Benoff, who was a Private Investigator working for James Kelly.
Do you remember the name Jerry Benoff?
A. No.
Q. And this statement was recorded by means of audio tape. And I believe that that transcript of the audio tape was played during trial.
Do you remember engaging with this July 20th, Jerry Benoff statement, during Mr. Kelly's trial?
A. No.
Q. In July of 1995, did you live at 2033 North Bambrey?
A. I don't know. I probably did. I don't remember.
Q. So do you remember if you were receiving any benefits from the State or the Government back in 1995?
A. I don't remember, sir.
Q. Have you ever at any time received any benefits?

Page 180

A. None of your business.
Q. And do you remember changing the address from 2023 to 2033 in order to continue to receive benefits from the Government?
A. I don't do stuff like that.
MS. GALBRAITH: Objection.
THE WITNESS: You still. You reaching, sir. Don't ask me no dumb shit like that. Why would I -- oh my God. You just as bad as her. Y'all act like y'all on some drugs. Especially her.
BY MR. POMERANTZ:
Q. Do you remember --
A. No, I don't.
Q. -- that you were getting ready to go to a New Years party at your mother's house prior to the events that bring us here today, the shooting of Travis Houston?
A. Yes.
Q. Okay. You do remember that?
A. Yes.
Q. So if that's in the transcript of this tape recorded statement, you're saying that that's a true fact?

Page 181

A. No. Whatever you got, if my signature is on it, that's a true fact.
Q. But if your signature is not on it, but it has that detail, that you were getting ready to go to your mother's house for a New Years party when your car got stuck --
A. I don't know, sir. I can't admit to that because I don't know. People make up all kind of shit. Just like she made up stuff she never been to my house. I'm not answering no dumbass question like that.
Q. And do you remember telling the investigator that --
A. I don't remember no investigator, sir. I don't remember talking to no investigator. Ain't nobody never introduced themself to me as no investigator that I remember.
Q. You testified earlier today about being stuck in the street and needing a jump --
A. Yes. I remember that.
Q. Okay.
A. I didn't tell that to no investigator, I told that to you guys today. A few minutes ago.
Q. But if it's in this transcript --

Page 182

A. Sir, I don't know nothing about that transcript. I'm talking about what I said today. I told you I don't remember no transcript. I don't remember no investigator.

You're reaching. You're talking -- you're going backwards. You're talking all around in circles trying to get me mixed up. You can't get me mixed up like that. Don't do that. That's disrespect. You crazy ass. You totally disrespecting me now.
Q. As we sit here today, you do remember talking to the police --
A. What?
Q. -- on the night of the shooting, correct?
A. What did you say?
Q. As we sit here today, you do remember talking to the police on the night of the shooting?
A. No, I don't remember talking to nobody.
Q. At any time --
A. No. I didn't talk to nobody.
Q. You didn't talk to the police on the night of the shooting?
A. I don't remember that.
Q. Do you remember that you were with Kevin Mathis

Page 183

on the night of the shooting?
A. I don't know, sir. I might have, I might have not.
Q. You did testify to that earlier. Would you like to change your testimony?
A. Yeah, he was at my house. But we didn't talk to no police that day. I don't remember talking to no police.
Q. Do you know if Kevin Mathis was incarcerated in 1995?
A. No, I don't know nothing about it, sir.
Q. Do you remember saying to an investigator that he was incarcerated in 1995?
A. No, I don't remember saying it.
Q. Do you remember if Kevin Mathis was ever incarcerated in Pittsburgh at any time?
A. I didn't even know he was in Pittsburgh.
Q. Did the police ever come to your house looking for Kevin Mathis while you are there?
A. Oh God. No.
Q. Did they ever come to your house while Kevin Mathis was there looking for you?
A. Oh God.
Q. And that he told you about that later?

Page 184

A. No. I don't know nothing about it.
Q. And --
A. Is we done? Because this is getting stupider and stupider. As late as it gets, they getting stupid questions to me. They ask me the same thing over and over. I keep telling you, I don't remember none of that. And I'm not trying to remember that.
Q. Do you remember ever telling anyone --
A. Shit.
Q. -- that when you were taken downtown --
A. I don't remember going downtown, man.
Q. -- they -- that you had to sit in a room for hours waiting --
A. Who would I tell some nonsense like that to?
Q. And did you ever have to wait at the police station for hours while you were there to give information about this case?
A. No. I don't remember nothing like that. Y'all making up shit now.
Q. Do you remember at any time police officers saying that you might feel more comfortable talking to a black officer as opposed to a white officer?
A. Oh, wow. You gotta be kidding me.
Q. I'm just asking the question, if you remember?

Page 185

A. No. No, sir. Nobody said nothing like that to me. Not that I remember.
Q. If there is information on this audio recording that you were taken to the police station about six times, does that sound right to you? Does that refresh your recollection?
A. I don't remember none of that, sir. Mm-mm, mm-mm, mm-mm. He a doozy, ain't he? He's really a piece of work.
Q. And as far as the description of the two people you saw on the night of the murder, do you remember that you had to go to the police several times before you were actually able to give that description?
A. No, I don't remember none of that.
Q. Do you remember in April of 1993, that the description you gave was that it was someone in their late 30s, around 6-1, brown skin like James Brown --
A. Oh God.
Q. -- and that was he -- and that he had big lips --
A. No, I don't remember.
Q. -- and a skinny face?
A. I don't remember none of that. But if I signed a statement saying that, that's what it was.

Page 186

Q. Did you ever see either of the individuals who were involved in this homicide within days after the event occurred?
A. I don't remember.
Q. About three to four days later?
A. I don't remember.
Q. Do you remember there being a fire on Stillman Street and you went around there to see if anybody got hurt, you went with your girlfriend --
A. You got to be kidding me. I don't remember no fire -- no, I don't remember it. And I don't have no girlfriends nowhere.
Q. So as we sit here today, you don't have any recollection of ever seeing either of the individuals involved in this homicide within a few days after?
A. I don't know, sir. I might have. I don't remember.
Q. Do you know why it took so long for you to give a description of these individuals to the police --
A. No, I don't remember.
Q. -- in other words, years after the event?
A. No, I don't know. I don't remember why.
Q. Do you remember, as we sit here today, and as you've had a chance to review these statements that

Page 187

you admit that you signed, seeing pictures that were showed to you by the police in connection with their interviews of you about this case?
A. No. I don't remember none of that. No.
Q. Do you remember if they ever showed you pictures ever?
A. No.
Q. And if the statement that you gave to Jerry Benoff says that two weeks prior to that statement they didn't show you a group of pictures, they just showed you one large picture, you wouldn't be able to deny that today because you don't remember, right?
A. I don't remember none of that. I don't even know who Jerry, whoever you said, is.
Q. But you don't, as we sit here today, you don't remember anything about any of these interviews, correct?
A. No. I can't remember none of that.
Q. So if there is documentation or an audio recording or a transcript that says on this particular occasion that you were only shown one, and it says, 8 by 11 or 8 by 10 --
A. Sir, I don't remember none of that, sir. The only thing I know, I had a interview. I remembered

Page 188

real good back then. My memory today is not as perfect as it was back then. Okay. So stop asking me the same stuff over and over, because I don't know. Whatever I signed is the truth. I keep telling you that. It's the truth. I can't tell you no clearer than that. My memory is bad from now -- from then to now. Trust me. I had a lot of things going through since then. Whatever I signed, that's the truth. I don't want to remember that mess. Whatever happened then, it happened. And I moved on. Just like y'all need to move on.
Q. Did you ever get shown a picture where the police told you that the person in the picture was already in custody?
A. Never. I don't remember none of that.
Q. And this was a picture of Mr. Kelly and it was shown to you about the time that you were supposedly --
A. I don't know, sir.
Q. -- being reinterviewed --
A. I don't know, sir. If he did, he did. I don't know. I don't remember that.
Q. So according to this interview with Jerry Benoff, there is, on page 10, a question at the top of

Page 189

the page, did you -- did they, police, ever tell you that they had him in custody --
A. I don't know, sir.
Q. -- and then the answer that -- well, let me just read it to you so I can see if you remember.
The answer that you gave is:
"Yeah. And when they showed me his picture. They said he's already locked up and you don't. They told me that I was lying at first. They told me that I know that these other guys did it" --
A. Ain't nobody told me no --
Q. -- "and I was like, what guys. They say Studder. And you know Studder. And I said I don't know Studder."
Does that refresh your recollection?
A. No. I don't remember none of that. Mm-mm.
Q. Do you remember anyone with that last name Studder?
A. No.
Q. Also reading from the same page, about midway through the page, there is an answer that you give that reads as follows:
"They said to me that you know those

Page 190

guys, that do that. I said, I don't know those other guys. And they say, you do know because it's around the prison that you're taking money from these other guys that put it on somebody else."

Were you ever taking money from anyone to put the case on someone else?

A. Oh God. No, sir. It get worse and worse.

Q. And then the next question is:

"Now you're saying that the police told you that you were taking money from someone and you were accusing the wrong guy" --

A. Where do you get this stuff from?

Q. So you don't have any recollection --

A. No. Where do you get this from? Is my signature on some stuff like that?

Q. I'm afraid I have to just cover this stuff --

A. Is my signature on that?

Q. -- and answer --

A. Is my signature on something like that? I just really need to know that.

Q. So your signature is not on this.

A. Well, don't ask me no dumb shit like that. That's being very disrespectful because you know I

Page 191

ain't never said nothing like that.

Q. It also says --

A. You -- she probably wrote that. Her (indicating).

Q. It's also says --

A. I don't know nothing about none of that. If I didn't sign it, then don't ask me that. Because she the one, this woman over here (indicating) got some stuff with her. I don't trust her as far as I can throw her.

Q. So on page 10 of the same document, it also says:

"They was trying" --

A. I'm not answering that. Because I don't know what you talking about. And if I didn't sign it, I don't know nothing about it.

MS. BRADFORD-GREY: She has to answer -- you have to answer the questions.

THE WITNESS: You wrote it. So you must know something about it. That's your shit, so you deal with that. Because I don't know nothing about that.

MS. BRADFORD-GREY: Okay.

THE WITNESS: Because you said all that

Page 192

on my porch, that I was going to be answering some dumbass questions and I'm going to jail because I lied on your friend or your brother-in-law, whoever he is to you.

MS. BRADFORD-GREY: You have to answer the questions.

THE WITNESS: Yeah. You answer it. You wrote it. You know about it. I don't. You answer it.

BY MR. POMERANTZ:

Q. So the statement or the transcript says:

"They was --

A. Ain't no transcript. That's her shit. That's her.

Q. -- "trying to tell me, which is a lie, that I'm taking money from these other guys, drug dealers" --

A. Oh wow.

Q. -- "to put the plan on somebody else."

A. No. That's her. She wrote that. She should know about that because I don't know.

Q. So you --

A. I never even heard that.

Q. You're denying that --

A. I never even heard it, sir, I'm not denying it,

Page 193

I never even heard it.

Q. You're denying that at any time police told you that you were taking money from someone to put the case on someone else?

A. I never even heard it before.

Q. But as we sit here today, you don't remember any of this --

A. I never heard that before, sir.

Q. As we sit here today, you don't remember any actions --

A. I never heard that before. That never was ever said. It ain't no remember, it never was said, sir. Nothing like that was ever said.

Don't be talking about stuff remember. Ain't nobody remember no bull crap like that because ain't nobody never said nothing like that.

Q. Are your familiar with a detective who was known as --

A. No, I'm not. I don't know no detectives. I don't remember no detective's name.

Q. Are you familiar with a detective who was known to you as Lubby (ph)?

A. No. Never heard of it before.

Q. And on page 11, at the top, it says:

Page 194

"I know Detective Lubby, the short, stocky, mean one" --
A. I ain't never ever said nothing -- is my signature on that?
Q. I've already answered that question.
"I told him" --
A. Well, why is you asking me something that I never signed, sir? I have no recollection of none of that. I don't know nothing about that. Only thing I know about is whatever I signed. So stop asking me about that because I don't know nothing about that. That's her shit (indicating). Her.
Q. It also says --
A. I don't care what it say, sir. I really don't.
Q. As the Court Reporter mentioned earlier, we're just trying to do our jobs and the more we argue, the longer this will take.
A. I'm not arguing with you, I'm just not answering nothing that I don't know -- I know nothing about. I don't know nothing about that.
Q. The same paragraph says:
"I told him that I'm leaving. I says they know who did it. They didn't need my help" --

Page 195

A. Oh, wow.
Q. "I said, I'm leaving" --
A. I never heard no such thing.
Q. -- "He said, well if you walk out, we gonna arrest you" --
A. Oh wow.
Q. -"I said, arrest me for what. He said" --
A. That's a lie.
Q. -- "we're gonna arrest you for trespassing" --
A. Could y'all tell him not to read no nonsense like that.
Q. -- "I said you brought me in here, I'm just" --
A. That's nonsense. She wrote that.
Q. -- "leaving on my own. He told me to sit down."
A. Wow.
Q. And this transcript was, according to the --
(Sotto voce conversation.)
A. That is such a lie. That is such a lie, I ain't never heard no such thing.
Q. You also, according to this transcript, said:
"Yeah, they showed me a couple of guys pictures" --
A. I ain't never said nothing like that.

Page 196

Q. -- "and they say you looking right at they faces, you know who they are, don't you. I said, I don't know none of these people on that. They had some photographs in front of me and I was like, I don't know none of these people on these pictures, so he said you're looking at right at him" --
A. Y'all just reaching.
Q. -- "you know you're taking money from one of those guys" --
A. My Lord.
Q. -- "a couple of those guys in the picture, aren't you. I said, no. I ain't taking no money from nobody" --
A. I ain't. That don't even sound like me, I ain't.
Q. -- "do I," something "unintelligible be nowhere to be found, so he says, yes you are."
A. That's her shit.
No, sir. I don't know. I never even heard nothing like that. Ain't nobody -- ain't nobody ever talked to me like that.
Q. A little further down, on the same page, 11, it says -- again, this is attributed to you, in this transcript:

Page 197

"I said if I was taking money from these guys, I wouldn't be nowhere to be found."
A. (Laughing)
That don't sound right.
Q. And the question that followed that was:
"So now are you telling me that they told you that they arrested somebody, that they don't believe committed the crime?"
And your response was, "Yep."
You don't have any recollection of telling that to anyone?
A. No, sir. I never heard nothing like that before.
James Kelly been busy, isn't he? He just writing shit. Like he really trying to sue somebody for some nonsense. Y'all really need to not get paid for this dumb shit.
Q. On page 12, starting at the top --
A. Y'all need help.
Q. -- the answer that's attributed -- or the statement that's attributed to you is:
"I have no idea and they arrested a guy and they had, I read the paper and it said,

Page 198

he's supposed to have murdered him. I never told them that that man murdered anybody."
A. Wow.
Q. QUESTION: "Which man?"
ANSWER: "The one they just arrested, the tall guy."
QUESTION: "James Kelly?"
ANSWER: "yeah, James. Because I read it in the paper that James Kelly was arrested, charged with murder. I never told them that he killed nobody. I said that man was standing there and I asked him to give me a jump. I asked him did he have a car to help me get my car started. He told me he didn't have a car. And he walked on down the street. And I just told them who I had seen that night, who I talked to."
Do you remember telling that to anyone at any time?
A. No. Just to you guys. I just told y'all that.
Q. Do you remember leaving the Bambrey address and staying with a girlfriend at 26th and Lehigh?
A. No. I don't know nobody at no 26th and Lehigh.
Q. And according to page 13 of this transcript, it

Page 199

says, at 26th and Lehigh, you were staying with Kevin's sister who was a friend of yours. And they asked you who was Kevin. And you said, "My friend and was there when I told him to look out the window."
So did Kevin Matthis have a sister?
A. Yeah, he had a sister.
Q. Did she ever reside at 26th and Lehigh?
A. I have no idea where she live.
Q. Did you ever stay with her there --
A. No. I never lived with nobody. I never stayed with his sister.
Q. And then further down, about midway on the page, your statement to the investigator, attributed to you, from this transcript says:
"I stayed over her house." Referring to Kevin's sister. "I stayed over her house with her for like three days and I am back home. And when I came back home these guys, two guys, was knocking on my door. Well, when Kevin left me, I told Kevin no to leave me, but he left me in the house. And then I was coming out the door because I didn't want to stay in the house by myself. So I was going down the street, and as I was going down the

Page 200

street, which is like three doors from me the other way, I looked back and heard somebody knocking on my door. I looked back and I seen two guys. They never was on my step. They was like standing against the wall, knocking on the door. And I asked them, who are you looking for. And they said, you Ernestine. Come here. And I said, I don't know you all. What do you want? They like, come here bitch. And you know who killed my brother. And I said, I don't know nothing about that. They say, yes, you do, you know who killed him. And they um, I seen my friend coming. I seen the guy live around the corner, one of my neighbors. I said, come here James, they gonna do something to me. James was like, what's up. What do y'all want. She told you she didn't know nothing about it. And they was like, we be back. We gonna get you. We be back. And then I left again."
"How long were you gone?"
"For about a year."
"And where did you go?"
Does that accurately describe the time

Page 201

when Mr. Houston's family came and threatened you?
A. Mm-hmm. Yeah.
Q. It does. Good. Okay.
And your statement goes on to say, and this is on the top of page 14 of this transcript:
"No, before that I went -- I came, I stayed there. That's when the detectives came back again. The detectives came the next day and then I heard that I left. And then I talked to the detectives. That's when I told the detectives what happened."
You told the detectives about being threatened by Travis Houston's family?
A. I think so. I don't remember.
Q. This transcript, in the middle of page 14, you're asked a question:
"Now when you first gave him the description, about a week after the incident" -- this is the Detective at 8th and Race.
"When you first gave him the description, about a week after the incident?
And your answer at that time is:
"They didn't believe me."

Page 202

QUESTION: "What do you mean?
ANSWER: When I first -- after the -- when they took me there, I was trying to tell him what I had seen, everything that happened. They told me that I was lying. And they told me that one of them didn't believe me but the other one did."
QUESTION: "Which one? Do you know the names? Was it the same detective?"
And the answer that you gave is:
"No, these are two different ones."
So do you remember --
A. No, I don't.
Q. -- the detectives telling you that you knew who did it?
A. No, I don't remember none of that. I don't even remember the conversation.
Q. Do you remember giving information to the detectives and them not believing you?
A. No.
Q. And at the bottom of page 14 --
A. Look, I'm tired of hearing this. I am so tired of listening to this. I don't want to hear it no more. I'm done. I'm really tired of hearing about

Page 203

this stuff.
Q. At the bottom of page 14 --
A. This is really starting to get to me.
Q. -- "These two was saying, we don't believe you. He said, well if one of them said my partner don't believe you, I said well, if he know better than me, he should go get them and stop harassing me" --
A. Why I gotta sit here and listen to this?
Q. -- "I am tired of you all harassing me, why I just broke down" --
A. You looking at me all crazy like you got a problem.
Q. -- "and want to tell you what happened" --
A. Why are you staring at me like that?
She's staring at me like something wrong with her.
Q. So "These two were saying" --
A. Trust some people.
Q. -- "we don't believe you. He said well, one of them said my partner don't believe you. I said, well, if he know better than me, he should go get them and stop harassing me. I'm tired. I'm tired of" --
A. I'm tired of listening to it now.
Q. -- "I'm tired of you all harassing me, that why

Page 204

I just broke down and want to tell you what happened because I'm tired of, you know, of you all keep coming to get me. And I'm tired of being scared because of these two guys who came to the house. So he told me well, we gonna want you to testify in court."
"I said no." This is the top of 15.
"I said no, I'm not going to Court. He said because you're telling a lie. I said no, I'm not telling a lie. I know they gonna get me if I tell it that in court."
So were afraid to go to Court?
A. I don't know, sir. I don't remember.
Q. And who were you afraid was going to get you?
A. I have no idea what you talking about.
Q. Page 15 continues, "Well --
A. Because I ain't scared of nobody. I'm not scared of her (indicating) or her (indicating) or you or nobody. I'm just tired of listening to this.
Q. Okay. On page 15 --
A. And I'm definitely not scared of James Kelly.
Q. So on page 15, it goes on.
The QUESTION: "Well, when you said they told you were telling a lie that is that you told them that they didn't believe?"

Page 205

ANSWER: "Who did it, the two guys that I described."
QUESTION: "Did they show you pictures at that time?"
ANSWER: "They even pulled out the pictures and asked me if these guys are the two guys. I said" --
A. Who was I supposed to be telling this to?
Q. The police.
"They even pulled out the pictures and asked me if these are the two guys. I said, yeah. I said, these are the two guys that I had seen and I pointed the darked skin one. I said, this one that did the shooting."
And the next question is:
"And that was a week after the incident?"
And the answer is --
A. That don't even make sense though. How you got some questions and answers what I said to the police? Where did you get that information from?
Q. So he --
A. That's what I need to know.
Q. So the question was, "That was a week after the

Page 206

incident."

And you say --

A. That's her shit.

Q. -- "he told me no, it's not. He said, that's not the guy. He tried to say," he being the police officer, "tried to say it was Tommy."

Do you know who Tommy is?

A. You should -- you the one know. You should know. You the one about reading all this stuff off the paper. I don't know nothing about nothing, nothing about this stuff on that paper.

Q. Do you know if you were talking about Tommy Lockwood --

A. I don't even know. I wasn't even talking to nobody. But that's not me. That's her. She wrote that. Her and James Kelly wrote that. So I don't know nothing about that.

Q. So that --

A. I don't have nothing to do with that, sir. I don't know nothing about that.

Q. I understand.

The transcript goes on, now about the middle of page 15, where the question was.

"Tommy?"

Page 207

And the answer was: "Yeah, guy live around the corner from me. I been knowing him for like seven or eight years."

QUESTION: "Tommy who?"

"I forget they last name."

QUESTION: "Tommy, a guy that lived what street does he live on?"

ANSWER: "Page Street. He lived right around the corner from me, but he's incarcerated now too."

Do you know who this Tommy on Page Street is --

A. Like I said, that's between her and James Kelly.

Q. Do you know --

A. I don't know nothing about that the paper, sir.

Q. Okay. Do you know what Tommy was incarcerated?

A. Didn't I just tell you I don't know nothing about that.

Q. Do you know -- do you know if Tommy Lockwood was ever incarcerated for --

A. Ask her. That's her and James Kelly's stuff. They wrote that. I don't know nothing about it. I never talked to nobody about that. I don't know

Page 208

nothing about that paper.

Q. And at the bottom of page 15, there is a question --

A. That's her and James Kelly's situation, sir.

Q. "Now this was within a week of the incident, they told you after" --

A. Ain't nobody told me nothing.

Q. "This was within a week of the incident. They told you after you identified two pictures, the taller guy and the shorter guy, they told you they didn't believe you and they showed you a picture of a guy that lives around the corner from you named Tommy and said he did it."

A. I don't know why I'm --

Q. And the answer is, "Yep. These was the two different detectives, now these not the same detectives that I talked to last week, two weeks ago."

Do you remember giving anyone that information, ma'am?

A. No, sir.

That's her and James Kelly's stuff. She wrote that because I don't know nothing about that.

Q. When you first identified James Kelly as the

Page 209

person involved in this homicide, did you know who he was?

A. Never seen him before.

Q. And did the police tell you his name?

A. No.

She told me his name. I don't that man's name. I still didn't know it. She was saying, her and her sister-in-law. Because I said who is she talking about. She said James Kelly is my brother-in-law, the one I had arrested for no reason at all. They told me his name.

Q. Starting on the middle of page 16, the question is:

"What name did they tell you?"

And the answer: "I don't know his name. I don't. James. They said his name was James" --

A. No, I didn't.

Q. QUESTION: "What about his last name, did they tell you his last name?"

ANSWER: "Yeah, James Kelly."

QUESTION: "What about the other guy, the short guy that did the shooting?"

ANSWER: "Yeah. They showed me his

Page 210

picture too and they told me his name, but I
forgot what his name is."
And then after that, it says:
QUESTION: "Now you said that they, you, they told you the name of the other person at that time also, the short guy, but you don't remember the name?"
And the answer is: "No."
And then the question after that is:
"And you're saying now that they knew the names of the two people involved in the shooting within a week of the shooting?"
And the answer is: "mm-hmm."
This is now on top of 17.
QUESTION: "But that James Kelly was only arrested a few weeks ago?"
ANSWER: "Yeah, because they didn't believe me."
QUESTION: "Because they didn't believe you?"
ANSWER: "I guess at first I left. They couldn't find me for a while. I left for about a year, two years. I've been gone after I told them who the two guys was. I left

Page 211

because if they was to arrest him, I was afraid they found somebody, they was gonna tell that I said I got him locked up. So I left because the two guys they know cause they seen me standing there. So they, if they get locked up, they call their friends and tell I had something to do with it."
Were you afraid that you were going to be retaliated against for identifying someone?
A. You asking me a question?
Q. Yes.
A. I don't have no idea what you talking about, sir.
Q. Were you afraid --
A. I don't know. I don't remember none of that.
Q. You don't remember if you were afraid of Tommy Lockwood at that time?
A. No. I don't remember none of that.
Q. So it's possible that you were when you --
A. I don't know even Tommy Lockman.
MS. BRADFORD-GREY: Lockwood.
THE WITNESS: Whatever. I don't know him.

Page 212

BY MR. POMERANTZ:
Q. You don't know Tommy Lockwood?
A. No.
Q. Okay. This is the same Tom- -- that's the same name of the person to whom you sold your house, right, Tommy Lockwood?
A. I didn't sell my house to him.
Q. Okay.
A. I don't remember who I sold my house to. I only know I sold it.
Q. So now at the bottom of 17.
QUESTION: "In March is when you came back. And how long were you back on Bambrey Street before the police came to talk to you?"
ANSWER: "A month, two months."
QUESTION: "A month or two?"
ANSWER: "Yeah. And after because I had got my address changed to 33."
"When you say changed from one what?"
ANSWER: "I had -- see, I never got my address changed from my house."
QUESTION: "You mean on your public assistance?"
ANSWER: -- this is now top of 18.

Page 213

"Yeah, around my, yeah, around I got my check transferred" --
A. Who I supposed to be talking to?
Q. So this the same statement or transcript of a recorded statement that you gave to Jerry Benoff.
And at the top page 18 the answer is:
"Yeah, around my -- yeah, round I got my check transferred to 33" --
A. I ain't telling nobody --
Q. -- "and it was like, um, a week after that now, a couple months after that they was knocking on my old door where I used to live and everybody, the neighbors kept saying the detectives been here looking for me."
So did you ever transfer your address from 23 to 33 on Bambrey?
A. No. That's crazy.
MS. BRADFORD-GREY: We're going to go to NK DEFS 21711, because she brought it up. So we're going to go through it.
It looks like it's an investigation report with the address of 2033 North Bambrey.
MR. POMERANTZ: And it's 21711.
MS. BRADFORD-GREY: This is what this particular exhibit is. We don't have a

Page 214

physical, we will have to send it to you.
It will be 5.
Because we just have it on our -- in our...
Did you mark this 5?
MR. POMERANTZ: I don't think.
Let's mark the Benoff statement as 5, and we'll do this police record as 6.
- - -
(Exhibit P-5, Transcription of Tape Recorded Statement taken on Thursday, July 20, 1995, 23 pages, was marked for identification.)
- - -
- - -
(Exhibit P-6, Investigator's Aid to Interview, 3-21-93, Bates stamped NK DEFS 021711, was marked for identification.)
- - -
THE WITNESS: So what, I'm on trial for this man killing or what?
MR. POMERANTZ: 6 is electronic.
THE WITNESS: Because you make me feel like I'm on trial for this man killing

Page 215

somebody.
MR. POMERANTZ: You're not on trial, ma'am.
THE WITNESS: So why is I'm here answering these dumbass questions? Because y'all acting like you're putting me on trial for this. Y'all are in my business, I sold my house, I did this, I live here. What does this got to do with me?
BY MR. POMERANTZ:
Q. Okay. I'm going to show you this document, which we've marked --
A. I don't want to see no more of this.
(Witness slams down Mr. Pomerantz's laptop.)
I'm done. I'm serious. I'm done. Y'all making me feel like I'm on trial.
MS. GALBRAITH: Ms. Williams --
THE WITNESS: No. This is done.
MS. GALBRAITH: We can't --
THE WITNESS: I can't do this no more.
MS. GALBRAITH: I understand that you're upset --
THE WITNESS: Because y'all making me

Page 216

feel like I killed somebody. I never hurt nobody. This man is -- he the killer, not me.
MS. GALBRAITH: I understand. But we can't touch other people's property --
THE WITNESS: Well, I don't want to deal with that.
MS. MANN: Calm down. Please, Ms. Williams. We're making it through. We're getting toward the end.
THE WITNESS: No. It's starting to really get to me.
MS. MANN: I understand your frustration. We can't have you touching their property --
THE WITNESS: Well, I didn't mean to touch your stuff, but I gotta go. I really have to go. I can't do this no more. Y'all making me feel like I'm on trial.
MS. GALBRAITH: Ma'am, I don't want you to get in any trouble with the Court. We're almost through. We should just finish the deposition.
THE WITNESS: What is -- is I'm on trial or what?

Page 217

MS. GALBRAITH: You're not on trial.
THE WITNESS: So I need to leave.
MS. GALBRAITH: You're just a witness, but you are under --
THE WITNESS: I'm not -- no -- why?
MS. MANN: Ms. Williams, hear me out. If we can make it through this, then we won't have to go through getting the Court involved --
THE WITNESS: But why is I'm going through this? Why is I'm going through this? Why is they putting all of my business out here, for what? What does that have to do with him suing the city?
MS. MANN: I understand what you're saying, but we have to get through the questions just to see what you know.
THE WITNESS: I don't know anything. That's the thing, I don't know.
MS. MANN: If that's your answer, then that's your answer.
THE WITNESS: That's what I'm saying, I don't know. And I don't want to deal with this.

Page 218

MS. MANN: Can I please ask you to sit so we can get through this?

THE WITNESS: I can't understand why is they putting me on the trial? I mean, why is all my business being aired like I did something wrong?

MS. MANN: Can we please have Mr. Pomerantz finish?

THE WITNESS: I'm not answering no more of his questions. That's the bottom line. I'm done.

MS. GALBRAITH: You do have to answer --

THE WITNESS: I'll sit here, I'm not going to say near another word.

MS. GALBRAITH: Ms. Williams, you do have to answer the questions --

THE WITNESS: I'm going to sit here, but I'm not answering no more questions. This man is on trial. Not me. I'm not doing this no more. This don't make sense to me.

MS. GALBRAITH: Can we -- are we off the record? Can we go off the record.

Page 219

(A short break was taken.)

MR. POMERANTZ: Ms. Williams, at this point we've all talked for a while and our preference is to continue this at another time.

THE WITNESS: I can't come back. I'm getting ready to have surgery on my lungs. I can't come back.

MR. POMERANTZ: So in that instance -- I mean, if you can't ever come back at any time, then we would need to finish today. And we have quite a number of things to go through. And it is our hope that we can ask questions and have your answers, even if they are that you don't know --

THE WITNESS: How much longer is this going to take?

MR. POMERANTZ: We have another hour or two.

THE WITNESS: I can't stay. I been here since 9:00 this morning. It's too much. Why is you all asking me -- if I'm not on trial, why is you asking me my life style?

MR. POMERANTZ: As we have explained, you are a witness in this case. And the Court gives us oral latitude in terms of a discovery deposition. And, you know, you are welcome to obtain counsel and, you know, seek options with regard to this. But as of now, you are here under subpoena, and we have, based on the rules of Court, a good bit of time remaining that we're permitted to conduct this.

Page 220

THE WITNESS: All right. Come on. Let's get it over with. But you don't need to ask me all these dumbass questions. I gotta go. I'm not coming back today.

(Discussion was held off the record.)

BY MR. POMERANTZ:

Q. All right. We're back on the record.

I'm showing you, I think it's 6.

(Discussion was held off the record.)

Okay. Going back to what we have marked for identification as Exhibit Number 5, it is a transcript of an interview from 1995, and I've read you a number of statements from this. We're going to go back to that. And it says on, the bottom of 17, we were talking about the change of address. And the statement, second line from the bottom, says:

"Yeah. And after, because I had gotten my address changed to 33."

Page 221

QUESTION: "When you changed" --

A. I never changed my address.

Q. Okay. So when you say changed from one what. And at the top of 18, it says:

"I had -- see I never got my address changed from my house."

QUESTION: "You mean on your public assistance?"

ANSWER: "Yeah, around my -- yeah, around -- I got my check transferred to 33" --

A. Mm-mm.

Q. -- "and it was like, um, a week after that, now a couple of months after that they was knocking on my old door where I used to live. And everybody, the neighbors kept saying the detective been around here."

So with regard to the change of address, I'm going to show you what we've marked as Exhibit-6. And this is Investigator's Aid to Interview, to be used, it's dated 3/21/93.

And I'll show you the highlighted portion of this where it says, "2033 North Bambrey Street."

Do you see that?

Page 222

A. Mm-hmm.
Q. Okay. Now, I'm not going to read this into the record. But do you see where it says social security number?
A. Mm-hmm.
Q. Is that your number?
A. Mm-hmm.
Q. Okay. And there is also a date of birth there, do you see that where I'm pointing?
A. Right.
Q. And is that the correct date of birth?
A. Mm-hmm.
Q. Okay. So this document reflects that 2033 North Bambrey Street is an address associated with you. Did you ever live at 2033 North Bambrey Street?
A. I don't know. I lived a lot of places. I don't remember.
Q. Well, do you remember living at 2023 Bambrey Street?
A. 2023?
Q. Yes.
A. That's where my house was at, yeah, I think.
Q. And did you ever live on -- at any other address on that block?

Page 223

A. No.
Q. Did you ever use a different address on that block?
A. No.
Q. Did you ever use a different address on that block?
A. No. Not that I remember, no. Why would I -- no, I don't remember doing nothing like that.
Q. Now, also going back to what we've marked as Exhibit 5, this is page 18.
QUESTION: "How many times did the police take you to 8th and Race before you finally identified the two people?"
A. I have no idea.
Q. And the answer that's given is, "About five about six or seven times."
A. No, I don't think I went there that many times.
Q. And then the next -- so when this says, you don't think you went there five or six or seven times, you're disputing that?
A. Yeah.
Q. Your recollection today is that you went how many times?
A. I don't know. I don't remember. I know I

Page 224

didn't go that many times.
Q. I mean, do you think it was at least four times?
A. I don't know. I don't remember. I know I didn't go a lot. I don't know. I don't remember. If I went a lot, I don't know.
Q. Now, they said -- the next -- this is about a quarter of the way down 18, just continuing.
QUESTION: "Now you said that it was a week after the incident. Are you saying they took you down there six or seven times within one week?"
ANSWER: "Yeah, they kept coming and coming like every day they was there."
A. Who wrote that? Where does that come from?
Q. So this is a transcript of a statement that was recorded --
A. No. That's a bunch of lies. All of that, that's a bunch of lies. Ain't nobody talked to me -- why is I'm on trial with this?
Q. You are not on trial, Ms. Williams?
A. It sound like it.
Q. I understand that.
QUESTION: "Every day they were there, they were at your house?"
ANSWER: "At my house."
QUESTION: "Every day they would take you to 8th and Race?"

Page 225

A. We need to see the Judge that put the man in jail. We need to go before them. Because this is unnecessary. But I can't do this with you guys. I need a Judge to go through this and ask me some questions. Y'all asking me these questions like I'm on trial. I'm not on trial. I didn't kill nobody.
Q. Midway through 18, it says:
"Sometimes I wouldn't, I wouldn't answer the door and they be sitting outside. They even came to my house" --
A. That's a lie. Where that come from?
Q. QUESTION: "To your aunt's house?"
A. Who my aunt?
Q. ANSWER: "Yeah, all the way up 8th and Franklin."
A. Who live 8th and Franklin?
Q. You mentioned your aunt earlier. Do you remember testifying --
A. My aunt live in Wilson, North Carolina. She just moved here. She wasn't even here then. My aunt

Page 226

just came from Wilson, North Carolina.
Q. And what's the name of the aunt from Wilson, North Carolina?
A. My aunt that live here now is Aunt Louise.
Q. Aunt Louise?
A. Is that the name on that paper?
Q. You mentioned earlier that you talked to your aunt --
A. Her name is Louise Taylor.
Q. Same aunt?
A. Yes.
Q. Okay.
A. That was on the phone when she came to my house.
Q. Just continuing on the same page.
"Well, how" --
A. That's a bunch of lies on that paper.
Q. QUESTION: "Well, how could they -- how would they take you to 8th and Race eight times, seven or eight times within the first week of the incident?"
ANSWER: "Well, it wasn't about a week, I guess, it was a couple of weeks. I know they kept coming a lot, harassing me, bothering me. They harassed me so much" --

Page 227

A. Her and James Kelly wrote that because that ain't -- I ain't never talked to nobody about that. That's something that they wrote up.
Q. Again --
(Interruption. Witness's phone is talking.)
A. Yeah. That's between her and James Kelly. I ain't got nothing to do with that.
Q. So I'm going to start again with that answer because of the interruption.
"Well, it wasn't about a week, I guess it was a couple of weeks. I know they kept coming a lot, harassing me and bothering me. They harassed me so much, I was so stressed out I really don't remember how many when I told them, but I know I told them."
A. Hmm.
Q. QUESTION: "Was it after the two guys came to your house and threatened you that you told them?"
ANSWER: "Yeah."
QUESTION: "And how long after the incident did they come to your house?"
ANSWER: "I can't recall. I stayed away for three days and I came back. I stayed away

Page 228

for three days I came back home it was, like, that night so I guess it was like four days."
So as we sit here today do you recall --
A. No.
Q. -- being threatened?
Just I ask that you please let me finish the question.
Do you recall being threatened within four days of the incident?
A. No.
Q. Looking at page 19 now, about a third of the way down, it says:
QUESTION: "Well, what did they do each time they came and got you?" Talking about the police. "Didn't you sign a statement?"
ANSWER: "No, only the very first time I signed a statement was it the very first time of the shooting when they came to the house."
QUESTION: "The first day?"
ANSWER: "The first day."
QUESTION: "And where, did they take you to 8th and Race that day?"

Page 229

ANSWER: "No. They interviewed me at home and I told them that they just asked me questions like did I know the guy that got shot. I said no. And did I ask me did I see anybody and I said no."
And that's what's in your statement.
And that's correct, that you didn't see anyone, that was your earlier testimony, do you remember?
A. Did I sign it?
Q. Well, I can't remember what number it is. I think it might be D-2 that you did sign, which says that you didn't see anybody.
A. All right. Well, if I said that, that's what I said.
Q. So that's true?
A. (No response.)
Q. So it's a true statement that the first time you told them you didn't see anybody, you were telling the truth?
A. Whatever I signed, sir.
Q. All right. Continuing on -- you're saying that the statement that's being marked as --
A. Like I said, sir. I seen James Kelly and another guy kill somebody. Okay. And that's the

truth. That's all I'm saying. I seen it and that's and I'm done with it. They killed somebody and I'm done with it. And it's the truth. Whatever I signed it's the truth.
Q. Okay. And this is D-2, and that has your signature --
A. Whatever I signed is the truth.
Q. And everything on D-2 is the truth, correct?
A. Yes, sir. It's the truth.
Q. Including the statement you didn't see anything?
A. If that's what I said when I signed it. Whatever I signed that's what happened.
Q. And then this is on 19.
"So that time" -- this is about two-thirds of the way down.
"So that time you told that you didn't seen anybody, that was the only time you signed a statement?"
ANSWER: "Exactly."
QUESTION: "And then after that, they had you down there six or seven more times before you identified photographs. You're saying but that was within a very short period



of time from the time that the incident occurred; is that right?"
ANSWER: --
A. No, I don't remember.
Q. "Mm-hmm."
A. I don't remember none of that.
Q. QUESTION: "Within the first week or so, too?"
MS. BRADFORD-GREY: So she -- Mike, just instruct her to wait until you finish the question to answer before -- I think it's just running...
(Discussion was held off the record.)
BY MR. POMERANTZ:
Q. All right. So we'll go back a little bit.
QUESTION: "And then after that they had you down there six or seven times before you identified the photographs, you're saying, but that was within a very short period of time from the time that the incident occurred; is that right?"
And then the answer is: "mm-hmm."
QUESTION: "Within the first week or so, two?"
ANSWER: "Like two weeks."



QUESTION: "Two weeks?"
ANSWER: "It was like two weeks, it was after the guy came to my house."
So do you remember going six or seven times within two weeks of the incident after you were threatened by the victim's family?
A. You asking me a question?
Q. Yes.
A. No, I don't remember. I don't know. I might have. I don't remember. I don't remember none of that on that paper.
Q. And do you remember testifying earlier that you worked at Seafood Shanty?
A. Yes. I did work at Seafood Shanty.
Q. Did you ever tell that to an investigator?
A. No. I don't know. I might have, if they asked me. I don't remember talking to no investigator.
Q. Okay. So I'm looking at page 20 going from the top.
QUESTION: "Did you work at the time?"
ANSWER: "Yeah."
QUESTION: "Where did you work?"
ANSWER: "At Seafood Shanty."
QUESTION: "And did they come on your



job?"
ANSWER: "Yeah, they came to my job but they got there before I did and they informed my supervisor that I knew. They wanted to talk to me about a shooting and they asked my supervisor some questions about me because my supervisor said they came and asked him some things about me. How did he know me and um."
QUESTION: "And did you leave your job?"
ANSWER: "Yeah. I didn't never go back after he told me that."
A. That's a lie. I don't remember talking to nobody about my job.
MS. GALBRAITH: Is there a question?
MS. BRADFORD-GREY: Did she say that? That's the question.
THE WITNESS: Ain't nobody talked to me about my job. That paper is full of crap. Somebody else wrote that. Because I don't know nothing about nothing like that was asked. No, I don't remember none of that.
BY MR. POMERANTZ:
Q. How did your employment at Seafood Shanty, that you had back then, how did that end? Did you quit?

Page 234

Were you fired? Something else?
A. He went bankrupt. The place closed down. He went bankrupt. He ain't never come back.
Q. And when did that happen?
A. I don't remember. It was years ago. You should know. Everybody went to Seafood Shanty. When you went there to go eat, it wasn't -- they closed down. They went out of business all seven stores.
Q. Do you remember the police ever coming to Seafood Shanty?
A. No.
Q. Do you remember ever hearing from your manager or supervisor that police had been --
A. No.
Q. -- at Seafood Shanty?
I ask that you please let me finish my question so we get a clear record.
Reading again from page 20, it's a little bit above the middle part.
"How many times did they go on your job?"
A. Oh God.
ANSWER: "Once. And they saw that I guess from my social security number, but I

Page 235

never told them I worked."
Were you collecting Social Security while you were working at Seafood Shanty?
A. You asking me a question?
Q. That's the question?
A. No.
Q. Were you collecting any benefits from --
A. I don't even collect Social Security. I'm too young for Social Security, sir.
Q. Were you collecting --
A. I'm not even old enough for Social Security. You have to be 65. I'm not 65.
Q. Were you collecting any State --
A. No.
Q. I ask that you please let me finish the question so we get a clear record.
Were you collecting any State or Government benefits at the same time that you were working at Seafood Shanty?
A. No.
This is making me feel like I'm on trial. What business is it -- y'all trying to sue the City, what has that got to do with this? Whatever my income was or what I was getting, what do this have to

Page 236

do with this case? That ain't none of y'all business.
Q. Just continuing on the same page --
A. Oh my God, what is wrong with you people? What is I'm here for?
Q. This is right in the middle of the page.
"Well there was other people in the neighborhood that probably knew where you worked."
ANSWER: "Oh, yeah, because they the ones told them that I was sitting in the car and I wasn't sitting in the car" --
A. What car?
Q. On the night of the shooting that you say you witnessed, were you sitting in the car that was -- were you sitting in a car?
A. No, I wasn't sitting in the car.
Q. And did your neighbors ever tell anyone that you were sitting in the car?
A. I have no idea what my neighbors told to anybody, sir.
Q. Did you ever hear from the police that your neighbors were talking about how you knew or had information about the shooting?
A. No.

Page 237

Q. All right. I'm going to continue to read on page 20.
QUESTION: "Do you know what neighbor told them that?"
That you were sitting in the car.
ANSWER: "No. They never told me. They just always say your neighbors, um, told us, you know, what happened. And your neighbors told us that you seen everything, that they say they tell me that my neighbors told them. I said, well, if my neighbors know so much you should then tell them to tell you who did it."
QUESTION: "Now you said to me that you saw the tall guy and the short guy sometime after the homicide on a bike somewhere, right? How long after the incident was that when you saw them?"
ANSWER: "Um, like a couple weeks."
Do you remember ever seeing either of the individuals who were involved in this homicide on a bike a couple of weeks later?
A. I don't know. I might have. I don't remember. I might have.
Q. And the next question, at the very bottom of

Page 238

page 20 is:
"Did you tell the police that you saw them together?"
And the answer is "No."
Do you remember giving that --
A. No.
Q. -- answer?
From the top of 21 -- so going to the top of page 21. And the question is why, referring to why you didn't tell the police. I know you dispute that statement, but just going along with what's in this transcript.
The question, "Why?"
ANSWER: "They," meaning the police, "They didn't believe me anyway. Some of the things I was that I told them so."
QUESTION: "Well, what were some of the other things that you told them that they didn't believe?"
ANSWER: "When I told them that the short, dark skinned guy, when I gave described the dark guy that shot him, he told me that that wasn't the one that shot him."
QUESTION: "Well, who did he say was the

Page 239

one that shot him?"
ANSWER: "Tommy."
QUESTION: "Why do you think he said that?"
ANSWER: "I guess because Tommy shot some other people, and Tommy live around that area and they kept saying that the shooting was with the people, drug dealers living in the area."
So as we sit here today, do you recall that the police told you that they thought Tommy was the person who shot Travis Houston?
A. No. Never heard nothing like that before.
Q. Do you remember the police telling --
A. I said I never heard it before, sir.
Q. This is a different question.
Do you remember the police telling you that Tommy shot some other people in the area?
A. I never heard nothing like that before, sir.
Q. Did the police or any -- did the police ever tell you that Tommy shot someone anywhere?
A. I never heard nothing like that before, sir.
Q. And are you independently aware of whether or not Tommy Lockwood ever shot someone?

Page 240

A. Why would you ask me some --
MS. BRADFORD-GREY: Did she answer?
THE WITNESS: Stupid as she is.
MR. POMERANTZ: Can you read back the question.
(The Court Reporter read the record as requested.)
BY MR. POMERANTZ:
Q. By the way, which Seafood Shanty did you work at?
A. I don't know. I don't remember. It was years ago. There was a lot of them.
Q. Was it in Philadelphia?
A. Yes.
Q. And do you remember what street it was on?
A. No, I don't remember.
Q. Do you remember what neighborhood --
A. I don't know.
Q. Do you remember what neighborhood it was in?
A. I don't know.
Q. Do you remember how long it took you to get to work --
A. No, I don't know.
Q. Do you remember if it was in North

Page 241

Philadelphia?
A. I don't remember.
Q. All right. And then the question I didn't get an answer to a moment ago is, are you aware of Tommy Lockwood ever shooting anyone?
A. I don't even know Tommy Lockwood.
Q. I understand that, but --
A. I don't know nothing about these people, sir.
Q. Is it fair to say that your response is no?
A. Yes. Because I don't know them people. I don't what they do with themselves, and don't care.
Q. Continuing on page 21.
QUESTION: "Do you know whether or not they arrested as a result of your" --
A. I don't.
Q. I'm going to start again.
QUESTION: "Do you know whether or not they arrested as a result of your identification of the -- of this picture?"
ANSWER: "Nope, I don't think so. They never -- they didn't say they did anyway. They just told me they already had him incarcerated. They got him incarcerated now. That's what they told me right after Fourth of

Page 242

July. They showed me his picture again and I said, yeah, that's him right there that did the shooting. They said, we have him incarcerated already."

QUESTION: "But you already saw his picture before and told them?"

ANSWER: "Yep."

QUESTION: "When they showed you his picture for the first time, did they tell you he was incarcerated?"

Top of 22.

ANSWER: "No, he wasn't because I had seen him --

A. Oh my God, it's 3 o'clock --

Q. -- "on a bike, so he" -- let me just start again.

Top of 22.

A. (Witness is looking at phone.)

I need to go.

Q. Top of 22.

ANSWER: "No, he wasn't because I had seen him on a bike, so he wasn't incarcerated then, but when I went to the Fourth -- after the Fourth of July."

Page 243

QUESTION: "This year?"

ANSWER: "This year. They told me that had him and when they showed me, uh, the other guy picture who I was talking to, they said, well, we gonna pick him up."

QUESTION: "And when they told you?"

ANSWER: "But they said, but you know that man is going to be surprised when we go and lock him up, he's going to be surprised to see us. I said, well, he didn't do any shooting, but I had seen him."

QUESTION: --

A. That don't even sound right. Don't even sound right.

Q. So with regard to the portion I just read about him not doing shooting, who are you talking about?

A. I don't even know what you're talking about, sir. I never even heard none of that.

Q. When they say he's --

A. I don't know what you talking about, sir. I never heard of it.

Q. When they say he's going to be surprised --

A. Oh God.

Q. -- when they go and lock him up, do you know

Page 244

who they're talking about?

A. I have no idea what you talking about, sir.

Q. And then continuing on.

So it's your testimony that you did not say that he was there?

A. I didn't say nothing, I don't even know what you're talking about.

Q. Continuing on page 22.

QUESTION: "Well, why did they say he would be surprised?"

ANSWER: "I don't know. But that's what they said, this man going to be surprised because we're gonna pick him up."

QUESTION: "Who said that?"

ANSWER: "The detectives."

QUESTION --

A. This James Kelly guy, he wrote all of this. This is James Kelly detective or body guard, whoever he is, this is where this come from?

(Interruption. Phone ringing.)

I need to go. This is my grandson. I gotta take it.

(Witness is talking on the phone.)

Yeah, I gotta go. I can't deal with

Page 245

this no more. I gotta get a lawyer. Because y'all asking me stuff like I'm on trial. I'm not on trial.

Q. Ms. Williams, we urge you to stay so we can finish today so that we won't have to resume.

MS. GALBRAITH: She said she wants a lawyer.

THE WITNESS: So y'all gotta get over it because I'm done.

MS. GALBRAITH: Did you say you want a lawyer?

THE WITNESS: Yeah. I think I need one, right.

MR. POMERANTZ: We're not able to answer your question.

MS. GALBRAITH: Yeah, we can't give you any advice on that. But as we offered before, we can stop the deposition, come back another day --

THE WITNESS: I can't come back.

MS. GALBRAITH: -- and you can come back with a lawyer.

THE WITNESS: I can't come back again. Because I told you I'm having my surgery August 18th.

Page 246

MS. GALBRAITH: I mean, if you want a lawyer, I'm sure we can reconvene with the team.

THE WITNESS: I can't come back because of my surgery. They going to take out one of my lungs. I'm not going to be coming back here after. I'm not dealing with this. This is this man's stuff. If he want to sue the City, that's on him. I ain't got nothing to do with it. He need to not involve me in his bull crap. I don't have nothing to do with that.

MS. GALBRAITH: Do you want to continue going today and get this over with, or do you want to reconvene another day?

THE WITNESS: How much longer I have to be here?

MS. BRADFORD-GREY: Trying to get through it.

THE WITNESS: How much longer do I have to be here?

MS. BRADFORD-GREY: We don't know. But if you can just answer the questions, we can --

THE WITNESS: I'm answering it, but y'all keep going on and on about the same stuff

Page 247

over and over. Y'all asking me the same questions over and over.

MS. BRADFORD-GREY: You keep interjecting, so we have to re-read it.

THE WITNESS: Because I'm staying here too long.

MS. BRADFORD-GREY: Understood. And we don't want you to be here too long. We want to get through it.

THE WITNESS: Oh, I hate you.

Go ahead. Come on. Let's get it over with, so I don't have to deal with you people no more. But I need to hurry up and get out of here, because my ride supposed to -- is on a time schedule.

MS. BRADFORD-GREY: Do you want to come back with a lawyer?

THE WITNESS: I said we can do this and be done with it, Miss.

MS. BRADFORD-GREY: All right. Let's do it.

THE WITNESS: I don't want you at my house no more.

Page 248

BY MR. POMERANTZ:
Q. So once again, on the middle of 22, you write -- it's attributed to you in this transcript --
A. I don't remember no transcript.
Q. -- Detective Lubby was the person who said that someone is going to be surprised because they're going to pick him up.
Are you denying that Detective Lubby said that?
A. Yes. I don't know nothing about no Detective Lubby and none of those questions or nothing that you asking me right now. I don't know nothing about them. I ain't never heard those questions and no, I'm denying all of that.
Q. The next question is: "Every time the detectives talk to you" --
A. I just said I'm denying everything on that paper, sir. I never talked to nobody that give me no transcript.
Q. I still need to ask these questions.
A. See, that's why it's taking so long. I'm telling you, everything on that paper is a lie. If I didn't sign it, I never dealt with that. I don't know nothing about it. That's what's taking long. You

Page 249

keep asking me something that I know nothing about. And then you reading it word for word, I don't know nothing about that.
Q. So the next question is --
A. Oh, god. That's what's keeping me here.
Q. "Every time the detectives talked to you, did they write down what you said?"
ANSWER: "No."
Is that correct, that there were times when you talked to the detectives and they didn't write down what you said?
A. You asking me a question?
Q. Yes.
A. I don't know. I don't remember.
Q. Next question, "Did they ever write down" --
A. I don't remember.
Q. I'll start again.
QUESTION: "Did they ever write down what you said, except for the first time when you signed a statement?"
ANSWER: "Yeah, when I, um, picked them out."
QUESTION: "When you picked out the photographs?"

Page 250

ANSWER: "Yeah."
QUESTION: "They wrote that down?"
ANSWER "Uh-huh."
QUESTION: "And that was about a week or two after the homicide?"
ANSWER: "Yep."
QUESTION: "Did they ever write down anything that you said after that, do you recall?"
On to page 23.
ANSWER: "No. The Fourth of July" --
A. You just want to hear yourself talk.
Q. Again, at the top of page 23.
ANSWER: "No, the Fourth of July, I didn't sign anything before they locked, um, the man up last two weeks ago. I ain't signed no papers or anything."
QUESTION: "You mean right before they lock up James Kelly?"
ANSWER: "Right."
QUESTION: "Two weeks ago?"
ANSWER: "Before they locked him up, they didn't, I didn't sign anything. They didn't even write down anything I said. They

Page 251

said to me, we gonna pick him up and he gonna be surprised."
Do you remember having that conversation with detectives around July 4th before James Kelly was arrested?
A. No.
Q. And when you say -- or when it's attributed that you said that there was no signed statement on July 4th, that's consistent with this document that was shown to you before --
A. I have no idea what you're talking about, sir.
Q. So I'm showing you P-4. This is the Affidavit of Probable Cause, it's from July 2, 1995. And I represented to you that there is no signed statement from that date, even though the affidavit says that you were reinterviewed by two detectives, one of whom is named Lubiejewski.
Do you remember when I showed you that earlier?
A. No. I don't remember none of that.
Q. But do you remember when I showed you that --
A. I don't remember.
Q. And in this statement, or this transcript, that we've been looking at for the past little while, it

Page 252

says the same thing, that there was no signed statement in connection with July 4, 1995?
A. I don't remember none of that.
- - -
(Exhibit P-7, Black and White photo, 1 page, was marked for identification.)
- - -
BY MR. POMERANTZ:
Q. I'm showing you what's been marked as P-7. And this purports to be a picture of Andre -- do you recognize this person?
A. I don't know nobody. No, I don't know them. I don't know nothing about them either.
Q. Okay. Is there a reason why you don't want to look at this?
A. I don't know him.
Q. I understand that, but when this has been put in front of you --
A. I don't know them, sir.
Q. It would be helpful if you would let me finish the question so that we can have a clear record and so that we can finish in a timely manner.
Is there a reason why you've turned this over --

Page 253

A. Because I don't know him.
Q. But is there something about this picture that's --
A. I don't know the person, sir. That's what I'm saying. I don't know him. Why is you showing me this because I don't know him?
Q. And you're saying you that you've never identified this individual to someone as --
A. I don't remember. No, I don't remember.
Q. Again, it would be preferable to let --
A. I don't remember, sir.
Q. I understand that, but I need to ask these questions. And I am asking once again that you do not interrupt so that we can finish in a timely manner.
Did you ever identify this individual to anyone as being involved in the shooting?
A. I don't know. I don't remember.
Q. Okay. Well, when you say you don't remember, does that mean it's possible that you did identify this person?
A. I don't know, sir.
Q. So you would agree with me that you're unable to say I never identified this person because you don't remember?

Page 254

A. I don't remember.
Q. Okay.
- - -
(Exhibit P-8, Color photo, 1 page, was marked for identification.)
- - -
THE WITNESS: (Reviewing document.)
I remember that face.
BY MR. POMERANTZ:
Q. Okay. And who is it?
A. James Kelly.
Q. When did you -- have you ever seen this picture before?
A. No. I never seen that picture but I seen his face.
Q. And where did you see his face?
A. On the corner on my block, when I was talking to him, when I asked him to give me a jump.
Q. And what did he say when you asked him to give you a jump?
A. I forget exactly what he said, but I was talking to him.
Q. And did you ever see him again?
A. Nope. I seen him when he hand that man that

Page 255

gun.
Q. And where were you when you saw that?
A. In my window, in my bedroom.
Q. And where was he?
A. Across the street.
Q. And which way was he facing?
A. He was facing me.
Q. How far away was he?
A. Across the street.
Q. What were the lighting conditions?
A. Yeah, the light was bright over there. There's a big street light right there.
Q. Was it night time?
A. Mm-hmm.
Q. I noticed you're wearing glasses today, did you wear glasses back then?
A. I don't know.
MR. POMERANTZ: I'm sorry. Can we just get clarification.
Read back the question that was answered mm-hmm, so we can make sure about which answer it is.
Thank you.
(The Court Reporter read the record as

Page 256

requested.)
BY MR. POMERANTZ:
Q. Was it nighttime?
A. Yeah. It wasn't that dark. It was getting dark.
Q. What time of night was it?
A. I can't remember, sir.
Q. And I was about to ask you about your vision. You're wearing glasses today. What do you wear glasses for?
A. I can see with my glasses. I had my glasses on.
Q. You had your glasses on at the time?
A. I think so. Yeah. Because I went in the house. Yeah, I had my glasses on.
Q. Okay. And what condition do you wear glasses for?
A. I don't know. So I can see.
Q. And did you have prescription glasses at the time?
A. Yes.
Q. And who was your eye doctor at the time?
A. You.
Like I'm supposed to remember that. I

Page 257

don't know. Could have been anybody. I don't remember that far back who was my eye doctor. I had a whole lot of eye doctors.
Q. And where did you get your prescription glasses filled?
A. I don't know, sir. I don't remember.
You can tell look at him the shifty eyes, you can tell he's a killer. Look at him.
Q. Referring you back to P-8. I think I asked you this, but when you identified the photo for the police, was it this photo?
A. I never seen no photo, sir. I don't remember seeing no photo.
Q. You don't remember seeing a photo which you identified for police in connection with this incident, right?
A. I don't remember.
Q. Okay. This is your signed statement that's been marked as D-5 from September 15, 1993. This statement says that you were shown photos?
A. Well, then I was shown photos. Is my signature on there?
Q. It is.
A. Yes, then he showed me photos. I just don't

Page 258

remember.
Q. And one of the photos was supposedly of James Kelly?
A. Yeah.
Q. And my question is, is it this photo or a different photo?
A. I don't remember, sir. All I know if he showed me photos, then he showed them to me. But I don't remember what photo it was. But if he showed it to me and I signed it, then he showed it to me. But I don't remember what photo it was.
Q. There is some indication in the record that you may have seen this photo in 2012, is that true?
A. I might have, sir. I know that face. I don't know about this photo, but I know that face when I see it. I don't know -- remember that photo. I don't know nothing about that photo. I don't remember nothing about that photo but I know that face.
Q. So were you shown this photo in --
A. I don't know, sir. You keep asking me the same old question.
Q. (Reviewing document.)
A. I can't believe this shit. They just holding me hostage here. Wasting my time.

Page 259

What I supposed to change my statement for this man to get out to sue the City. You crazy as hell.

MS. BRADFORD-GREY: Do you have any followup?

MS. GALBRAITH: At this point, we do not.

MS. BRADFORD-GREY: All right. We're done.

MR. POMERANTZ: Ms. Williams, thank you very much.

THE WITNESS: You're very welcome.

MR. POMERANTZ: We don't have any other questions.

MS. GALBRAITH: Ms. Williams, in conclusion, I just want to very quickly ask you if you'd like to read your statement or if you want to waive your signature -- or the deposition --

MR. POMERANTZ: The deposition transcript.

MS. GALBRAITH: -- or if you would like to waive. If you want to read it and you have any minor corrections, such as a spelling

Page 260

error, something along those lines, you would have to set up a time to come meet and make those changes. You can also just waive, in which case you don't ever have to look at this deposition again.

THE WITNESS: I don't want to see none of that.

MS. GALBRAITH: Are you okay with my description?

MR. POMERANTZ: That was fine.

THE WITNESS: I'm done. I just want to move on, forget about this whole nightmare.

MS. GALBRAITH: I understand. We do appreciate your time.

THE WITNESS: Thank you.

MR. POMERANTZ: Thank you, Ms. Williams.

MS. GALBRAITH: Thank you, Ms. Williams.

THE WITNESS: Have a blessed day. And just keep her from my house, please. I really, really stress that she stay away from my house.

(Deposition concluded at 3:28 p.m.)

Page 261

C E R T I F I C A T I O N

I, Lisa DePascale, Court Reporter, certify that the foregoing is a true and accurate transcript of the foregoing deposition, that the witness was first sworn by me at the time, place and on the date herein before set forth.

I further certify that I am neither attorney nor counsel for, not related to nor employed by any of the parties to the action in which this deposition was taken; further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.



Lisa DePascale
Court Reporter and Notary Public
in the Commonwealth of Pennsylvania

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.